**22-1939**

**IN THE**

# UNITED STATES COURT OF APPEALS
**FOR THE FEDERAL CIRCUIT**

PROMPTU SYSTEMS CORPORATION,

*Plaintiff-Appellant*,

v.

COMCAST CORPORATION, COMCAST CABLE COMMUNICATIONS, LLC,

*Defendants-Appellees*.

**Appeal from the United States District Court for the Eastern District of Pennsylvania in Case No. 2:16-cv-06516-JS, Chief Judge Juan R. Sánchez**

## CORRECTED PRINCIPAL BRIEF FOR APPELLANT PROMPTU SYSTEMS CORPORATION

J. Michael Jakes
Christopher T. Blackford
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

Benjamin R. Schlesinger
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
271 17th Street, NW, Suite 1400
Atlanta, GA 30363
(404) 653-6400

Jacob A. Schroeder
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, CA 94304
(650) 849-6600

*Counsel for Appellant Promptu Systems Corporation*

October 20, 2022

## Claim Language at Issue (Emphases Added)

**’538 patent, claim 34**. A centralized multi-user voice operated television control system, comprising:

television remote controls configured to directly and wirelessly control television sets and additionally to receive user voice input and wirelessly transmit first output representative of the voice input to television set-top boxes;

television set top boxes configured to receive television input signals via cable television link and provide television output signals compatible with television sets, the set top boxes additionally responsive to receiving the first output from the television remote controls to transmit representative second output to a central processing station via the cable television link;

a *centralized processing station* configured to receive and process second output from a multitude of television set top boxes by applying voice recognition to the second output to identify user-intended voice commands, to derive set-top-box-compatible instructions to carry out the identified voice commands, and returning signals representing the instructions to respective top boxes via the cable television link;

where the set top boxes are further responsive to receiving the signals representing the instructions from the central processing station to execute the instructions.

**’196 patent, claim 53**. A method of operating at least part of a *speech recognition system coupled to a wireline node* in a network, comprising the steps of:

processing a multiplicity of *received identified speech channels* to create a multiplicity of identified speech content; and

responding to said identified speech content to create an identified speech content response that is unique to each of said multiplicity of identified speech contents;

wherein said speech recognition system is provided said multiplicity of received identified speech channels based upon a *received back channel* at said wireline node from a multiplicity of user sites coupled to said network;

wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

## CERTIFICATE OF INTEREST

**Case Number** 22-1939

**Short Case Caption** Promptu Systems Corporation. v. Comcast Corporation

**Filing Party/Entity** Promptu Systems Corporation

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: October 20, 2022 Signature: /s/ *Jacob Schroeder*

Name: Jacob Schroeder

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| ☐ None/Not Applicable | ☒ None/Not Applicable | ☒ None/Not Applicable |
| Promptu Systems Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Gerald F. Ivey<br>Stephen Kabakoff<br>Sydney R. Kestle<br>Jinwoo Kim<br>Daniel F. Klodowski<br>Cara E. Regan<br>Jeffrey C. Totten<br>John Williamson<br><br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP | David H. Marion<br>Natalize Molz<br><br>White & Williams LLP | Scott Richard Mosko<br>Stacey M. Tam<br>Wade C. Yamazaki<br>Robert J. Yorio<br><br>Carr & Ferrell, LLP |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| *Promptu Sys. Corp. v. Comcast Cable Commc'ns*, No. 20-1253 (Fed. Cir.) | *Promptu Sys. Corp. v. Comcast Cable Commc'ns*, Nos. 19-2368, 19-2369 (Fed. Cir.) | *Promptu Sys. Corp. v. Comcast Cable Commc'ns*, No. 22-1093 (Fed. Cir.) |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

STATEMENT OF RELATED CASES ........ xiii

STATEMENT OF JURISDICTION ........ xiv

PRELIMINARY STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

I. Historical and Technological Background ........ 5

A. Promptu's Mission and Its Technology ........ 5

1. U.S. Patent No. 7,047,196 ........ 6

2. U.S. Patent No. 7,260,538 ........ 8

B. Promptu's Relationship with Comcast ........ 10

II. Promptu's Litigation Against Comcast ........ 12

A. Final Written Decisions in the Patent Office Proceedings ........ 13

B. European Proceedings ........ 14

C. District Court Claim Construction Proceedings ........ 16

D. District Court Claim Construction Order ........ 18

E. The District Court's Final Judgment ........ 19

SUMMARY OF THE ARGUMENT ........ 20

ARGUMENT ........ 22

I. Standard of Review ........ 22

II. The proper constructions of the terms of the '196 patent warrant a remand. ........ 22

A. The '196 patent uses "channel" to refer to a stream of communications regardless of the protocol..........................................23

1. The '196 patent uses "back channel" to refer to the stream of communications transmitted upstream from set-top boxes and does not require fixed frequencies or time slots..........................23

a. Claim language: The "back channel" conveys speech channels from multiple user sites over a network to a speech recognition system........................23

b. Specification: "Back channel" refers to the stream of communications received by the speech recognition system from the user sites. .............25

c. Specification: "Back channel" is not limited to a specific format or protocol.........................................27

d. Specification: The "back channel" places no significance on the mode of transmission and embraces a flexible upstream architecture. ...................30

e. Judicial Estoppel: Comcast successfully argued during the IPR proceedings that "back channel" refers to the "upstream communication channel delivering signals from multiple user sites to a central wireline node."..................................................32

f. Extrinsic Evidence: Dictionaries define "channel" as a stream of communications.....................33

g. Foreign Litigation: The UK Patents Court held the "back channel" was not limited to frequencies or time slots...............................................34

h. The district court erred by restricting "back channel" to "a fixed band of frequencies or times slot(s) for transmitting signals to a speech processing system or engine." .......................................36

i. The district court's constructions conflict with this Court's construction of "received back channel." ....................................................................40

j. The correct construction of "back channel" is "stream of communications transmitted upstream from set-top boxes." ......................................41

2. The '196 patent uses "speech channels" to refer to a stream of communications that include speech information and does not require a fixed frequency or time slot. ........................................42

a. Claim language: "Speech channels" from multiple user sites are processed to create "speech content." ..........................................................42

b. Specification: "Speech channels" may be sent as a packet-based, Ethernet-compatible data stream. ....................................................................43

c. The district court erroneously limited "speech channels" based on a teaching in the incorporated '874 application. ......................................45

d. The correct construction of "multiplicity of received identified speech channels" is "plurality of streams of communications received by a speech processing system or engine identified as originating from specific user sites." ....................................................................50

B. The '196 patent uses the phrase "speech recognition system coupled to a wireline node" to refer to a speech recognition system in communication with a wired network node ...............................50

1. A "speech recognition system" can perform functions other than recognizing speech. .................................................................51

a. Claim language: "speech recognition system" is "a system that performs speech recognition." ................51

b. Specification: The speech recognition system need only perform some speech recognition processing tasks and may perform tasks unrelated to speech recognition processing. ....................51

c. The district court erroneously construed "speech recognition system" as a term of degree. ....................53

d. The proper construction of "speech recognition system" is "a system that performs speech recognition." ....................55

2. The '196 patent describes various couplings, indicating that "coupled to," without modification, simply permits network communications ....................55

a. Claim language: The claims use "coupled to" to refer to a distinct component, not one located "at" or within a different component. ....................55

b. Specification: The '196 patent describes many different couplings. ....................56

c. The district court's construction of "coupled" contradicts this Court's prior construction and improperly imports a proximity requirement. ....................58

d. The correct construction of "coupled to" is "in communication with." ....................61

3. The '196 patent uses "wireline node" to refer to a wired node in a network. ....................61

C. A remand is warranted. ....................63

III. The proper construction of "centralized processing station" in the '538 patent warrants a remand. ....................64

A. The '538 patent uses "centralized processing station" without regard to its physical location. ....................65

1. Claim language: "centralized processing station" is not defined by its physical location other than it being a "processing station" that is "centralized." ....65

2. Specification: An embodiment where a "centralized processing station" is located at a head-end unit does not amount to lexicography. ....66

3. The district court erred by construing "centralized processing station" as limited to a "head end." ....67

4. The district court erred by rewriting "applying" as "performing" when the claims treat the two words differently. ....69

5. The proper construction of "centralized processing station" is not restricted by a location at a "head-end unit" and need not "perform" voice recognition. ....70

B. A remand is warranted. ....70

CONCLUSION ....71

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ....................................................................33

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
340 F.3d 1298 (Fed. Cir. 2003) ....................................................................60

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ....................................................................34

*AstraZeneca AB v. Mylan Pharms. Inc.*,
19 F.4th 1325 (Fed. Cir. 2021) ............................................................. 63, 67

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) ....................................................................49

*Baxalta Inc. v. Genentech, Inc.*,
972 F.3d 1341 (Fed. Cir. 2020) ............................................................. 47, 68

*Bd. of Regents of Univ. of Tex. Sys. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) ....................................................................67

*Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp.*,
55 F.3d 615 (Fed. Cir. 1995) ........................................................................62

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013) ....................................................................48

*Bradford Co. v. Conteyor N. Am., Inc.*,
603 F.3d 1262 (Fed. Cir. 2010) ....................................................................59

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*,
224 F.3d 1308 (Fed. Cir. 2000) ....................................................................65

*ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*,
35 F.4th 1345 (Fed. Cir. 2022) ....................................................... 37, 46, 53

*Comcast Cable Commc'ns v. Promptu Sys.*,
838 F. App'x 551 (Fed. Cir. 2021) ....................................................... passim

*Comcast Cable Commc'ns v. Promptu Sys.*,
838 F. App'x 555 (Fed. Cir. 2021) .......... xiii, 13

*Comcast Cable Commc'ns v. Promptu Sys.*,
CBM2018-00033, Decision, Paper 9 (PTAB Oct. 10, 2018) .......... 14

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) .......... 54, 59

*Eidos Display, LLC v. AU Optronics Corp.*,
779 F.3d 1360 (Fed. Cir. 2015) .......... 22, 38

*Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*,
946 F.3d 1367 (Fed. Cir. 2020) .......... 48

*E-Pass Techs., Inc. v. 3Com Corp.*,
343 F.3d 1364 (Fed. Cir. 2003) .......... 69

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) .......... 68

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997) .......... 59

*Gillette Co. v. Energizer Holdings, Inc.*,
405 F.3d 1367 (Fed. Cir. 2005) .......... 35

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) .......... 68

*IGT v. Bally Gaming Int'l, Inc.*,
659 F.3d 1109 (Fed. Cir. 2011) .......... 63, 67

*In re Varma*,
816 F.3d 1352 (Fed. Cir. 2016) .......... 46

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 784 (Fed. Cir. 2021) .......... 37, 46

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) .......... 58, 59, 60, 62

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999) ........................................................................65

*Kumar v. Ovonic Battery Co.*,
351 F.3d 1364 (Fed. Cir. 2003) ......................................................................62

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
453 F.3d 1364 (Fed. Cir. 2006) ......................................................................48

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017) ......................................................................59

*MicroStrategy Inc. v. Bus. Objects Ams.*,
238 F. App'x 605 (Fed. Cir. 2007) .................................................................65

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
243 F.3d 1316 (Fed. Cir. 2001) ........................................................ 62, 63, 67

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*,
386 F.3d 1133 (Fed. Cir. 2004) ......................................................................39

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) .............................................................. 47, 68

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................... 23, 33, 38, 46

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
318 F.3d 1143 (Fed. Cir. 2003) ......................................................................47

*Regeneron Pharms., Inc. v. Merus N.V.*,
864 F.3d 1343 (Fed. Cir. 2017) ......................................................................54

*Seabed Geosols. (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) .........................................................................38

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
983 F.3d 1367 (Fed. Cir. 2021) ......................................................................22

*SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*,
820 F.3d 419 (Fed. Cir. 2016) ................................................................ 67, 69

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
329 F.3d 823 (Fed. Cir. 2003) ....................................................................69

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)........................................................................................22

*Thorner v. Sony Comp. Entm't Am.*,
669 F.3d 1362 (Fed. Cir. 2012) .............................................................. passim

*Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*,
593 F.3d 1346 (Fed. Cir. 2010) ....................................................................32

*Trs. of Columbia Univ. v. NortonLifeLock, Inc.*,
No. 3:13-cv-808, 2019 WL 7040931 (E.D. Va. Dec. 20, 2019) ................ 32, 49

*Va. Panel Corp. v. MAC Panel Co.*,
133 F.3d 860 (Fed. Cir. 1997) ......................................................................62

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ................................................................ 39, 40

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) ....................................................................46

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .................................................................. 25, 39

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ....................................................................62

*Wi-LAN Inc. v. Sharp Elecs. Corp.*,
992 F.3d 1366 (Fed. Cir. 2021) ....................................................................59

**STATUTES**

28 U.S.C. § 1295(a)(1).......................................................................................4

28 U.S.C. § 1331 ..............................................................................................4

35 U.S.C. § 315(e)(2)........................................................................................17

## STATEMENT OF RELATED CASES

This appeal involves U.S. Patent Nos. 7,047,196 and 7,260,538.

The '196 patent was addressed by this Court in *Comcast Cable Communications v. Promptu Systems*, Nos. 2019-2287, 2019-2288, 838 F. App'x 551 (Fed. Cir. 2021) (Moore, Lourie, Schall), and is at issue in Appeal No. 22-1093.

The '538 patent was addressed by this Court in *Comcast Cable Communications v. Promptu Systems*, Nos. 2019-1947, 2019-1948, 838 F. App'x 555 (Fed. Cir. 2021) (Moore, Lourie, Schall).

Additionally, Patent No. RE44,326 is a child of the '196 patent and is at issue in Appeal Nos. 2020-1253, 2019-2368, and 2019-2369.

Counsel for Promptu are not aware of any other case that will directly affect or be directly affected by this appeal under Fed. Cir. R. 47.5.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 and entered final judgment on June 16, 2022. Appx22. Promptu timely appealed on June 21, 2022. Appx9449-9450. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## PRELIMINARY STATEMENT

Appellant Promptu Systems Corporation pioneered the technology for voice-activated remote controls to search for and access video content. Rather than performing speech recognition locally on a user's device, Promptu's system sent a user's voice command to a server for speech processing and returned the requested content or a command to control a device in the user's home. Today, this technology is commonplace with services like Apple's Siri, Amazon's Alexa, and Comcast's voice remote. These services perform speech recognition in the cloud to deliver content or control a user's device.

Promptu also taught Comcast how to implement this technology. Together they deployed Promptu's voice-activated remote control in Comcast's cable network. Comcast's CEO featured Promptu's voice-activated remote control on CNBC's Kudlow and Cramer show in 2004. Comcast, however, decided to shelve the technology—only to release its own infringing product, the Xfinity voice remote, a decade later. This is not hyperbole. In a parallel infringement action in the United Kingdom, the UK Patents Court determined that Comcast's UK system (including the Sky Q Voice remote) infringes the European counterpart to the '196 patent. And though the UK Patents Court (applying UK law) determined that certain European patent claims were invalid, Promptu's U.S. patents have largely withstood Comcast's invalidity challenges at the United States Patent Office.

In this U.S. litigation, Comcast sought and obtained litigation-inspired constructions of Promptu's patent terms far narrower than their plain meaning to avoid its infringement. These constructions bear no resemblance to the terms' plain meanings, nor do they match the broad meanings Comcast used in the IPRs. The district court, however, adopted virtually all of Comcast's narrow constructions, often with little or no analysis.

Specifically, for the "channel" terms in the '196 patent, the district court held this required the use of fixed frequency bands or time slots. Nothing in the record warrants such a narrow interpretation.

For "speech recognition system coupled to a wireline node" in the '196 patent, the district court held this excludes systems that, though they perform speech recognition, "primarily perform[] other functions." The court then construed "coupled to" contrary to this Court's prior construction of the same term. And the district court construed "wireline node" as if it recited "centralized wireline node," a different term expressly defined in the specification. These, too, are unwarranted.

For the '538 patent, the district court held that the "centralized processing station" must be located at a "head-end unit," ignored the doctrine of claim differentiation, and imported limitations from a preferred embodiment.

Promptu disagrees with the district court's remaining constructions, but has chosen to appeal only the most critical issues. Promptu respectfully requests this

Court vacate the district court's constructions of the terms on appeal, adopt the proper construction of those terms, and remand for further proceedings.

## STATEMENT OF THE ISSUES

1. Did the district court err in construing "back channel" and "speech channels" in the '196 patent to require fixed frequencies or time slots?

2. Did the district court err in construing "speech recognition system coupled to a wireline node" in the '196 patent when it added a "primary function" requirement to the speech recognition system, a "nearness" requirement to "coupled to," and "centralized" to "wireline node"?

3. Did the district court err in construing "centralized processing station" from the '538 patent when it added a location requirement ("at a head-end unit") and required it to "perform" speech processing?

# STATEMENT OF THE CASE

## I. Historical and Technological Background

This appeal comes with a lengthy history. The Court addressed the ’196 and ’538 patents in prior appeals from IPR proceedings. Still pending are related appeals from other Patent Office proceedings. Below provides a global context for the dispute between Promptu and Comcast with a focus on those aspects most relevant to this appeal.

### A. Promptu’s Mission and Its Technology

Promptu was founded in 2000 to develop technologies allowing users to quickly find and access video content over content delivery networks (such as cable television) using their voice. Appx896 ¶ 7. Then-existing technologies required complex, costly systems close to the user. Appx98, 1:59-63. There was a need for a network-based speech processing system that could service voice commands from multiple users. Appx98, 1:62-63. Though there had been extensive research into the mechanics of speech recognition, this research did not reveal how to do so efficiently over content delivery networks. Appx62, 4:51-67. At the time, no system “provid[ed] speech recognition to a collection of users over a cable television network.” Appx62, 4:59-60.

Promptu is a small, privately funded company. Given the nature of the cable industry, Promptu’s business model required significant investments in engineering

resources to design a product for the large cable network operators. Promptu therefore relied on the patent system to protect its investments in research and development. *See* Appx896 ¶¶ 9-10. By 2005, Promptu's patent portfolio had about 20 pending patent applications, including the two at issue in this appeal (*see* Appx873), and reflected over $10 million in investments.

### 1. U.S. Patent No. 7,047,196

The '196 patent stems from Promptu's earliest filing (*see* Appx873) and describes an architecture for performing speech processing within a cable network.

The '196 patent discloses performing speech recognition in a network that delivers video to multiple users. Appx23, Abstract. Prior attempts had implemented speech recognition at each user site, such as depicted below:




Appx8442. Rather than performing costly speech recognition processing at each user site (as shown above), the patented invention implements it over a network.

Speech processing is applied via a "speech recognition system" located remotely from multiple users' premises. Appx61-63, 1:63-2:2, 4:52-67, 5:3-31. The below demonstrative, based on Figure 3 of the '196 patent, depicts this architecture:




Appx8617; *see also* Appx8455.

Speech data travels from a user to a speech recognition system that processes the user's request, formulates a response, and returns that response to the user. *See, e.g.*, Appx23, Abstract; Appx69, 18:31-33. This allows the user to search for programming and content with their voice rather than pressing buttons on a remote control. *See* Appx66-67, 12:66-13:4.

Claim 53 of the '196 patent is illustrative:

> 53. A method of operating at least part of a *speech recognition system coupled to a wireline node* in a network, comprising the steps of:

> processing a multiplicity of *received identified speech channels* to create a multiplicity of identified speech content; and
>
> responding to said identified speech content to create an identified speech content response that is unique to each of said multiplicity of identified speech contents;
>
> wherein said speech recognition system is provided said multiplicity of received identified speech channels based upon a *received back channel* at said wireline node from a multiplicity of user sites coupled to said network;
>
> wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

Appx89 (emphases added). Independent claims 1, 14, and 27 recite the "back channel" term at issue. *See, e.g.*, Appx85, 50:62-64 (claim 1 reciting "a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites").

**2. U.S. Patent No. 7,260,538**

The '538 patent, like the '196 patent, concerns remote speech recognition processing. The '538 patent, however, is focused on controlling a user's device based on speech processing performed at a remote location. Appx91, Abstract; Appx101, 7:13-22. The '538 patent describes a system that uses a microphone activated by a "push-to-talk" button on a remote control to capture a voice command, send it to a set-top box, transmit it over a network for speech recognition processing, generate an appropriate command, and transmit the command to the set-top box for

performance. Appx91, Abstract; *see also* Appx92-93, Figs. 1, 2. The below graphic depicts the architecture discussed above side-by-side with Figure 1 from the '538 patent:




Appx8446.

Claim 34 of the '538 patent is illustrative:

> 34. A centralized multi-user voice operated television control system, comprising:
>
> television remote controls configured to directly and wirelessly control television sets and additionally to receive user voice input and wirelessly transmit first output representative of the voice input to television set-top boxes;

> television set top boxes configured to receive television input signals via cable television link and provide television output signals compatible with television sets, the set top boxes additionally responsive to receiving the first output from the television remote controls to transmit representative second output to a central processing station via the cable television link;
>
> a *centralized processing station* configured to receive and process second output from a multitude of television set top boxes by applying voice recognition to the second output to identify user-intended voice commands, to derive set-top-box-compatible instructions to carry out the identified voice commands, and returning signals representing the instructions to respective top boxes via the cable television link;
>
> where the set top boxes are further responsive to receiving the signals representing the instructions from the central processing station to execute the instructions.

Appx104 (emphasis added).

### B. Promptu's Relationship with Comcast

Around 2001, Comcast expressed interest in Promptu's capability of integrating a speech recognition system into Comcast's cable network. Appx896-897 ¶ 13. The parties entered into a series of confidentiality agreements while Comcast performed diligence on Promptu's technology. Appx897-899 ¶¶ 14-32. In 2003, Comcast's Senior Vice President of Strategic Planning signed a Memorandum of Understanding with Promptu, stating: "Comcast believes that [Promptu's] speech recognition technology enabling the control and navigation of cable services on the television via voice commands has the potential to be an attractive service that could

have a significant benefit to cable subscribers." Appx899-900 ¶¶ 33-34; Appx762-763.

In a presentation dated February 2004, Comcast acknowledged that Promptu (then AgileTV) knew more about voice recognition over a cable network than anybody else. Appx4101; Appx4127. Comcast also acknowledged that nobody else was doing this:

**Potential Vendor–Partners for VR Development**

**IBM** — **Role: Prime contractor**

**Rationale:** Leader in voice recognition across many platforms, a leading system integrator for development and deployment, substantial IP position in VR

**Status:** Preliminary conversations underway. Next step is technical discussions to frame project

**VR Customers:** Honda, SprintPCS

**Alternate Vendors:** Microsoft, system integrators (e.g. Accenture)

**Tellme.®** — **Role: VR app dev/engine, cross-platform apps**

**Rationale:** Leader in innovating and scaling service provider voice recognition applications

**Status:** VoIP trial planned in early 2005. Evaluating for customer support. Prelim. STB technical discussions

**Customers:** American Airlines, Fidelity, AT&T Wireless, Toll Free Directory, Verizon

**Alternate Vendors:** BeVocal, HeyAnita, Nuance, ScanSoft, etc.

**AGILETV** — **Role: Cable integration**

**Rationale:** Only vendor that has focused on VR over cable plant, has more knowledge than anyone else

**Status:** Trial in progress, investment in progress

**Customers:** No revenue generating customers to date

**Alternate Vendors:** None

**IDEO** — **Role: Market study, human factors, remote control design, etc.**

**Rationale:** Leader in consumer product development and innovation

**Status:** Preliminary proposal for VR remote project, visiting Comcast on 11/10

**Customers:** Apple, Microsoft, P&G, Tivo, Vodafone

**Alternate Vendors:** Frog

27 **Comcast Proprietary and Confidential** comcast

Appx4127.

In 2005, the parties executed two other agreements. The first was a License and Development Agreement. Appx796-873. It provided Comcast options to license

Promptu's patent portfolio, including the '196 and '538 patents. Prior to entering into this agreement, Comcast had performed diligence on Promptu's portfolio, including a prior art search. Appx6157; Appx6112-6136. The second was a Marketing Trial Agreement. Appx767-794. It allowed Comcast to conduct a field trial of Promptu's voice-activated remote control and speech processing system. Appx767. Promptu successfully deployed its network-based speech recognition system within Comcast's network in Willow Grove, Pennsylvania, as well as other locations. *See* Appx900 ¶¶ 38-40. Comcast later terminated the relationship (Appx1096; Appx902 ¶ 50) and decided not to pursue voice recognition at that time.

Nearly a decade later, in 2015, Comcast announced a voice remote with its Xfinity product. *See* Appx902-905 ¶¶ 51, 53-65.

## II. Promptu's Litigation Against Comcast

In December 2016, Promptu filed a Complaint alleging that Comcast's Xfinity products infringed the '196 and '538 patents. *See* Appx506. Promptu also asserted a third patent, U.S. Patent No. RE44,326, and various state law causes of action. *See* Appx506. In response to an order by the district court, Promptu elected to proceed on claims 1-2, 4-5, 12-15, 18, 25, 27-28, 31, 39-40, 53-54, 61-62, and 65 of the '196 patent and claims 2, 6, 19, 34, and 40 of the '538 patent. Appx9536-9537.

One year into the case, Comcast filed six petitions for inter partes review—two petitions against each patent. A few months later, Comcast filed two petitions for

covered business method review, one against the '196 patent and one against the '326 patent. The Patent Office proceedings are discussed in more detail below.

Meanwhile, claim construction briefing proceeded in parallel in the district court. The parties filed opening and responsive briefs and the court conducted a claim construction hearing in June 2018.

By the following month, the Patent Office had instituted each of Comcast's six petitions for inter partes review. Facing the prospect of nearly $2 million in legal fees for the Patent Office proceedings alone, Promptu sought a stay of the district court proceedings to conserve resources until each of Comcast's eight Patent Office proceedings ran their course. Appx4839-4844. Comcast did not oppose (Appx4845-4846) and the court stayed proceedings (Appx4847-4848). The court did not issue its decision on claim construction prior to the stay.

### A. Final Written Decisions in the Patent Office Proceedings

Promptu's claims largely survived Comcast's attacks at the Patent Office.

For the '538 patent, the Patent Office confirmed the patentability of every claim challenged by Comcast. *Comcast Cable Commc'ns v. Promptu Sys.*, 838 F. App'x 555 (Fed. Cir. 2021). In a prior appeal, this Court affirmed the Patent Office. *Id.* at 556.

For the '196 patent IPRs, the Patent Office also confirmed the patentability of every challenged claim (1-7, 17-24, 33-35, 37, and 40-41). *Comcast Cable*

*Commc'ns v. Promptu Sys.*, 838 F. App'x 551 (Fed. Cir. 2021). In a prior appeal, this Court affirmed the Patent Office on half of those claims (claims 14-15, 17-19, 25-26, 53-55, 61-62, and 64-66), construed "received back channel" to mean a "back channel that has been received," and remanded the remaining claims to the Board. *Id.* at 554. On remand, the Patent Office confirmed the patentability of half of those claims (claims 27-28, 30-32, and 38-42) (Appx8002-8091), while the remainder (claims 1-2, 4-6, and 12-13) are presently on appeal (Case No. 2022-1093).

For the '196 patent CBM, the Patent Office exercised its discretion to deny institution, because Comcast was "maintaining diametrically opposing positions on the proper claim construction of the same claim term." *Comcast Cable Commc'ns v. Promptu Sys.*, CBM2018-00033, Decision, Paper 9 at 7 (PTAB Oct. 10, 2018).

**B. European Proceedings**

Meanwhile, in 2018, Comcast had acquired European TV and broadband provider, Sky. After the acquisition, the CEOs of Comcast and Sky confirmed that Comcast deployed its voice-activated remote within the Sky network. Appx6282-6283. Promptu initiated infringement proceedings in the UK and in Germany asserting the European counterpart to the '196 patent, European Patent No. 1,290,889. Appx6282-6283. While the German proceedings remain ongoing, the UK proceedings have concluded. The specification for the EP '889 patent is

practically identical to that of the ’196 patent, and claim 1 from the ’196 patent is practically identical to claim 1 of the EP ’889 patent:

**US 7,047,196**


(12) United States Patent
Calderone et al.
(10) Patent No.: US 7,047,196 B2
(45) Date of Patent: May 16, 2006
(54) SYSTEM AND METHOD OF VOICE RECOGNITION NEAR A WIRELINE NODE OF A NETWORK SUPPORTING CABLE TELEVISION AND/OR VIDEO DELIVERY

1. A method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network supporting at least one of cable television delivery and video delivery, comprising the steps of:
receiving said back channel to create a received back channel;
partitioning said received back channel into a multiplicity of received identified speech channels;
processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content; and
responding to said identified speech content to create an identified speech content response that is unique, for each of said multiplicity of identified speech contents.

**EP 1,290,889**


Case 2:16-cv-06536-JS Document 261-5 Filed 12/22/21 Page 2 of 78
(19) Europäisches Patentamt
European Patent Office
Office européen des brevets
(11) EP 1 290 889 B1

1. A method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites (1100) presented to a speech recognition system (3200) at a wireline node (1300) of a network supporting at least one of cable television delivery and video delivery, comprising the steps of:
receiving said back channel to create a received back channel,
partitioning said received back channel into a multiplicity of received identified speech channels;
processing each of said multiplicity of said received identified speech channels with said speech recognition system to create corresponding recognized speech content for each received identified speech channel;
responding to said recognized speech content to create a recognized speech content response that is unique for each of said received identified speech channels; and
individually controlling the delivery of entertainment and information services to each user site (1100) in accordance with said recognized speech.

Appx8645.

In the UK, the UK Patents Court conducted an infringement trial in June 2021 and received live expert testimony. Appx7747; Appx7751-7752. The UK Patents Court resolved disputes over the meaning of the claim terms. Specifically, the UK Patents Court rejected Comcast’s narrow construction of “back channel” (seeking to limit it to a specific frequency band) and instead determined it simply referred to a return path. Appx7774; Appx7776 ¶ 147 (stating that “‘back channel’ means a channel suitable to carry a multiplicity of speech signals from multiple set-top boxes

to the wireline node of the claim”). According to the UK Patents Court, the invention described in the EP ’889 patent does “not reside, even partly, in the nature of the network that connects the set top box and the wireline node.” Appx7774 ¶ 134. Rather, “[t]he teaching as a whole supports the general impression that the invention is indifferent to the specific type of network or physical cabling.” Appx7775 ¶ 139.

The UK Patents Court held that Sky’s system would infringe the EP ’889 patent if it were valid. Appx7779 ¶ 168. On the issue of validity, however, the UK Patents Court held the EP ’889 patent was invalid based on Houser (U.S. Patent No. 5,774,859). Appx7794-7795 ¶¶ 240-41.

The United States Patent and Trademark Office held differently. Houser was considered by the Patent Office during original prosecution of the ’196 patent. Appx24. And statutory estoppel, 35 U.S.C. § 315(e)(2), precludes Comcast from maintaining a position that Houser invalidates any claim of the ’196 patent.

### C. District Court Claim Construction Proceedings

By October 2019, the Patent Office had decided Comcast’s eight Patent Office proceedings. In September 2020, the district court lifted the stay. Appx5144-5146. Given the passage of time, the court reordered claim construction briefing. Appx6321-6322; Appx6347.

The parties simultaneously exchanged opening briefs ((Appx7500-7521) (Promptu); (Appx6412-6431) (Comcast)) and responsive briefs ((Appx7968-7990)

(Promptu); (Appx8193-8211) (Comcast)). During the two-day hearing in February 2022, the parties presented a tutorial on the technology (*see, e.g.*, Appx8436-8473) and their arguments on eight terms. Neither side presented live expert testimony. Three groups of terms are relevant to the issues on appeal.

For the "channel" terms ("back channel" and "multiplicity of received identified speech channels") in the '196 patent, the primary dispute was whether "channel" required fixed frequency bands or time slots or whether it simply referred to a stream of communications:

| Claim Term | Promptu | Comcast |
|---|---|---|
| "back channel"<br><br>Claims **1, 2, 14, 27, 28, 53** | "stream of communications transmitted upstream from set-top boxes" | "a fixed band of frequencies or time slot(s) for transmitting signals to a speech processing system or engine" |
| "multiplicity of received identified speech channels"<br><br>Claims **1, 2, 13, 14, 15, 27, 28, 53, 54, 62** | "plurality of streams of communications received by a speech processing system or engine identified as originating from specific user sites" | "multiple different channels carrying speech data, with each channel assigned to a particular user site"<br><br>"channel" means "a single band of frequencies or a designated time slot for transmitting signals" |

Appx8614; *see also* Appx7507-7511; Appx7975-7979.

For "speech recognition system coupled to a wireline node" in the '196 patent, the parties' disputes are shown below:

| Claims 14, 27, and 53 | |
|---|---|
| **Promptu** | **Comcast** |
| "**speech recognition system**" should be given its plain and ordinary meaning, which is "a system that performs speech recognition" | "**speech recognition system**" means "a system directed to speech recognition" |
| "**coupled to**" means "in communication with" | "**coupled to**" means "connected in or near" |
| "**wireline node**" means "node connected by a wire, as opposed to a wireless connection" | "**wireline node**" means "a network node providing video or cable television delivery to multiple users using a wireline physical transport between those users at the node" |

Appx8700.

For the '538 patent, the parties disputed whether a "centralized processing station" must be located at a "head-end unit" and "perform[]" voice recognition:

| Claims **34, 40** | |
|---|---|
| **Promptu** | **Comcast** |
| "portion of a cable television system at which voice commands are received and command functions are transmitted" | "device at a cable-TV network head-end unit that receives and performs voice recognition on voice commands, and generates and returns instructions to set-top boxes to carry out the commands" |

Appx8537.

## D. District Court Claim Construction Order

With the exception of the construction for "speech recognition system" in the '196 patent, the district court adopted Comcast's constructions verbatim. Appx1-3. With respect to "speech recognition system," the court adopted Comcast's construction but replaced "directed to" with "whose function is": "a system <u>whose</u>

function is speech recognition." Appx2. A month later, the district court provided its reasoning in a sealed order. Appx4-21.

### E. The District Court's Final Judgment

Given the constructions adopted by the district court, Promptu stipulated to noninfringement (Appx9529-9533) and the court entered final judgment against Promptu (Appx22). Because Promptu had sought a single trial against Comcast, and because the district court refused to certify judgment against Promptu on the '196 and '538 patents in view of its claim construction ruling under Federal Rule of Civil Procedure 54(b) (Appx9452-9476), Promptu dismissed its state law claims and those involving the '326 patent so it could pursue this appeal. Appx9529-9532; Appx9449-9451.

## SUMMARY OF THE ARGUMENT

The district court's constructions conflict with the construed terms' plain meanings, the intrinsic record, and this Court's prior holdings. The Court should reverse.

For the "channel" terms in the '196 patent, all agree these refer to a stream of communications sent from a user to a remote location for speech recognition processing. Yet the district court confined this term to communications sent using fixed frequencies or time slots. Nothing in the intrinsic record commands such a limitation. The district court's construction also contradicts the constructions of the Patent Office (adopted at Comcast's urging).

For "speech recognition system coupled to a wireline node," the district court added a "primary function" requirement to the "speech recognition system," a "nearness" requirement to "coupled to," and added "centralized" to "wireline node." Nothing in the intrinsic record supports narrowing the scope of this phrase in this way.

Finally, for "centralized processing station" in the '538 patent, the district court added two requirements: (a) it must be located at a head-end unit, and (b) it must perform speech recognition processing. But nothing in the intrinsic record redefines this term or disavows the full scope of the claim language. Moreover, the district

court's construction violates the doctrine of claim differentiation, as other claims recite those requirements as separate, express limitations.

Under the proper constructions, the district court's judgment of noninfringement should be vacated and the case remanded for further proceedings.

## ARGUMENT

### I. Standard of Review

When the district court relies only on intrinsic evidence for the construction of claim terms, this Court reviews the court's claim constructions de novo. *Teva Pharms. v. Sandoz, Inc.*, 574 U.S. 318, 331-33 (2015); *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech.*, 983 F.3d 1367, 1374 (Fed. Cir. 2021). And even if the district court relies on extrinsic evidence, when "the meaning of the claim at issue is clear in view of the intrinsic record and undisputed facts," this Court reviews the court's claim construction de novo. *See, e.g.*, *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1364-65 (Fed. Cir. 2015) (citing *Teva*, 574 U.S. at 331-33).

### II. The proper constructions of the terms of the '196 patent warrant a remand.

The '196 patent describes locating a speech processing system within a network to serve multiple users, as opposed to within a single user's device. The specification teaches locating the speech processing system anywhere within the network to support any network architecture or protocol. The district court's constructions artificially narrow the scope of Promptu's claims to require locating the speech recognition system at a single, fixed place within a network and confine communications with it to those using fixed frequencies or time slots.

## A. The '196 patent uses "channel" to refer to a stream of communications regardless of the protocol.

The '196 patent uses "channel" to refer to a stream of communications. For "back channel," it refers to the stream of data in the reverse direction (away from the user). And "speech channels" refers to a stream of speech data. The intrinsic record does not place any significance on the physical format of those streams, the network protocols by which they are sent, or whether they must use a fixed frequency or time slot.

### 1. The '196 patent uses "back channel" to refer to the stream of communications transmitted upstream from set-top boxes and does not require fixed frequencies or time slots.

#### a. Claim language: The "back channel" conveys speech channels from multiple user sites over a network to a speech recognition system.

The language of "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Additionally, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

Here, the claims of the ’196 patent use “back channel” to refer to an upstream communications pathway over a network between multiple users and the speech recognition system. *See, e.g.*, Appx85, 50:62-66. This pathway conveys the speech data from the multiple user sites to the speech processing system. Appx89 (claim 53 reciting “wherein [the] speech recognition system is provided [the] multiplicity of received identified speech channels based upon a received back channel at said wireline node from a multiplicity of user sites coupled to [the] network”); Appx85 (claim 1 reciting “a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network”).

The user sites can communicate with the speech recognition system over multiple types of networks. For example, the speech recognition system is coupled to a wireline node in a network and, over that network, receives a back channel. Appx88 (claim 27). The back channel conveys speech channels from multiple user sites over that network. *Id.* The network may include fiber-to-the-curb residential broadband networks (Appx89 (claim 41)), fiber-to-the-home residential broadband networks (Appx89 (claim 42)), and switched-digital-video residential broadband networks (Appx89 (claim 43)). Moreover, not all user sites need even be on the same type of network. Appx89 (claim 40 reciting “wherein said network includes a wired residential broadband network *servicing at least part of said multiplicity of*

*user sites*" (emphasis added)). Thus, the claimed "back channel" is agnostic to the specific network architectures used to communicate with the speech recognition system. Nor does the language of the disputed element refer to frequencies or time slots—those terms appear nowhere in any claim.

**b. Specification: "Back channel" refers to the stream of communications received by the speech recognition system from the user sites.**

The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Here, the specification uses "back channel" to refer to communications sent upstream from set-top boxes (also referred to as "user sites"). *See, e.g.*, Appx75, 30:4-9. Communications primarily flow downstream, in the direction from the content provider (e.g., a cable company) to a user. *See* Appx61-62, 2:62-3:3. The "back" channel, however, flows in the reverse direction—from a user towards the content provider. Appx75, 30:4-9.

The "back channel" may traverse a cable television network, a video delivery network, or both. Appx23, Abstract. For example, Figure 3 depicts one embodiment implemented in a cable television network:




FIG. 3

Appx28 (annotated).

A set-top box (e.g., 1100) communicates "via a two-stage wireline communications system containing a wireline physical transport 1200." Appx65, 9:48-52. Wireline physical transport 1200 is described as including "uplink physical transport 1204 and downlink physical transport 1202." Appx75, 29:49-51. "Uplink 1204 communication includes a back channel." Appx75, 30:4-9. Speech data from

multiple user sites (set-top boxes) are sent over the back channel to a speech recognition system. *Id.* Thus, the back channel refers to the stream of communications transmitted upstream from set-top boxes. Appx66, 12:45-56 (the upstream signal "may be in the form of a data stream containing speech and address information").

#### c. Specification: "Back channel" is not limited to a specific format or protocol.

The specification uses the term "back channel" without regard to the specific protocol used to carry the information over it. Because these protocols govern how data travels upstream, the district court erred by limiting the claimed channels to a protocol using fixed frequencies or times slots. For example, Figure 24 depicts a speech recognition system located within a node in a network:



Fig. 24

Appx8630 (annotating Appx49). The back channel enters the network node 1310 over the wireline physical transport 1200. Appx49; Appx75, 29:49-51, 30:4-9; Appx76, 31:64-32:34. The back channel then passes through switch 1390 before it is delivered, as 1392, to speech engine 1330. Appx76, 32:1-3. The back channel may arrive in many formats, as the switch supports various interfaces and protocols, including "digital interfaces," "Ethernet protocols," "analog interfaces," and "wavelength division multiplexing," and may include one or more circuit switches or ATM switches. Appx76, 32:25-34.

Other examples illustrate that the back channel may be converted from one format or protocol to a different one. For example, Figure 29 depicts a detailed block diagram of a speech engine 1330:




Fig. 29

Appx8631 (annotating Appx54); Appx79, 37:55-57. The back channel 1326 travels to speech processor computer 1520 via speech gateway 3100. Appx79, 37:61-64. This stream of communications is the "back channel" before and after the gateway and irrespective of its physical format or protocol. Appx79, 37:55-64. The speech gateway converts incoming communications to different formats so it can

communicate with different types of networks or protocols. Appx65, 9:65-10:13. For example, the gateway may:

- completely convert one protocol to another protocol;
- support one protocol from within another protocol;
- convert between two messaging or mail protocols;
- act as a go-between for two networks with similar protocols;
- provide an entry/exit point for one network to a different network;
- switch speech and data between a terrestrial network and a satellite network; and
- perform layer switching tasks between at least two networks and coordinate the delivery of information (whether as messages, packets, data, or other) to various destinations in the networks.

*Id.* Thus, the back channel may traverse multiple networks in myriad formats or protocols along its path. Nothing limits the "back channel" to a particular format or protocol, let alone those mandating fixed frequencies or time slots.

#### d. Specification: The "back channel" places no significance on the mode of transmission and embraces a flexible upstream architecture.

At the time of Promptu's invention, there was no system providing speech recognition services to a collection of users over a network that supports "cable television and/or video delivery." Appx23, Abstract; Appx62-63, 4:59-5:5. The specification describes embodiments that can be incorporated within then-existing

architectures, as well as others that can be incorporated within custom architectures. The particular physical transmission protocol is a design choice.

For example, one embodiment includes a set-top box using a "5 to 40 MHz cable return path" to send speech data to the speech recognition system. Appx66, 11:15-18. But the set-top box may employ any other protocol to do so, including using a DOCSIS type cable modem. Appx66, 11:51-56. And the specification does not limit the system to these embodiments. In other examples, the set-top box "may not be used to transmit the digitized speech data upstream" at all. Appx66, 11:23-25.

At the receiving end, return path receiving equipment can interpret whatever protocol the speech data uses. Appx66, 12:27-65. For commercial set-top boxes, "the return path receiving equipment in the central location may be specific to that type of box." Appx66, 12:27-30. "[C]ustom return path receivers" can also be used for custom upstream protocols including at least one of "FM or AM modulation/demodulation, FDMA, TDMA, FSK, PSK, or QPSK digital modulation/demodulation, Spread Spectrum modulation/demodulation, Telephony, cellular return, or Wireless." Appx66, 12:36-44, 12:57-65. The "received upstream signal," the back channel, "may be in the form of a data stream containing speech and address information" that "may be Ethernet compatible" (Appx66, 12:45-56) and may be transmitted "as a series of packets" (Appx67, 14:12-15). No significance is placed on using protocols requiring fixed frequencies or time slots.

**e. Judicial Estoppel: Comcast successfully argued during the IPR proceedings that "back channel" refers to the "upstream communication channel delivering signals from multiple user sites to a central wireline node."**

Comcast's arguments in the IPR proceedings further confirm Promptu's construction. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 593 F.3d 1346, 1353-54 (Fed. Cir. 2010). "Judicial estoppel applies just as much when one of the tribunals is an administrative agency as it does with both tribunals are courts." *Id.* at 1354; *see Trs. of Columbia Univ. v. NortonLifeLock, Inc.*, No. 3:13-cv-808, 2019 WL 7040931, at *4-6 (E.D. Va. Dec. 20, 2019).

Judicial estoppel has three elements: (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether the party succeeded in persuading a court to accept that party's earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage if not estopped. *NortonLifeLock*, 2019 WL 7040931, at *5. Each is met here.

During the IPR proceedings, Comcast's expert opined that a skilled artisan reading the '196 patent "would understand the term 'back channel' to refer to the

'upstream communication channel delivering signals from multiple user sites to a central wireline node." Appx7994-7995 ¶¶ 82-83 (stating the '196 patent uses "back channel" "in this generally understood way"). Based on Comcast's arguments, the Board held prior art disclosing "an upstream communication channel" met the claimed "back channel." Appx8025-8029. Nowhere was it suggested then that "back channel" required "fixed" "frequencies or time slots" nor did Comcast attempt to show this feature was present in the prior art. Finally, it would be unfair for Comcast to obtain a broad construction of this term during inter partes review (in an attempt to invalidate the patent), to now seek a narrow interpretation of the same term during litigation (in an attempt to avoid infringement). A patent may not, like a nose of wax, be twisted one way for invalidity and another for infringement. *E.g.*, *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

#### f. Extrinsic Evidence: Dictionaries define "channel" as a stream of communications.

Extrinsic evidence "can shed useful light on the relevant art," though it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (citations omitted).

Here, the extrinsic evidence supports a construction of "channel" as a stream of communications. For example, a 1998 publication by the European Broadcasting Union defines "[b]ack channel" as "[t]he segment of a two-way communications

system that flows from the consumer back to the Content provider, or to a system component, to provide feedback." Appx7597. This definition was "produced by a group of over 200 experts from Europe, Japan, Australia and North America," and was listed as "jargon familiar to those in the television production, post-production, broadcasting, telecommunications and computer industries." Appx7592-7596.

Even dictionaries proffered by Comcast, such as the *IEEE Standard Dictionary* from 1996 (Appx6726-6729), include definitions of "channel" as communication paths including "[a] means of one-way or two-way transmission provided by a vendor between two defined interface points," "[a] logically independent data path between two Functions," and "[a] one-way path for transmission of signals between two or more points; for example, a data channel." Appx6729. None of these definitions limits channels to fixed frequencies or time slots.

**g. Foreign Litigation: The UK Patents Court held the "back channel" was not limited to frequencies or time slots.**

In construing a patent's claims, this Court also considers statements made during "official proceeding[s]" concerning a foreign counterpart to a U.S. patent. *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1312-13 (Fed. Cir. 2014). These statements must be "relevant" to the term at issue and "not related to unique aspects of foreign patent law." *Id.* For example, this Court relied on an accused infringer's "blatant admission" before the European Patent Office concerning the European

counterpart to a U.S. patent in reversing a district court's construction of a "virtually identical claim" in the U.S. patent. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005).

Official proceedings before the UK Patents Court concerning the foreign counterpart to the '196 patent are relevant to the construction of "back channel." Comcast Cable Communications LLC is a named defendant both in the UK proceedings and in this appeal. Appx7747. The UK Patents Court, much like this Court directs in *Phillips*, construes the terms of a patent based on the plain language of the claims in view of the specification. *See* Appx7772-7773 ¶ 129.

In the proceedings before the UK Patents Court involving the EP counterpart to the '196 patent, the parties contested the construction of "back channel." Comcast had argued that "back channel" was limited to a specific low-frequency band used in closed TV cable networks. Appx7776 ¶ 145; *but see* Appx8647-8648 (Comcast's counsel conceding at trial that the term is not so limited). Promptu explained that "back channel" was not so limited and that it includes any return path, including the "'open' internet." Appx7774-7775 ¶¶ 136-138.

The UK Patents Court agreed with Promptu, holding:

- "[T]he alleged invention and its advantages do not reside, even partly, in the nature of the network that connects the set top box and the wireline node." Appx7774 ¶ 134.

- "The teaching as a whole supports the general impression that the invention is indifferent to the specific type of network or physical cabling." Appx7775 ¶ 139.
- Back channel "does not exclude networks which use the internet." Appx7777 ¶ 152.

The UK Patents Court thus construed "back channel" as "a channel suitable to carry a multiplicity of speech signals from multiple set-top boxes to the wireline node" of the claim. Appx7776 ¶ 147. This construction mirrors Promptu's construction here, defining "back channel" as a communication stream not limited to fixed frequencies or time slots of a specific protocol.

**h. The district court erred by restricting "back channel" to "a fixed band of frequencies or times slot(s) for transmitting signals to a speech processing system or engine."**

The district court construed "back channel" as "a fixed band of frequencies or time slots for transmitting signals to a speech processing system or engine." Appx19. The district court gave three reasons for its construction. None withstands scrutiny.

*First*, the district court stated Promptu's construction "would eliminate the meaning of the word channel, and lacks sufficient intrinsic evidence to support it." Appx18. For support, the district court quoted an unsupported assertion from Comcast's brief that a "channel" is "defined by frequencies or time slots." Appx18

(citing Appx6427; Appx2443-2444; Appx3529-3535). Even though nothing in the intrinsic record defines the "back channel" in that way, the district court held "[t]he intrinsic record does not support rendering the word 'channel' utterly meaningless." Appx18.

But "it is not always appropriate to break down a phrase and give it an interpretation that is merely the sum of its parts." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 791-92 (Fed. Cir. 2021) (holding the claim construction inquiry "is not limited to an analysis of the phrase in isolation"). Instead, "[a] term can be defined only in a way that comports with the [specification] as a whole." *Id.* (citation omitted). In *ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th 1345, 1350-51 (Fed. Cir. 2022), for example, this Court rejected a defendant's attempt to construe "self-similar" as a sum of *self* and *similar* "in isolation" when the entire term had a well-known meaning.

*ClearOne*'s logic applies here. The term "back channel" has an established meaning in telecommunications. It simply means upstream communications. *See, e.g.*, Appx7597. This comports with how the specification describes its upstream data path. *See* Appx66, 12:45-50 (explaining how the "upstream signal" "may be in the form of a *data stream* containing speech and address information" (emphasis added)). Nothing in the '196 patent limits the format of that stream to specific frequency ranges or time slots. *See supra*.

Nor did the district court explain why construing "back channel" as upstream communications would "render[] the word 'channel' utterly meaningless." Appx18. It would not. Promptu's construction merely interprets the "back channel" as upstream communications rather than a specific type of channel with frequency and time slot requirements nowhere mentioned in the claims. No meaning is lost.

*Second*, the district court quoted Comcast's expert that channels "are the equivalent of lanes on a road." Appx18. But expert testimony "can suffer from bias that is not present in intrinsic evidence" as it is "generated at the time of and for the purpose of litigation." *Phillips*, 415 F.3d at 1318. And even if channels may be analogized to lanes on a road, this does not restrict a channel to a fixed frequency or time slot from end-to-end. For example, when traveling from a home to an office, a car may traverse multiple types of roads from unmarked rural roads to multi-lane highways and may change lanes along the way. *See, e.g.*, Appx8667-8676. Similarly, a back channel may traverse switches and gateways, changing formats and protocols along the path. *See supra*.

Nothing in the intrinsic record supports the district court's narrow definition. And "[t]o the extent the district court considered extrinsic evidence in its claim construction order . . . , that evidence is ultimately immaterial to the outcome because the intrinsic record is clear." *E.g.*, *Eidos*, 779 F.3d at 1365; *Seabed Geosols. (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287, 1290 (Fed. Cir. 2021) (rejecting a

construction "based entirely on extrinsic evidence" when the intrinsic record was clear).

*Third*, the district court's construction excludes disclosed embodiments. This is improper. *Vitronics*, 90 F.3d at 1583-84; *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification."); *On-Line Techs. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138-39 (Fed. Cir. 2004) (citing cases).

Here, the district court agreed that the claims cover "packet-based communications over the internet." Appx19 (citing Appx6444 ¶ 35). It is undisputed that those embodiments *need not* use fixed frequency bands or time slots. As Comcast's expert acknowledged, these embodiments "may, *or may not*, be sent upstream using defined frequency bands, or 'channels.'" Appx8215 ¶ 7 (emphasis added). Comcast even phrased these features as "optional." Appx8207 ("Any of these three *optional* transmission features (*i.e.*, packets, Ethernet, or address headers) can be used *with or without* channels; they do not supplant the channel requirement."). This supports Promptu's construction. Nothing in the intrinsic record evinces an intent to draw a line between back channels that use a "fixed frequency or time slot" and those that do not.

Indeed, the district court's only justification for its approach was the unremarkable observation that some internet communications remain within the scope of the claims. Appx19 (citing Appx6444 ¶ 35). But simply because some of the patent's embodiments fall within a construction is no reason to exclude others expressly described. *E.g.*, *Verizon*, 503 F.3d at 1305. After all, a patentee "is free to choose a broad term and expect to obtain the full scope" of its meaning. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012). And here, the court's construction improperly excludes embodiments that the court acknowledges the claims must cover.

**i. The district court's constructions conflict with this Court's construction of "received back channel."**

This Court held "back channel" and "received back channel" refer to the same element, just at two different points in time. *Comcast*, 838 F. App'x at 554. It did so because "the specification treats the 'back channel' and 'received back channel' as interchangeable." *Id.* Thus, the Court construed "received back channel" as "merely the 'back channel' after being received." *Id.* The "received back channel" and "back channel" are thus structurally the same. *Id.*

The district court's constructions disregard this holding. The court construed "received back channel" as "*data* received via the back channel." Appx20 (emphasis added). Construing "received back channel" as data makes sense. Comcast agreed.

Appx8208. Receiving a channel means receiving data. Appx19-20; Appx8208. Yet for "back channel," the district court construed it to refer to "*a fixed band of frequencies or time slots*." Appx19 (emphasis added). In other words, "received back channel" is "data" (Appx20), but "back channel" is a *physical channel* having specific frequency or time slot requirements (Appx19). This Court rejected such disparate constructions. *Comcast*, 838 F. App'x at 554.

The district court's construction of "speech channels" (Appx20-21) further highlights the flaws with its constructions. *See infra*. Under this construction, the "back channel" is a fixed band of frequencies or time slots (Appx19), which is then converted to data upon receipt (the "received back channel") (Appx20) only to be converted back to a fixed frequency or time slot after the data is partitioned (e.g., to create "speech channels" in claim 27) (Appx21). Nothing in the intrinsic record requires a conversion from fixed frequencies or time slots to data, and back into a fixed frequency or time slot.

**j. The correct construction of "back channel" is "stream of communications transmitted upstream from set-top boxes."**

The proper construction of "back channel" is a "stream of communications transmitted upstream from set-top boxes." The parties agree that the back channel refers to communications sent upstream from the set-top boxes. Appx18 n.13; Appx3529. Nothing in the intrinsic record justifies a construction that excludes

using dynamic frequencies, dynamic time slots, or some other protocol altogether. *Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."). As detailed above, the specification describes a flexible architecture that may be implemented over a variety of networks using a variety of protocols, so long as the communications from the users can reach the speech recognition system in the network. Or, as stated by the UK Patents Court after review of the written description, "the invention is indifferent to the specific type of network or physical cabling." Appx7775 ¶ 139. It was error for the district court to limit the claimed "back channel" to only those streams formatted as "a fixed band of frequencies or time slot(s)" absent express lexicography or disavowal. *Thorner*, 669 F.3d at 1367.

### 2. The '196 patent uses "speech channels" to refer to a stream of communications that include speech information and does not require a fixed frequency or time slot.

#### a. Claim language: "Speech channels" from multiple user sites are processed to create "speech content."

According to the claims, "speech channels" from multiple user sites are (a) associated with a specific user site and (b) sent over a network to the speech recognition system. Appx89, claim 53 (the "speech recognition system is provided [the] multiplicity of received identified speech channels based upon a received back

channel at [the] wireline node from a multiplicity of user sites coupled to [the] network"). "[S]peech channels" are then processed to create "speech content." *Id.* ("processing a multiplicity of received identified speech channels to create a multiplicity of identified speech content"). Nothing in the claim language limits "speech channel" to a single band of frequencies or a designated time slot.

Some claims, such as claim 1, recite that the "speech channels" are formed by "partitioning" the "received back channel." Appx85-86. Other claims, such as claim 53, do not require partitioning. Appx89. Claim 53, for example, requires providing the speech recognition system with speech channels "based upon" a received back channel. Appx89.

As with "back channel," the language of the disputed element nowhere refers to a frequency band or a time slot.

#### b. Specification: "Speech channels" may be sent as a packet-based, Ethernet-compatible data stream.

The specification describes speech channels as data streams. For example, the '196 patent describes capturing a user's speech command, such as through a remote control with a push-to-talk button, and sending it to a speech recognition system. Appx65, 10:22-32. The speech command may travel "in the form of a data stream containing speech and address information" that "may be Ethernet compatible." Appx66, 12:45-56.

Consistent with this broad disclosure, the specification embraces flexibility in how speech data may be sent. For example, the speech commands "may be preprocessed" before being sent. Appx65, 10:54-61. This preprocessing may take several forms, such as encryption, compression, or other conversion. *Id.* Nor must this optional preprocessing occur at a specific location. Appx65-66, 10:62-11:11 (explaining how preprocessing may occur at a remote control or set-top box).

Additionally, the specification describes that the speech data can be sent using any efficient transmission protocol. *See, e.g.*, Appx66, 11:51-59 (set-top boxes "capable of sending and receiving speech data using efficient data transmission protocols"). The specification leaves the choice of protocol as a design choice. Other embodiments transmit speech information to the speech recognition system as "a series of packets," "digital speech packets," or as "digital speech signals." Appx63, 5:46-48; Appx66, 12:45-56; Appx67, 14:12-32.

Nothing in the specification mandates sending speech data in a specific format, using a specific protocol, as an assigned frequency, or in a designated time slot. Rather, the specification describes a flexible architecture that accommodates multiple types of network architectures supporting a variety of protocols. *See, e.g.*, Appx67, 14:22-32 (disclosing embodiments where the speech data is sent as speech packets).

### c. The district court erroneously limited "speech channels" based on a teaching in the incorporated '874 application.

The district court construed "multiplicity of received identified speech channels" as "multiple different channels carrying speech data, with each channel assigned to a particular user site." Appx21. The district court further construed "channel" as "a single band of frequencies or designated time slot(s) for transmitting signals." Appx21. For the construction of channel, the district court gave two reasons for its construction. Appx20-21. Neither withstands scrutiny.

*First*, the district court relied on the same reasoning it provided for limiting "back channel" to fixed frequencies or time slots, stating Promptu "yet again tries to render the word 'channel' meaningless." Appx20. Without providing any citation to the intrinsic record, the district court held Promptu's construction "extend[s] far beyond what is intended by the specification." Appx20-21. But as explained above, Promptu's construction does not render "channel" meaningless. Rather, it gives it a construction consistent with how it is used in the specification to simply refer to a stream of communications—in this case, speech data. *See supra.*

Moreover, the district court's construction of "channel" in "speech channels" is inconsistent with its construction of "channel" in "back channel." Despite incorrectly holding that a "back channel" requires a "fixed band of frequencies or time slots" (Appx19), the district court required a "speech channel" to instead reflect

a "single band of frequencies or designated time slot(s)" (Appx21). In other words, a "channel" means a "fixed band of frequencies" for a back channel, but a "single band" for a speech channel. Appx19; Appx21. These disparate constructions violate the presumption that the same patent term generally receives the same meaning. *E.g.*, *Phillips*, 415 F.3d at 1314 ("[C]laim terms are normally used consistently throughout [a] patent . . . ."); *In re Varma*, 816 F.3d 1352, 1363-65 (Fed. Cir. 2016) ("The principle that the same phrase in different claims of the same patent should have the same meaning is a strong one . . . ."); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323-24, 1331 (Fed. Cir. 2009) (finding error when a district court applied a different claim construction than the one in its claim construction order).

To the extent Comcast objects that the "channels" are different due to the "back" and "speech" prefixes, this just confirms Promptu's argument on the impropriety of construing "channel" in isolation. *See supra*; *Intel*, 21 F.4th at 791-92 ("[I]t is not always appropriate to break down a phrase and give it an interpretation that is merely the sum of its parts."); *ClearOne*, 35 F.4th at 1350-51 (improper to construe individual words of a phrase "in isolation").

*Second*, the district court then referred to a "portioning scheme" described in a related patent application that was incorporated by reference in the '196 patent, U.S. Patent App. No. 09/664,874. Appx21. The district court's terse decision appears to have adopted Comcast's argument concerning the '874 application. The '874

application is titled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems." Appx6898-6929. And while it teaches sending speech data using assigned transmission channels and time slots, this teaching should not limit the claims of the '196 patent for several reasons.

First, the '196 patent does not mandate the use of the invention described in the '874 application. The '874 application is referenced seven times in the '196 patent.[1] The first is in the priority chain. Appx61, 1:14-16. The remaining references describe embodiments that *may* use the invention described in the '874 application. *See, e.g.*, Appx74, 27:48-54, 27:66-28:7, 28:12-16, 28:37-44, 28:61-65; Appx75, 29:8-12. "May" does not mean "must." Consistent, permissive language "makes clear the patentee did not intend . . . to define [the term]." *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1349 (Fed. Cir. 2020); *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1343 (Fed. Cir. 2020); *see also, e.g.*, *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1150-51 (Fed. Cir. 2003) (explaining how the word "may" provides "open-ended examples [that] . . . are merely illustrative; that is, they do not exhaustively delineate the [term] that is clearly defined in the claims"). This is especially so when the alleged definition appears in an incorporated

---

[1] The first instance (Appx61, 1:14-16) gets the application number correct. The remaining six instances get the title correct but have a typo in the application number. *See, e.g.*, Appx74, 27:48-54 (referring to "Ser. No. 09/679,115").

reference, not the '196 patent. *E.g.*, *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 (Fed. Cir. 2013) (declining to import a definition from an incorporated reference because that definition "does not necessarily reflect how a person of ordinary skill in the art would understand the disputed term in the context of the [incorporating] patent"); *see also LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1374 (Fed. Cir. 2006); *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1373 (Fed. Cir. 2020) (declining to import descriptions from incorporated references into the claims). The '196 patent exhibits no intent to incorporate a specific partitioning scheme into the claims. It was thus improper for the district court to limit the claimed speech channels to an exemplary partitioning scheme from an incorporated disclosure.

Second, the '874 application describes a different invention for improving Aloha-based systems. *See, e.g.*, Appx6898. But the '196 patent uses a variety of different protocols and network configurations. *See supra*. It is not limited to "Aloha-based frequency hopping transmission systems." *See, e.g.*, Appx66, 11:51-59 (referring to embodiments using the DOCSIS protocol).

Further, a skilled artisan would understand that the '196 patent uses "partitioning" broadly to include any technique to divide a communication channel into identifiable portions. Comcast's expert agreed during the IPR proceedings involving the '196 patent:

> Because neither the claims nor the specification specifically describe or limit the term "partitioning" to any particular approach or technique, it is my opinion that a person of ordinary skill in the art would understand the phrase "partitioning said received back channel" broadly to include any technique used to divide a communication channel into identifiable portions.

Appx8694 (quoting Appx7997-7998 ¶ 87). The Patent Office agreed with Comcast's expert and held partitioning means demultiplexing. Appx8695 (citing Appx8035). This is now part of the intrinsic record for the '196 patent. *E.g.*, *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359-61 (Fed. Cir. 2017). Principles of judicial estoppel preclude Comcast from seeking its narrow definition of this term after it sought and obtained a broad construction of the term before the Patent Office. *NortonLifeLock*, 2019 WL 7040931, at *3-6 ("Principles of judicial estoppel also caution against allowing [defendant] to argue for its narrow definition of the disputed term after it prevailed when arguing for a broad construction of the term before the PTAB . . . ."). It would be unfair for Comcast to establish this element in the prior art based on a broad construction, only to seek a narrow construction to avoid infringement.

Finally, even if the only type of partitioning described is that in the '874 application (it is not), that would not warrant a narrow construction of this term. It is inappropriate to limit a term based on the preferred embodiments even if "the only embodiments, or all of the embodiments, contain a particular limitation." *Thorner*,

669 F.3d at 1366 ("We do not read limitations from the specification into claims; we do not redefine words.").

#### d. The correct construction of "multiplicity of received identified speech channels" is "plurality of streams of communications received by a speech processing system or engine identified as originating from specific user sites."

For the reasons stated above, the district court erred when it limited "speech channels" to require "a single band of frequencies or designated time slot(s)." Appx21. Nothing in the intrinsic record expresses an intent to limit the invention based on how speech data is formatted. Rather, the specification describes a flexible architecture that may be implemented over a variety of networks using a variety of protocols. Accordingly, the proper construction of "multiplicity of received identified speech channels" is "plurality of streams of communications received by a speech processing system or engine identified as originating from specific user sites."

### B. The '196 patent uses the phrase "speech recognition system coupled to a wireline node" to refer to a speech recognition system in communication with a wired network node.

The district court made three errors when construing this term. First, it limited "speech recognition system" to systems that only "primarily" perform speech recognition. It excluded all other systems. Second, it construed "coupled to" as "in or near." And third, it construed "wireline node" as "centralized wireline node,"

despite the absence of the "centralized" qualifier in the claims. These constructions contradict the claims' plain language, the intrinsic record, and this Court's construction of the same patent. The district court's construction should be reversed.

**1. A "speech recognition system" can perform functions other than recognizing speech.**

**a. Claim language: "speech recognition system" is "a system that performs speech recognition."**

The meaning of "speech recognition" and "system" are readily understood and their scope is not in dispute. *See* Appx7511-7512 (both parties' proposed constructions include these terms). The dispute is whether the "speech recognition system" may perform other tasks in addition to "speech recognition."

The claim language bears on this in two ways. First, every claim of the '196 patent uses the transition word "comprising," indicating that the claimed systems and methods are met even if unclaimed elements are present. *See* Appx85-90. Second, claim 53 recites a method for operating "at least part of a speech recognition system," indicating that unclaimed parts of the "speech recognition system" exist that may perform steps not mandated by claim 53. Appx89.

**b. Specification: The speech recognition system need only perform some speech recognition processing tasks and may perform tasks unrelated to speech recognition processing.**

The specification describes several embodiments illustrating that the speech recognition system can perform other tasks and may be distributed across multiple

computers. For example, Figure 10 depicts an embodiment performing speech recognition based on multiple speech channels received over a back channel:




Appx35; *see also* Appx71, 22:8-15, 22:43-63. The specification describes embodiments of the "speech processing system" that perform these steps (Appx71, 22:14-15); others that perform only steps 2022 and 2032 (Appx71, 22:43-45); others that perform "at least some of the operations of FIG. 10" (Appx80, 39:56-61); and others that perform the operations depicted in Figure 10 plus other operations (Appx75, 30:8-9, 30:30-31). The speech recognition system may include multiple computers (Appx71, 22:52-53 ("The speech processing system may include at least

one computer.”)), and the functionality may be distributed across multiple computers (Appx80, 40:42-46 (“At least one computer contained in speech processor computer network . . . performs at least some of the operations of Fig. 10 . . . .”)). Other embodiments, such as the AgileTV™ engine, perform unrelated functions such as executing an internet browser, decomposing the browser view, processing MPEG streams, and facilitating frequency conversions. Appx85, 50:38-41.

Nothing restricts what else the speech recognition system can do.

#### c. The district court erroneously construed “speech recognition system” as a term of degree.

The district court’s construction of “speech recognition system” transforms it from an open-ended system into a closed one with subjective bounds. According to the court, the term covers only systems that “primarily” perform speech recognition, excluding those that “perform[] other functions.” Appx16. There are at least two errors in this construction.

First, it needlessly injects a subjective term of degree—“primarily”—into an otherwise clear claim. Rather than cover any system that performs speech recognition, the court’s construction limits the system to those “primarily” performing these functions. Appx16. This Court generally refuses to construe terms as implicating terms of degree when they do not use adverbs or graduated language. *See, e.g.*, *ClearOne*, 35 F.4th at 1351 (refusing to construe “self-similar” as a term

of degree when it had an established meaning); *Thorner*, 669 F.3d at 1369 (declining to construe "flexible" as "noticeably flexed with ease"). Here, "speech recognition system" has no language of degree. The court erred by construing it as though it did.

Second, by excluding systems that "perform[] other functions," the district court effectively rewrote the claimed "comprising" transition into "consisting of." Claims 14, 27, and 53 each use the transition word "comprising." *See* Appx86, 52:67; Appx88, 55:10, 55:14; Appx89, 58:14. This transition "creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) (citation omitted); *see also, e.g.*, *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1352 (Fed. Cir. 2017) ("Because 'comprise' is inclusive or open-ended, the use of the term does not exclude unrecited elements."). The court's construction violates this axiom. It expressly excludes "larger systems that . . . perform speech recognition" just because they "perform[] other functions" in addition to speech recognition. Appx16. This restriction is inappropriate for claims using the "comprising" formulation. The court should not have ignored this drafting choice.

**d. The proper construction of "speech recognition system" is "a system that performs speech recognition."**

The proper construction of "speech recognition system" is consistent with the plain language used to claim it: "a system that performs speech recognition." Nothing in the intrinsic record indicates an intent to exclude large systems that, in addition to performing speech recognition processing, also perform other tasks. *Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

**2. The '196 patent describes various couplings, indicating that "coupled to," without modification, simply permits network communications.**

**a. Claim language: The claims use "coupled to" to refer to a distinct component, not one located "at" or within a different component.**

The '196 patent describes a speech recognition system accessible to multiple users over a network. The invention "comprises a multi-user control system for audio visual devices that incorporates a speech recognition system that is centrally located in or near a wireline node[,] . . . a server farm[,] a web-site hosting facility, or a network gateway." Appx63, 5:11-17. Nothing in the intrinsic record further confines where, within the network, the speech recognition system must be located.

As noted by this Court's prior decision in the related appeal involving this patent, the claims fall into two buckets—those reciting "a speech processing system *at* a wireline node" (such as claim 1 (emphasis added)) and those reciting "a speech recognition system *coupled to* a wireline node" (such as claims 14, 27, and 53 (emphasis added)). This Court held that by separately reciting "speech recognition system" and "wireline node" and by using the word "coupled," claims 14, 27, and 53 cover embodiments where the "'speech recognition system' is distinct from the 'wireline node'" and that these are "distinct components." *Comcast*, 838 F. App'x at 553. Claims 14, 27, and 53 thus cover embodiments of the "speech recognition system" that are not in the wireline node, but those that are merely coupled to (i.e., in communication with) it. *See id.*

**b. Specification: The '196 patent describes many different couplings.**

The '196 patent uses "couplings" to refer to communications pathways as shown in Figure 1:




Appx26; *see, e.g.*, Appx61, 2:15-36 (describing "couplings" between the boxes to permit communications between the boxes); Appx62, 4:25-47 (same with respect to Fig. 2). The specification uses the term "coupling" irrespective of the particular communications protocol used. *See, e.g.*, Appx85, 50:26-28 ("The methodology using these innovations provides a remarkably large amount of computing resources coupling to almost any communications protocol."). Coupling may be wired or wireless and may include bidirectional communications. Appx65-66, 10:64-11:3 ("Coupling 1002 may use a wireline or wireless physical transport."). These couplings depict that the boxes can communicate with one another over the network.

The patent discloses many types of couplings, many preceded with a modifier including the following examples: "hierarchically coupled," "tightly coupled," "downlink coupling," "uplink coupling," "accessibly coupled," "communicatively coupled," "directly communicatively coupled," "locally coupled," "distinctly coupled," "input coupling," and "output coupling." *See, e.g.*, Appx61, 2:15; Appx64, 7:24, 7:36, 8:27, 8:48-49; Appx65, 9:59-62, 10:19-21; Appx71, 21:21; Appx74, 27:20; Appx75, 30:13-14, 30:61-64; Appx79, 38:52-54. The specification uses "coupled" to refer both to direct and indirect coupling. Appx65, 9:59-62 ("[A] server farm refers to a collection of at least two server components communicatively coupled to one another. The server components may or may not all be directly communicatively coupled to each other."). Thus, "coupling" without a modifier must be broader than each of these modified versions of "coupling." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("[M]odifiers will not be added to broad terms standing alone.").

**c. The district court's construction of "coupled" contradicts this Court's prior construction and improperly imports a proximity requirement.**

The record does not support the district court's construction of "coupled to" as "in or near." Appx17-18. Neither preposition is appropriate.

As for *in*, this Court has already rejected such a construction. In the prior appeal, this Court construed "coupled to" as excluding arrangements where the "speech

recognition system" resides "in" a wireline node. *Comcast*, 838 F. App'x at 553. It did so even under the "broadest reasonable" interpretation standard—a standard more permissive than the one applicable here. *Id.* To the Court, "coupled to" requires the "'speech recognition system' and 'wireline node' [to] be distinct elements." *Id.* The district court's construction flouts this ruling, permitting the speech recognition to sit "in" the wireline node. Appx17-18.

Nor is there any support for the district court's construction of "coupled to" as *near*. "Near" is a term of degree. *See, e.g.*, *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1290-91 (Fed. Cir. 2017). "Coupled to" is not. The district court should not have interpreted a simple structural phrase as implicating an amorphous "nearness" requirement. *See, e.g.*, *Thorner*, 669 F.3d at 1369; *Crystal*, 246 F.3d at 1348. Instead, the plain meaning of "coupled to" is "connected to" or "in communication with." *E.g.*, Appx7513-7514; *see also Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1378 (Fed. Cir. 2021). This connection may be direct or indirect. *See Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1270 (Fed. Cir. 2010); *see also, e.g.*, *Johnson*, 175 F.3d at 992 (explaining how "coupled" is a "broad and general term" but does not "lack[] clarity"). Nothing about "coupled to" requires nearness.

The district court likely concluded "coupled to a wireline node" means "in or near a wireline node" given this passage in the specification:

> The invention comprises a multi-user control system for audio visual devices that incorporates a speech recognition system that is centrally located in or near a wireline node, and which may include a Cable Television (CATV) Head-end. The speech recognition system may also be centrally located in or near a server farm[,] a web-site hosting facility, or a network gateway.

Appx63, 5:11-17. But such a conclusion ignores that each of the other alternative locations (e.g., CATV Head-end, server farm, web-site hosting facility, network gateway) are themselves network nodes that may be connected to the network by a wire. By reciting "coupled to a wireline node" in the claims, Promptu intended to cover these embodiments too. The above passage does not recite "coupled." Nor does it redefine "coupled." Yet, when Promptu drafted its claims, it used "coupled," not near, to claim its invention.

Indeed, the '196 patent uses "coupled" to describe a variety of different connections. *See supra*. "[V]aried use of a disputed term in the written description attests to the breadth of a term rather than providing a limiting definition." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308-09 (Fed. Cir. 2003); *see also Johnson*, 175 F.3d at 991. And when the claims wanted to recite the location of the wireline node, they did so expressly. Appx89, claim 44 ("wherein said wireline node is located proximate to a node"), claim 45 ("wherein said wireline node is located proximate to a Headend"), claim 46 ("wherein said wireline node is located proximate to a central office"). The district court thus erred when it narrowly

defined a broad term with an inapplicable word plucked from an exemplary embodiment.

#### d. The correct construction of "coupled to" is "in communication with."

The term "coupled to" should be construed consistent with its full scope, as it is used in the '196 patent, to denote that two elements can communicate with one another, such as over a network. *Thorner*, 669 F.3d at 1367.

### 3. The '196 patent uses "wireline node" to refer to a wired node in a network.

The '196 patent uses the term "wireline node" to refer to a wired node in a network. The plain language of the term "wireline node" is just that, a "node connected by a wire, as opposed to a wireless connection."

The district court construed this two-word phrase as a twenty-three-word sentence. Appx16. To do so, the court first construed "wireline node" as a specific type of wireline node expressly defined in the specification: "*centralized* wireline node." Appx16 (emphasis added). The district court then imported the definition for the latter into the claims. Appx16.

The district court erred when it implicitly construed "wireline node" as a "centralized wireline node." The claims do not recite a "centralized" wireline node. They recite a "wireline node," expressly omitting the *centralized* qualifier. *E.g.*, Appx85, 50:64-65; Appx86, 52:66; Appx88, 55:11.

It is improper to import a definition for a qualified term into a claim that does not include the qualifier. *See, e.g.*, *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1369-70 (Fed. Cir. 2003) (refusing to apply a definition for "completely amorphous" to "amorphous" when the latter had no such "qualification[]"); *Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1328-29 (Fed. Cir. 2001) (refusing to define "preferred codon" as the "most preferred codon" via lexicography). "[M]odifiers will not be added to broad terms standing alone." *Johnson*, 175 F.3d at 989; *see also Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 865-66 (Fed. Cir. 1997) ("slide plates" need not be "linear" slide plates); *Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 621-22 (Fed. Cir. 1995). Doing so impermissibly renders the qualifier superfluous. *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) (explaining how it is "highly disfavored" to render words superfluous).

Had the patentees wanted to claim a "centralized" wireline node, they "could have . . . included this limitation in the claims themselves." *Mycogen*, 243 F.3d at 1328-29. They knew how to do so in the written description. Appx61, 1:66-2:2. They knew how to use "centralized" in claims of other patents. *See, e.g.*, Appx104, 13:37, 13:51, 14:37, 14:52; Appx105, 15:5, 16:3. But they did not do so for the claimed "wireline node" of the '196 patent. *E.g.*, Appx85, 50:64-65; Appx86, 52:66; Appx88, 55:11. The district court should have heeded that choice. *Mycogen*, 243

F.3d at 1328-29; *see also AstraZeneca AB v. Mylan Pharms. Inc.*, 19 F.4th 1325, 1333-34 (Fed. Cir. 2021) (declining to insert an "about" qualifier when the patentee "knew how to claim ranges or describe numbers with approximation" but did not do so in the claims); *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1116-17 (Fed. Cir. 2011) (refusing to construe "one" as "only one" when the patent used "only one" elsewhere).

The correct construction of "wireline node" is "node connected by a wire as opposed to a wireless connection." The term "wireline node" should be construed consistent with its usage in the specification to refer to a wired node in a network. Had the patentee intended to limit its claims to a "centralized wireline node," as that term was separately defined in the specification, it knew exactly how to claim it. Indeed, nothing in the specification requires that the speech recognition system must be "coupled to" a node that provides video or cable television delivery to multiple users over the same wire (as required by the district court's construction). *See, e.g.*, Appx63, 5:11-17.

### C. A remand is warranted.

Each claim of the '196 patent recites the channel terms: "back channel" and "multiplicity of received identified speech channels." Appx85-90. Independent claims 14, 27, and 53 each recite "speech recognition system coupled to a wireline

node." Appx86-89. Based on the court's constructions of these terms, Promptu stipulated to noninfringement. Appx9530.

If this Court revises the district court's construction of the channel terms or "speech recognition system coupled to a wireline node," this Court should vacate the judgment regarding the '196 patent and remand for further proceedings.

## III. The proper construction of "centralized processing station" in the '538 patent warrants a remand.

The '538 patent describes "a centralized voice command processing system" serving multiple users. Appx98, 1:59-63. Some embodiments are claimed by reference to a specific location (head-end unit), whereas others are location-agnostic (centralized processing station). Moreover, some embodiments specify the component that must "process" the voice command, whereas others specify the component that applies voice recognition. *Compare* Appx102, claim 1 ("processing said voice command at said head-end unit"), *with* Appx102, claim 2 (no similar requirement) *and* Appx104, claim 34 ("applying voice recognition"). Despite these differences, the district court construed "central[ized] processing station" as a "device at a cable-TV network head-end unit that receives and performs voice recognition on voice commands, and generates and returns instructions to set-top boxes to carry out the commands." Appx12. This construction improperly conflates these concepts and reduces them to their lowest common denominator.

### A. The ’538 patent uses “centralized processing station” without regard to its physical location.

#### 1. Claim language: “centralized processing station” is not defined by its physical location other than it being a “processing station” that is “centralized.”

The language used to claim this element is a “processing station” modified by the term “centralized.” This language does not specify where this element must be located or what kind of “processing” can (or cannot) be performed by it.

Claim differentiation reflects that the “centralized processing station” is both different and broader than “head-end unit.” The doctrine of “claim differentiation” is “based on the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.” *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). “[D]ifferent claim terms are presumed to have different meanings.” *MicroStrategy Inc. v. Bus. Objects Ams.*, 238 F. App’x 605, 609 (Fed. Cir. 2007) (citing *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)).

Here, independent claims 2 and 19 recite “voice recognition processing at a cable television head-end unit” (Appx102-103), whereas independent claims 34 and 40 recite a “centralized processing station” that “appl[ies] voice recognition” (Appx104). Thus, it is presumed that “head-end unit” and “centralized processing station” have different meanings and scope. By their plain language, “head-end

unit" is narrower, as it bears some relation to the location of a specific component, a "head end." By contrast, a "centralized processing station" is broader and defined by its functionality of being "centralized" with respect to a multitude of users. *See, e.g.*, Appx99, 4:17-24 ("The central processing station is designed to handle a multitude of voice command inputs from a multitude of cable television users."); Appx104 (claim 34 reciting "a centralized processing station configured to receive and process second output from a multitude of television set top boxes"); Appx104 (claim 40, similar).

**2. Specification: An embodiment where a "centralized processing station" is located at a head-end unit does not amount to lexicography.**

The '538 patent describes an embodiment of a centralized processing station located at a head-end unit: "The voice command is then transmitted, for example, to a central processing station located at a cable television head-end unit." Appx98, 2:29-32. But this passage is exemplary, not definitional. *Id.* ("for example"). Nor should the claims be limited to this embodiment even if it were the only embodiment where the location of the centralized processing station is described. *Thorner*, 669 F.3d at 1366 ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation.").

### 3. The district court erred by construing "centralized processing station" as limited to a "head end."

The district court construed "centralized processing station" in the '538 patent as being limited to a "head end." Appx10-11. There are two problems with this construction.

First, it violates claim differentiation. Different claim terms are presumed to have different meanings. *E.g.*, *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 431 (Fed. Cir. 2016) (citing *Bd. of Regents of Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008)) (declining to construe "data channel" as "data feed"). Here, claims 34 and 40 recite a "centralized processing station." Appx104, 13:51, 14:52. By contrast, claims 1, 18, and 19 recite a "head-end unit." Appx102, 9:21; Appx103, 11:27, 11:57. Had Promptu wanted to limit claims 34 and 40 to a "head-end" embodiment, it knew how to do so. It did not. The district court should not have rewritten the claim and ignored this drafting choice. *See Mycogen*, 243 F.3d at 1328-29; *AstraZeneca*, 19 F.4th at 1333-34; *IGT*, 659 F.3d at 1116-17.

Second, the district court's construction conflicts with the specification. The patent explains how voice commands can be "transmitted, *for example*, to a central processing station located at a cable television head-end unit." Appx98, 2:29-35 (emphasis added). Using such permissive, exemplary language "makes clear the patentee did not intend this excerpt of the written description to define [the term]."

*Baxalta*, 972 F.3d at 1349; *see also Personalized Media*, 952 F.3d at 1343 (declining to limit a term to passages in the specification when "[t]hey are not definitional; instead, they are merely illustrations that use open-ended, permissive phrases such as . . . 'for example'").

The district court's only justification is that "for example" here makes the *transmission* optional, not the location of the centralized processing station. Appx10-11. Nothing supports such an interpretation. The transmission of voice commands to a remote location is not optional. It is a fundamental requirement of the patent. Moreover, the rest of the paragraph explains what happens after the transmission. *See* Appx98, 2:35-39. This entire description becomes superfluous under the court's reading. *Id.* The patent does not describe what the set-top box might do other than sending it, nor does it explain how else the centralized processing station might receive the voice command. *Id.* The court had no basis to take a passage from the specification with exemplary language and use it as a definition. *Baxalta*, 972 F.3d at 1349; *Personalized Media*, 952 F.3d at 1343. This is so even if the cited passage were the only example described in the specification. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014); *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372-73 (Fed. Cir. 2014).

#### 4. The district court erred by rewriting "applying" as "performing" when the claims treat the two words differently.

Finally, the district court erred by construing "*applying* voice recognition" to mean "*perform[ing]* voice recognition." Appx11-12 (emphases added). "Apply" and "perform" are different words. The '538 patent uses the verb "perform" throughout other claims. *See, e.g.*, Appx102, 9:39, 9:60, 10:10, 10:58, 10:62; Appx103, 11:15, 12:27; Appx104, 13:25; Appx105, 15:9, 15:13, 16:11. Once again, Promptu did not do so for the centralized processing station of claims 34 and 40. The court improperly ignored these differences. *SimpleAir*, 820 F.3d at 431.

The sole support for the court's construction was a vague allusion to "the overall purpose of the patent." Appx11-12. This reliance is misplaced. While a patent's purpose may help shed light on the *meaning* of certain terms, "*limit[ing]* claim scope based on the purpose of the invention[ ] . . . is impermissible." *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 832 (Fed. Cir. 2003) (emphasis added); *see also E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention. Rather, the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution.").

Nor does the patent's alleged "purpose" mandate the district court's construction. Even if the centralized processing station sends voice commands elsewhere to be interpreted, the purpose of recognizing speech remote from a user remains fulfilled. Nothing in the claims or specification *requires* the centralized processing station to perform this task instead of another system. So long as the voice recognition occurs, the claims fulfill their purpose. *See* Appx98, 1:14-17.

#### 5. The proper construction of "centralized processing station" is not restricted by a location at a "head-end unit" and need not "perform" voice recognition.

This term should be given the full scope of its plain meaning, which is a "portion of a cable television system at which voice commands are received and command functions are transmitted." The problem with the prior art was performing speech recognition processing locally, on a user's device. The solution described and claimed in the '538 patent involves processing the user's speech remotely. *See, e.g.*, Appx99, 4:17-23. Embodiments describing a "centralized processing station" place no restriction on where, other than remote from the user, the actual speech recognition is performed.

### B. A remand is warranted.

Claims 34 and 40 of the '538 patent recite "centralized processing station." Appx104. Based on the court's constructions of this term, Promptu stipulated to noninfringement. Appx9530. If this Court revises the district court's construction

of this term, this Court should vacate the court's judgment regarding claims 34 and 40 of the '538 patent and remand for further proceedings.

## CONCLUSION

The district court's construction of the "channel" terms, "speech recognition system coupled to a wireline node," and "centralized processing station" served as the basis for its entry of final judgment. If this Court revises those constructions, this Court should vacate the district court's judgment and remand for further proceedings under the revised constructions.

Date: October 20, 2022

Respectfully submitted,

/s/ *Jacob Schroeder*

Jacob Schroeder
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, CA 94304
(650) 849-6600

J. Michael Jakes
Christopher T. Blackford
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Benjamin R. Schlesinger
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
271 17th Street, NW, Suite 1400
Atlanta, GA 30363
(404) 653-6400

*Counsel for Appellant*
*Promptu Systems Corporation*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PROMPTU SYSTEMS CORPORATION | : | CIVIL ACTION |
| | : | |
| v. | : | No. 16-6516 |
| | : | |
| COMCAST CORPORATIONS, et al. | : | |

**ORDER**

AND NOW, on this 12th day of May, 2022, upon consideration of extensive briefing by the parties, the June 4, 2018 Claim Construction Hearing, the February 24 and 25, 2022 Supplemental Claim Construction Hearing, and subsequent modified proposals, it is hereby ORDERED that the Court construes the following claim terms of the following patents: (1) U.S. Patent No. 7,260,538 ('538 Patent); and (2) U.S. Patent No. 7,047,196 ('196 Patent)[1].

An appropriate Memorandum regarding the below constructions will issue within 30 days.

| | CONTESTED TERMS FOR CONSTRUCTION | |
|---|---|---|
| **CLAIM TERM** | **Usage** | **COURT'S CONSTRUCTION** |
| "Head-end unit" | '538 Patent (Claims 2 and 19) | A unit located at a cable-TV distribution facility that processes and delivers cable-TV signals to subscribers. |
| "central/centralized processing station" | '538 Patent (Claims 34 and 40) | Conversion of a user's speech into computer text or other representation of the contents of the speech. |
| "Voice recognition [processing]" | '538 Patent (Claims 19, 34 and 40) | Interpreting the user's voice signal to determine the user's command. |
| "[set-top-box-/controller-compatible] command function" | '538 (Claims 2, 19)<br>'538 (Claims 34, 40) | Command or instruction processed by and directing the set top box to execute the user's request, as opposed to only causing or leading to fulfillment of the user's request. |

[1] The parties agreed on the construction of the term "speech recognition engine" in RE 44,326. "Speech recognition engine" is constructed as "hardware and/or software used to identify spoken words."

| | | |
|---|---|---|
| and "[set-top-box-/means-compatible instruction][2] | | |
| "back channel" | '196 (Claims 1, 2, 14, 27, 28, 53) | A fixed band of frequencies or time slot(s) for transmitting signals to a speech processing system or engine. |
| "received back channel" | '196 (Claims 1, 2, 14, 27, 28, 53) | Data received via the back channel. |
| "Multiplicity of received identified speech channels" | '196 (Claims 1, 2, 13, 14, 15, 27, 28, 53, 54, 62) | Multiple different channels carrying speech data, with each channel assigned to a particular user site.<br><br>Furthermore, the Court constructs the term "channel" as: a single band of frequencies or a designated time slot for transmitting signals. |
| "Speech Recognition system coupled to a wireline node" | '196 (Claims 14, 27, 53) | The Court construes the term "Speech recognition system" as: "a system whose function is speech recognition."<br><br>The Court construes the term "coupled to" as: connected in or near.<br><br>The Court construes the term "wireline node" as: a network node providing video or cable television delivery to multiple users using a wireline physical transport between those users at the node. |

BY THE COURT:

/s/ Juan R. Sánchez ____________
Juan R. Sánchez, C.J.

[2] The Federal Circuit, the PTAB, and the parties all construed the claim terms "controller-compatible command function" in claim 2, "set-top-box-compatible command function" in claim 19, "set-top-box-compatible instruction" in claim 34, and "set-top-box-means-compatible instruction" in claim 40 interchangeably and the same way. We do so as well.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PROMPTU SYSTEMS CORPORATION | : | CIVIL ACTION |
| | : | |
| v. | : | No. 16-6516 |
| | : | |
| COMCAST CORPORATION, et al. | : | |

**ORDER**

AND NOW, this 19th day of May, 2022, the May 12, 2022, Order (ECF No. 299) is AMENDED insofar as the Court's construction of "central/centralized processing station" is corrected to read as follows:

| | CONTESTED TERMS FOR CONSTRUCTION | |
|---|---|---|
| **CLAIM TERM** | **USAGE** | **COURT'S CONSTRUCTION** |
| "central/centralized processing station" | '538 Patent (Claims 34 and 40) | Device at a cable-TV network head-end unit that receives and performs voice recognition on voice commands, and generates and returns instructions to set-top boxes to carry out the commands. |

The Court's May 12, 2022, Order shall remain in effect in all other respects.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PROMPTU SYSTEMS CORPORATION | : | |
| | : | CIVIL ACTION |
| v. | : | No. 16-6516 |
| | : | |
| COMCAST CORPORATION, et al. | : | |

## MEMORANDUM

**Chief Judge Juan R. Sánchez** **June 10, 2022**

Plaintiff Promptu Systems Corporation ("Promptu") brought this patent infringement suit against Defendants Comcast Corporation and Comcast Cable Communications, LLC ("Comcast"), for infringing three of its patents, all of which relate to different aspects of voice recognition technology, along with several other state law claims. Promptu claims Comcast infringed the patents-in-suit—U.S. Patent Nos. 7,260,538 ('538 Patent); 7,047,196 ('196 Patent); and RE 44,326—by manufacturing, using, selling, offering for sale and/or importation in the United States various devices, including remotes, set-top boxes, receivers or other equipment capable of receiving and enabling the processing of voice commands to generate content on a Comcast cable subscriber's television or other content-receiving device. Promptu also asserts Comcast's products, methods and systems as they relate to voice recognition technology and as implemented in services and content offered by Comcast in its XFINITY and its X1 Entertainment Operating Systems further infringed its patents-in-suit.

**LEGAL STANDARD**

"[T]he ultimate question of the proper construction of the patent [is] a question of law." *Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 135 S. Ct. 831, 837-38 (2015). While "there is no magic formula or catechism for conducting claim construction," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted) there are a number of "statutes and policies that inform patent law" and appropriate sources to which the Court can give weight when construing the claims. Nonetheless, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marcos's Società' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

"[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."[1] *Phillips.*, 415 F.3d at 1312–13. There are two exceptions to this rule: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Outside of these two exceptions, the claim words are given the ordinary and customary meaning they would have to a POSITA at the time of filing. *Phillips*, 415 F.3d at 1312-13.

---

[1] The abbreviated term "POSITA" will be used going forward to signify a person of ordinary skill in the art at the time the patent application is filed.

While "the claims themselves provide substantial guidance as to the meaning of particular terms," context is important. *Id.* at 1314. After all, "the ordinary meaning of a claim term is its meaning to the ordinary artisan *after reading the entire patent*." *Id.* at 1321 (internal quotation marks omitted) (emphasis added). In cases where the meaning of a claim term is not obvious, the court should consider intrinsic evidence, including "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," as well as extrinsic evidence "concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (internal citations and quotation marks omitted).

"Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Extrinsic evidence is less reliable than intrinsic evidence, in part because "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318-19.[2] As a result, the Federal Circuit has cautioned "extrinsic evidence . . . is unlikely to result in a reliable

[2] As discussed herein, the standard applied by the PTAB during Inter Pares Review and Covered Business Method proceedings is the "broadest reasonable construction standard." The federal district courts do not use this standard. As such, a federal district court can of course construe the claim terms more narrowly than the PTAB. *Skyhawks Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016).

interpretation of patent claim scope unless considered in the context of the intrinsic evidence."[3] *Phillips*, 415 F.3d at 1319.

**DISPUTED CLAIM TERMS**[4]

**A. The '538 Patent**

The '538 patent is titled "Method and Apparatus for Voice Control of a Television Control Device" and it describes an improvement to prior art voice recognition systems which "require a sophisticated voice recognition system in close proximity to the user" by employing a "centralized voice command processing system [that] services a multitude of users" at a "head-end unit" or "central processing station" at the head-end in a cable network. Pl.'s Ex. 1 at 1:59-63, 2:29-36, 4:7-23. There are a number of disputed terms, and the Court will address the construction of each in turn.

[3] Both Promptu and Comcast have submitted extensive expert declarations in support of their proposed claim constructions (including declarations in support of each parties' constructions in 2018, supplemental declarations in support of a party's response claim construction briefs, and declarations in support of each party's 2022 constructions). The Court has considered the declarations, in which the experts offer their competing opinions as to how a person of ordinary skill in the art would understand the disputed claim terms in the context of the patents. Because the experts' use of the intrinsic record to support their opinions is also reflected in the briefing, and considering the reliability of extrinsic versus intrinsic evidence, the declarations are cited only sparingly herein.

[4] The Court has reviewed the briefing from the parties' original and supplemental opening claim construction briefs. Most citations are to the supplemental opening claim construction briefs because some of the proposed constructions have changed over time, and the later briefing contains more accurate information regarding the IPR proceedings and Federal Circuit appeal.

**1. Head-end Unit**

The term "head-end unit" appears in asserted claims 2 and 19.[5] Both parties have proffered exceedingly different proposed constructions.[6] Promptu's proposed construction is a "component of a cable system that is upstream from a head-end receiver for providing voice recognition services."[7] Comcast's proposed construction is "a unit located at a cable-TV distribution facility that processes and delivers cable-TV signals to subscribers."[8] The Court will adopt Comcast's proposed construction.

In support of its construction, Promptu argues "head-end unit" is not interchangeable with "head end," as used in the specification and claims, and asserts that even *if* they were used interchangeably, Comcast's construction reads out embodiments and is inconsistent with the usage within the patent itself. Pl.'s Supp. Constr. Br. 12. The Court disagrees. Reading the entirety of the '538 patent, it seems "head-end" and "head-end unit" are used interchangeably, as exemplified in Figure 2, which identifies block 460 as a "head end" and, in the specification,

---

[5] For this term and other disputed terms discussed herein, the Court has carefully reviewed each claim where the term is utilized. For the sake of brevity, the claims are not transposed herein.

[6] Both parties are in agreement that there is no lexicography—the '538 patent does not define "head-end unit."

[7] This is Promptu's modified proposed construction from the 2022 claim construction hearing. The proposal was filed on the docket on February 28, 2022. *See* ECF No. 287-2. Promptu notes its proposed construction has changed since the prior briefing, largely because of the record that developed at the Patent Office during the IPR proceedings, which "reveals that "head end unit" has a narrower definition than Promptu's previous proposal." Pl.'s Resp. Claim Constr. Br. 10.

[8] This is Comcast's proposed modification to construction from the 2022 claim construction hearing. The proposal was filed on the docket on March 2, 2022. *See* ECF No. 288-2. During the 2022 Claim Construction Hearing, Comcast also proposed a modified construction to acknowledge: (1) the "same head-end facility can have more than one head-end unit" and (2) "the claimed head-end unit need not be the thing at that head-end facility that actually does the TV distribution." ECF No. 290, 5:1-15.

refers to the same block as a "head end unit" at 4:26 and 4:61, and as a "head end" at 2:39 and 5:45. Construing the two interchangeably, the plain meaning, in the context of the patent, controls. See *InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("The plain meaning of claim language ordinarily controls unless the patentee acts as his own lexicographer and provides a special definition for a particular claim term."). As a result, the Court must construe the term "according to the understanding of a person of ordinary skill in the art ("POSITA") as of the earliest filing date (2002)." Defs.' Supp. Claim Constr. Br. 3; Schmandt ¶¶ 58, 64.

Promptu attempts to argue its construction falls in line with the '538 patent's centralization of speech processing to avoid needing "costly" and "sophisticated" voice recognition systems located at each user's site. Pl.'s Ex. 11 ¶ 43; Pl.'s Supp. Constr. Br. 12. While that is indeed the purpose of the patent, Promptu's proposed definition is over broad. By defining "head-end unit" so broadly, the construction could capture *any* components upstream from the head-end receiver—something that contradicts the purpose of the patent and extends far beyond what the specification envisioned.

Additionally, Promptu's definition contradicts the very definition Promptu took during the IPR. During the IPR, Promptu "distinguished the '538 claims from prior art that disclosed "processing a voice command at a 'remote server,'" and argued this was "not enough to suggest a head end unit[] because a remote server is not necessarily a 'cable head-end server.'" Defs.' Supp. Claim Constr. Br. 4; Defs.' Ex. 16 at 23.

Promptu's previous counsel argued the court should infer there was an error by the patentees regarding the use of the terms. That argument was unlikely at best given Promptu's

failure to request a correction of the patent. Now, Promptu argues the Court should recognize Figure 2 is imprecise and not particularly detailed, and thus assume block 460 includes components not shown. This also does not receive support from the majority of the intrinsic evidence. Comcast's definition hews more closely to the established meaning of "head-end" without ignoring the term "unit," and avoids the over-broadness of Promptu's construction.

Accordingly, the Court will construe "head-end unit" to be "a unit located at a cable-TV distribution facility that processes and delivers cable-TV signals to subscribers."

2. **Central[ized] Processing Station**

The term "central[ized] processing station" appears in asserted claims 34 and 40. Promptu's proposed construction is a "portion of a cable television system at which voice commands are received and command functions are transmitted." Comcast's proposed construction is a "device at a cable-TV network head-end unit that receives and performs voice recognition on voice commands, and generates and returns instructions to set-top boxes to carry out the commands." In sum, the parties disagree both functionally and structurally about "centralized processing system." The Court will adopt Comcast's proposed construction.

Structurally, the parties dispute where the "central[ized] processing station" is located. The court finds it is located at the head end unit. This is supported by the patent itself, which states "the voice command is then transmitted, *for example*, to a central processing station located at a cable television head-end unit. A computer at the cable head-end unit processes the voice command for voice command recognition." '538 at 2:30-35 (emphasis added); *see also* '538 Patent at 2:29-33, 4:7-9, 4:17-23; Defs.'s Ex. 15 at 134:11-23, 135:23-136:1. Based on the structure of the sentence, the phrase "for example" applies not to the location of the centralized

processing station, (as Promptu argues) but to the "transmission" of the voice command. Defs.'s Resp. Supp. Claim Constr. Br. 4.

Promptu's argument regarding claim differentiation is also incorrect. It is true that "different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *See* Pl.'s Supp. Claim Constr. Br. 13 (quoting *Karlin Tech, Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). This presumption is not irrefutable, and is not stronger than the scope of the specification and intrinsic evidence.[9] As Comcast points out, "claim differentiation cannot broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). Here, Claims 2 and 19 use the term "head-end unit" but do not mention "centralized processing station" while claims 34 and 40 provide for a "centralized processing station" which "appl[ies] voice recognition," but do not utilize the term "head-end-unit." Pl.'s Ex. 8 at 4:17-24; Schmandt Decl. ¶ 79 n. 9. Based on the claims, elements, and specification, the terms are at the same location.

Functionally, the parties' dispute is focused on the difference between "apply voice recognition" and "perform voice recognition." When read in the context of claim 34, the term *applying*, as used in the claim, cannot mean simply "processing them by sending them to a different component to perform voice recognition processing." Pl.'s Resp. Supp. Claim Constr.

---

[9] This is evidenced in part by the Federal Circuit, PTAB, this Court, and the party's understanding that (1) "controller-compatible command function" in claim 2; (2) "set-top-box-compatible command function" in claim 19; (3) "set-top-box-compatible instruction" in claim 34; (4) "set-top-box- means-compatible instruction" in claim 40 are interchangeable.

Br. 13. To interpret it as such would ignore the overall purpose of the patent, which includes a voice command being transmitted to a cable head-end unit for voice and word recognition processing" and the claims themselves. *See* '538 abstract; *id.* at 13:53-56 (claim 34); 14:54-57 (claim 40).

The Court construes "central[ized] processing station" as a "device at a cable-TV network head-end unit that receives and performs voice recognition on voice commands, and generates and returns instructions to set-top boxes to carry out the commands."

**3. Voice Recognition [processing]**

The term "voice recognition [processing]" appears in asserted claims 2, 19, 34, 40. Promptu's proposed construction is "understanding by a computer of a spoken utterance." Comcast's modified proposed construction is "interpreting the user's voice signal to determine the user's command."[10] The Court will adopt Comcast's modified proposed construction.

The parties dispute is minimal. At the 2022 Claim Construction Hearing, Promptu acknowledged that while conversion (which was a term in Comcast's original proposed construction) was not required, "what's important is . . . that what was spoken is u*nderstood or comprehended*. That's what's important and that's what voice recognition is all about." Claim Constr. Hrg. Day 1, ECF No. 289, 130:21-24 (emphasis added). In its briefing, Promptu also noted: "[w]hile some conversion may occur, the user's intent must be understood as part of that processing so that a "command function" or "instruction" can be derived and sent back to the user's device."

---

[10] This is Comcast's proposed modification to construction from the 2022 claim construction hearing. The proposal was filed on the docket on March 2, 2022. *See* ECF No. 288-2.

During the 2022 Claim Construction Hearing, Comcast's counsel noted that they were not necessarily opposed to Promptu's proposal but were wary of the word "understanding" because it was not precise. Claim Constr. Hrg. Day 1, ECF No. 289, 138:8-12. Comcast also noted, if "it's clear to the Court that understanding . . . means there has to be some interpretation of the spoken request, some understanding and some translation into the version that the set-top box understands . . . . [t]hen I think we have substantive agreement." Claim Constr. Hrg. Day 1, ECF 289, 137:20-25, 138:1-7. "Voice recognition processing, which is the claim term, requires recognition." Claim Constr. Hrg. Day 1, ECF No. 289, 138:6-7.

The intrinsic evidence does not support the pass-through functionality that could be included in "understanding" nor the limitations implied in "conversion." The Court will define "voice recognition [processing] as "interpreting the user's voice signal to determine the user's command."

**4. "[Set-top-box-/controller-compatible] command function" and "[set-top-box-/ means-compatible] instruction"**[11]

The terms "[set-top-box-/controller-compatible] command function" and "[set-top-box-/ means-compatible] instruction" appear in asserted claims 2, 19, 34, and 40. Promptu's proposed construction is: 1) "set-top-box . . . compatible" should be given its plain and ordinary meaning, no construction necessary; and 2) "command function"/"instruction" means "a function commanding an action to be taken." Comcast's proposed construction, on the other hand, is a "command or instruction processed by and directing the set-top box to execute the user's request,

---

[11] The Federal Circuit, the Parties, and the PTAB all treated "controller-compatible command function" in claim 2, set-top-box-compatible command function in claim 19, set-top-box-compatible instruction in claim 34, and set-top-box-means-compatible instruction in claim 40 as interchangeable. This Court will do the same.

as opposed to only causing or leading to fulfillment of the user's request." Based on the evidence, the Court will adopt Comcast's proposed construction.

Promptu argues its construction matches the Federal Circuit's previous decision, where "[t]he Federal Circuit affirmed the [PTAB]'s decision, holding the "plain language" of this term in light of the patent is a "function[] that commands an action to be taken." Pl.'s Supp. Claim Constr.Br. 15 (citing *Comcast Cable Commc'ns v. Promptu Sys.*, 838 F. App'x 555, 556-57 (Fed. Cir. 2021). While Promptu acknowledges this construction was under the "broadest reasonable interpretation," Promptu nonetheless asserts the Federal Circuit's construction was based on the claim's plain language and specification, which is what the court must consider here.

Interestingly, Comcast *also* alleges its construction is supported by the Federal Circuit, which "explained that when a function is "performed upon the satisfaction of a condition, *e.g.,* when A happens, then do B," "A is not a command to perform B" even if "B is performed as a result of A occurring."" Defs.'s Supp. Claim Constr. Br. 6 (quoting *Comcast Commc'ns, LLC v. Promptu Sys.*, 838 F. App'x 555, 557 (Fed. Cir. 2021)). Comcast also asserts its construction is supported by intrinsic evidence because it: (1) excludes the three prior-art examples mentioned by the PTAB from the term "command function" because "they do not involve "directing the set-top-box to execute the user's request, as opposed to only causing or leading to fulfillment of the user's request"; (2) requires the command function actually be "processed by" set-top-boxes, as the patent claims and specifications allegedly require the set-top box to "perform" or "execute"

the command functions; and (3) requires that the set-top box processes command functions "to execute the user's requests." Defs.'s Supp. Claim Constr. Br. 6-7.[12]

Both parties claim the Federal Circuit's IPR decision supports their respective proposed constructions. The Court has carefully reviewed *Comcast Cable Commc'ns LLC v. Promptu Sys. Corp.*, 838 F. App'x 555 557 (Fed. Cir. 2021) and finds that Comcast's proposal sufficiently excludes the prior art examples and avoids inclusion of functions which should be excluded under the Federal Circuit's reasoning, while Promptu's proposal could include those examples. The term therefore is construed to mean "command or instruction processed by and directing the set-top box to execute the user's request as opposed to only causing or leading to fulfillment of the user's request."

**B. The '196 Patent**

**1. "Speech recognition system coupled to a wireline node."**

The term "speech recognition system coupled to a wireline node" appears in asserted claims 14, 27, and 53. Promptu's proposed construction is: 1) "speech recognition system" should be given its plain and ordinary meaning, which is "a system that performs speech recognition functions;" 2) "coupled to" means "in communication with;" and 3) "wireline node" means a "node connected by a wire, as opposed to a wireless connection." In contrast, Comcast's proposed construction is: 1) "speech recognition system" means "a system directed to speech

[12] In support of (1), Comcast cites to Schmandt ¶¶ 84, 88-91; Defs.' Ex. 18 (IPR2018-00340 Decision) at 27-36; Defs.' Ex. 19 (IPR2018-00341 Decision) at 21-30; Defs.' Ex. 16 ((IPR2018-00340 Resp.) at 28-29; Defs.'s Ex. 17 (IPR2018-00341 Resp.) at 30). In support of (2), Comcast cites to Schmandt ¶¶ 86, 93; '536 at 9:60 (claim 2); 12:13 (claim 19); 13:61 (claim 34); 14:63 (claim 40); 2:35-39 ("set-top-box performs the command function); 4:19-23 ("where the command is then performed").

recognition;" 2) "coupled to" means "connected in or near;" and 3) "wireline node" means "a network node providing video or cable television delivery to multiple users using a wireline physical transport between those users at the node."

Regarding the construction of "speech recognition system," Promptu's construction is too broad. Figure 23 shows a "speech engine" as object 1130, and discusses in Figure 29 how the speech engine has a "speech processor computer" with gateways, interfaces, and a memory to support the speech recognition function. '196 at 37:55-38:47; 30:4-9, 34:10-15. Promptu's proposed construction would sweep in larger systems that ancillarily perform speech recognition, while primarily performing other functions. This is not in line with the intrinsic evidence. The Court therefore construes "speech recognition system" as "a system whose function is speech recognition." This construction is similar to Comcast's proposal, but uses "whose function is" instead of "directed to" for increased clarity.

The parties also disagree about how "wireline node" should be construed. The crux of the dispute is whether "wireline node" should be equated to "centralized wireline node," the latter of which is defined in the specification, (*see* Pl.'s Ex. 1 at 1:66-2:2), but not used in the claims. "Wireline node" is a shorthand for "centralized wireline node." There is no other reason for the inclusion of a definition for a term ("centralized wireline node") never used in the patent. Thus, there is lexicography. To give meaning to the definition of "centralized wireline node," and based on the usage of the term itself, the Court will construe "wireline node" to mean "a network node providing video or cable television delivery to multiple users using a wireline physical transport between those users at the node."

Lastly, the parties dispute the construction of the term "coupled to" in the context of a speech recognition system "coupled to" a wireline node. In support of its construction, Promptu argues that the patent provides for "speech recognition services to a collection of users over a network that supports cable television and/or video delivery," and is comprised of a control system for audio visual devices that "incorporates a speech recognition system that is centrally located in or near a wireline node[,] . . . a server farm[,] a web-site hosting facility or a network gateway." Pl.'s Exh. 1 at 5:3-5; 5:11-17; s*ee also* Pl.'s Supp. Claim Constr. Br. 9. As a result, Promptu concludes that the claims involving "coupled to" are focused on implementations of the speech recognition system that are not at, but merely "coupled to" (i.e. in communication with) the wireline node. Pl.'s Supp. Claim Constr. Br. 9; Ex. 11 ¶ 76.

However, Promptu ignores that this portion of the specification still requires the speech recognition system to be "centrally located in or near" the different locations. Promptu's argument also ignores the fact that despite the specification, the claims themselves *only* contemplate the speech recognition system being coupled to the wireline node—not to the server farm, web-site hosting facility, or a network gateway. Furthermore, the Federal Circuit's opinion also provides for "coupled to" to mean in *or* near, but not to entirely read out the proximity requirement. *Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp*., 838 F. App'x 551, 553 (Fed. Cir. 2021) ("While the '196 patent's written description contains an embodiment where a speech recognition system is "in" a wireline node, it also describes an embodiment with a speech recognition system "near" a wireline node. *See* '196 patent at 5:11–15."). However, the weight of the intrinsic evidence, including the abstract, the specification, and the claims, indicates some degree of proximity is required. *See* '196 patent at 5:12-13, 18:20-23, 18:24-30, 5:11-18.

Promptu's proposal is simply over broad. The court will construe "coupled to" to mean "in or near."

**2. "Back channel"**

The term "back channel" appears in claims 1, 2, 14, 27, 28. Promptu's proposed construction is a "stream of communications transmitted upstream from set-top boxes." Comcast's proposed construction is "a fixed band of frequencies or time slot(s) for transmitting signals to a speech processing system or engine."

The parties agree the "back channel" flows upstream.[13] The crux of the dispute between the parties, however, is whether the term "channel" refers to a stream of communications (as Promptu proposes), or an actual channel (as Comcast proposes). Promptu's definition would eliminate the meaning of the word channel, and lacks sufficient intrinsic evidence to support it. "[A] back channel is a known concept in the field: it is a "channel"—whether defined by frequencies or time slots—to send data upstream." Defs.'s Supp. Claim Constr. Br. 13; *see also* ECF No. 104 at 12-13; ECF No. 119 at 8-14. "Channels in a communication path are the equivalent of lanes on a road: subdividing the path into channels/lanes allows traffic to flow more efficiently." Schmandt ¶ 108. The intrinsic evidence does not support rendering the word "channel" utterly meaningless, nor does it support "back channel" being the stream of communications itself.

---

[13] According to Promptu, the "[p]lain meaning of back channel refers to communications in the reverse, or non-standard, direction." Pl.'s Claim Constr. Br. 3; Pls. Exh. 11 ¶¶ 54-68. Comcast agrees that "the asserted claims make clear that the "back channel" flows upstream." Defs.'s Resp. Claim Constr. Br. 11.

Furthermore, Promptu's argument regarding DOCSIS misses the mark. As support for its proposed construction, Promptu points out how the patent "describes a back channel embodiment implemented using packet-based communications over the internet using DOCSIS cable modems," and alleges Comcast's construction would exclude this embodiment. Pl.'s Claim Constr. Br. 4; Pl.'s Exh. 1 at 11:51-59, 14:5-11, 14:22-32; *see also* Pl.'s Exh. 1 at 5:46-48, 12:45-56, 14:22-32. But DOCSIS *can* use different frequency bands for different data. Schmandt Decl. ¶35. Comcast's proposed construction does not exclude the use of DOCSIS.

Read in the context of the patent, the court will construe the term "back channel" as "a fixed band of frequencies or time slots for transmitting signals to a speech processing system or engine."

**3. "Received back channel"**

The term "received back channel" appears in claims 1, 2, 14, 27, 28, and 53. Promptu's proposed construction is "a back channel that has been received." Comcast's proposed construction is "data received via the back channel." The Court will adopt Comcast's proposed construction.[14]

Here too, Comcast's construction and Promptu's are not truly substantively different. The difference in phrasing between the constructions exists solely after Comcast changed their

---

[14] Promptu argues that when the Federal Circuit analyzed the plain language of the '196 patent using the "broadest reasonable interpretation" standard, the Federal Circuit held a "received back channel" refers to "a 'back channel that has been received.'" Pl.'s Supp. Claim Constr. Br. 5 (quoting *Comcast Cable Commc'ns v. Promptu Sys.*, 838 F. App'x 551, 554 (Fed. Cir. 2021). Despite the different standard applied by the Federal Circuit, Promptu urges this Court to adopt the Construction, as 1) the Federal Circuit stated nothing in the plain language forecloses such a construction/the written description does not narrow the plain language, and 2) under a theory of judicial estoppel. Pl.'s Supp. Claim Constr. Br. 5-6 (quoting *Comcast Cable Commc'ns v. Promptu Sys.*, 838 F. App'x 551, 554 (Fed. Cir. 2021).

definition, allegedly to "accommodate Promptu's argument that receiving a channel means receiving the data transmitted on a channel." Despite this change, both parties' proposed constructions have negligible substantive difference. However, having construed "back channel" as a channel, instead of as a "stream of communications," the Court will construe "received back channel" as "data received via the back channel" for clarity.

**4. "Multiplicity of received identified speech channels"**

The term "multiplicity of received identified speech channels" appears in claims 1, 2, 13, 14, 15, 17, 27, 28, 53, 54, 62. Promptu's proposed construction is a "plurality of streams of communications received by a speech processing system or engine identified as originating from specific user sites." Comcast's proposed construction is "multiple channels carrying speech data, with each channel assigned to a particular user site." Comcast would also define "channel" as "a band of frequencies or a designated time slot of transmitting signals." The Court will adopt Comcast's proposed construction.

The heart of the dispute here is the construction of the term "speech channel." Promptu argues that the term "speech channel" has a plain meaning "that refers to a stream of data regardless of the protocol." Pl.'s Supp. Claim Constr. Br. 6-7; Pl.'s Ex. 11 ¶¶ 69-72. In support of this meaning, Promptu points to a particular embodiment in the '196 patent, which shows digital speech packets sent upstream that "may be in the form of a data stream containing speech and address information" which is "ethernet compatible" (*see* Ex. 1 at 5:46-48, 12:45-56, 14:22-32). Promptu is incorrect, as its proposal yet again tries to render the word "channel" meaningless and apply it to the stream of data itself, instead of an actual channel. This Court

cannot adopt Promptu's proposal, which construes the term so broadly it could extend far beyond what is intended by the specification.

The '196 patent also necessitates dividing the back channel into a "multiplicity of received identified speech channels" and such "multiplicity of received identified speech channels" is from a "multiplicity of user sites." '196 at 41:3-4 (claim 1), 55:17-19 (claim 27), 50:62-64 (claim 1), 53:7-10 (claim 14), 55:11-13 and 55:1-19 (claim 27), 58:21-24 (claim 53)). While this portioning scheme is not discussed extensively in the '196 patent, it is discussed in U.S. App. No. 09/664,874 (the '874 application) which is incorporated by reference. Def's. Supp. Claim Constr. Br. 15; U.S. App. No. 09/664,874.

The Court construes "multiplicity of received identified speech channels" to mean "multiple different channels carrying speech data, with each channel assigned to a particular user site" and the term "channel" to mean "a single band of frequencies or designated time slot(s) for transmitting signals."

**CONCLUSION**

Accordingly, the above terms are construed as discussed in the previously issued Order on May 12, 2022.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PROMPTU SYSTEMS CORPORATION | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. 16-6516 |
| COMCAST CORPORATION and COMCAST CABLE COMMUNICATIONS, LLC | : | |

**ORDER**

AND NOW, this 16th day of June, 2022, upon consideration of the parties' June 13, 2022 Joint Stipulation of Dismissal and for Entry of Final Judgment on Promptu's First and Second Claims for Relief, the Court hereby acknowledges:

1. Promptu's Amended Complaint pled Eight Claims for Relief. ECF No. 30.
2. On June 7, 2022, this Court dismissed with prejudice Promptu's Fourth Claim for Relief. ECF No. 311.
3. On June 13, 2022, the parties stipulated to the dismissal with prejudice of Promptu's Third and Fifth through Eighth Claims for Relief.
4. Promptu requests, and Comcast does not oppose, entry of final judgment on Promptu's First and Second Claims for Relief on the basis of non-infringement by the Comcast Defendants under the Claim Construction Order issued on May 12, 2022 and clarified on May 19, 2022 (ECF Nos. 299 & 301).

WHEREFORE, having considered the foregoing, it is hereby ORDERED:

1. Counts 3, 5, 6, 7 and 8 of the Amended Complaint are DISMISSED with prejudice.
2. The Clerk of Court is DIRECTED to enter final judgment for Comcast and against Promptu on Counts 1 and 2.
3. The parties shall each bear their own attorneys' fees and costs.
4. The Clerk of Court is DIRECTED to mark the case as closed.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

US007047196B2

(12) **United States Patent**
**Calderone et al.**

(10) **Patent No.: US 7,047,196 B2**
(45) **Date of Patent: May 16, 2006**

(54) **SYSTEM AND METHOD OF VOICE RECOGNITION NEAR A WIRELINE NODE OF A NETWORK SUPPORTING CABLE TELEVISION AND/OR VIDEO DELIVERY**

(75) Inventors: **Theodore Calderone**, San Carlos, CA (US); **Paul M. Cook**, Woodside, CA (US); **Mark J. Foster**, Palo Alto, CA (US)

(73) Assignee: **AgileTV Corporation**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1138 days.

(21) Appl. No.: **09/785,375**

(22) Filed: **Feb. 16, 2001**

(65) **Prior Publication Data**

US 2001/0056350 A1 Dec. 27, 2001

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/708,315, filed on Nov. 7, 2000, now Pat. No. 6,480,703, and a continuation-in-part of application No. 09/679,115, filed on Oct. 4, 2000, and a continuation-in-part of application No. 09/664,874, filed on Sep. 19, 2000, now abandoned, and a continuation-in-part of application No. 09/661,486, filed on Sep. 14, 2000.

(60) Provisional application No. 60/210,440, filed on Jun. 8, 2000.

(51) **Int. Cl.**
***G10L 21/00*** (2006.01)

(52) **U.S. Cl.** .................. **704/270.1**; 704/201; 704/231; 715/719; 715/512; 715/726; 709/217

(58) **Field of Classification Search** ........ 704/270–278, 704/231, 251, 246, 201; 715/719, 512, 513, 715/716, 721, 723, 726, 733; 709/217
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,506,387 A 3/1985 Walter ........................ 455/612

FOREIGN PATENT DOCUMENTS

EP 0 782 337 7/1997 .................... 7/173

(Continued)

OTHER PUBLICATIONS

*ACTV Awarded Three Key Digital Television Patents: Coverage Extended to ACTV's Core Technology for Eliminating Video Switching Delay*; May 8, 2001; PRNewswire.

(Continued)

*Primary Examiner*—Vijay Chawan
(74) *Attorney, Agent, or Firm*—Michael A. Glenn; Glenn Patent Group

(57) **ABSTRACT**

A method and system of speech recognition presented by a back channel from multiple user sites within a network supporting cable television and/or video delivery is disclosed. The preferred embodiment of the invention comprises ans system and method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network that supports at least one of cable television delivery and video delivery. One embodiment of the invention comprises a method having the steps of receiving the back channel to create a received back channel; partitioning the received back channel into a multiplicity of received identified speech channels; processing the multiplicity of received identified speech channels to create a multiplicity of identified speech content; and responding to the identified speech content to create an identified speech content response that is unique, for each of the multiplicity of identified speech contents.

**66 Claims, 35 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| RE32,012 | E | 10/1985 | Pirz et al. | 381/43 |
| 4,633,499 | A | 12/1986 | Nishioka et al. | 381/43 |
| 4,653,045 | A | 3/1987 | Stanley et al. | 370/62 |
| 4,757,541 | A | 7/1988 | Beadles | 381/43 |
| 4,780,906 | A | 10/1988 | Rajasekaran et al. | 381/43 |
| 4,783,809 | A | 11/1988 | Glinski | 381/43 |
| 4,797,910 | A | 1/1989 | Daudelin | 379/67 |
| 4,821,027 | A | 4/1989 | Mallory et al. | 340/521 |
| 4,827,520 | A | 5/1989 | Zeinstra | 381/43 |
| 4,837,830 | A * | 6/1989 | Wrench et al. | 704/238 |
| 4,847,885 | A | 7/1989 | Vittorelli | 379/6 |
| 4,907,079 | A | 3/1990 | Turner et al. | 358/84 |
| 4,931,950 | A | 6/1990 | Isle et al. | 364/513 |
| 4,959,855 | A | 9/1990 | Daudelin | 379/213 |
| 4,972,485 | A | 11/1990 | Dautrich et al. | 381/43 |
| 4,991,217 | A | 2/1991 | Garrett et al. | 381/43 |
| 5,006,987 | A | 4/1991 | Harless | 364/419 |
| 5,125,024 | A | 6/1992 | Gokcen et al. | 379/88 |
| 5,127,003 | A | 6/1992 | Doll, Jr. et al. | 370/110.1 |
| 5,155,760 | A | 10/1992 | Johnson et al. | 379/67 |
| 5,163,083 | A | 11/1992 | Dowden et al. | 379/88 |
| 5,165,095 | A | 11/1992 | Borcherding | 379/88 |
| 5,181,237 | A | 1/1993 | Dowden et al. | 379/88 |
| 5,197,005 | A | 3/1993 | Shwartz et al. | 364/419 |
| 5,199,062 | A | 3/1993 | Von Meister et al. | 379/67 |
| 5,208,848 | A | 5/1993 | Pula | 379/67 |
| 5,220,657 | A * | 6/1993 | Bly et al. | 711/152 |
| 5,231,670 | A | 7/1993 | Goldhor et al. | 381/43 |
| 5,247,347 | A | 9/1993 | Litteral et al. | 358/85 |
| 5,255,305 | A | 10/1993 | Sattar | 379/34 |
| 5,271,088 | A | 12/1993 | Bahler | 395/2 |
| 5,274,560 | A | 12/1993 | LaRue | 364/444 |
| 5,325,421 | A | 6/1994 | Hou et al. | 379/67 |
| 5,329,608 | A | 7/1994 | Bocchieri et al. | 395/2.52 |
| 5,333,237 | A | 7/1994 | Stefanopoulos et al. | 395/12 |
| 5,335,276 | A | 8/1994 | Thompson et al. | 380/21 |
| 5,345,538 | A | 9/1994 | Narayannan et al. | 395/2.84 |
| 5,349,678 | A | 9/1994 | Morris et al. | 395/800 |
| 5,353,336 | A | 10/1994 | Hou et al. | 379/67 |
| 5,369,575 | A | 11/1994 | Lamberti et al. | 364/419.08 |
| 5,386,556 | A | 1/1995 | Hedin et al. | 395/600 |
| 5,434,777 | A | 7/1995 | Luciw | 364/419.13 |
| 5,442,749 | A | 8/1995 | Northcutt et al. | 395/200.09 |
| 5,446,489 | A | 8/1995 | Egendorf | 348/3 |
| 5,475,792 | A | 12/1995 | Stanford et al. | 395/2.42 |
| 5,500,920 | A | 3/1996 | Kupiec | 395/2.79 |
| 5,513,298 | A | 4/1996 | Stanford et al. | 395/2.52 |
| 5,519,608 | A | 5/1996 | Kupiec | 364/419.08 |
| 5,526,034 | A | 6/1996 | Hoarty et al. | 348/7 |
| 5,550,578 | A | 8/1996 | Hoarty et al. | 348/7 |
| 5,553,119 | A | 9/1996 | McAllister et al. | 379/67 |
| 5,564,001 | A | 10/1996 | Lewis | 395/154 |
| 5,566,271 | A | 10/1996 | Tomitsuka et al. | 395/2.84 |
| 5,585,858 | A | 12/1996 | Harper et al. | 348/485 |
| 5,602,963 | A | 2/1997 | Bissonnette et al. | 395/2.84 |
| 5,608,448 | A | 3/1997 | Smoral et al. | 348/7 |
| 5,608,624 | A | 3/1997 | Luciw | 395/794 |
| 5,615,296 | A | 3/1997 | Stanford et al. | 395/2.1 |
| 5,625,814 | A | 4/1997 | Luciw | 395/605 |
| 5,634,086 | A | 5/1997 | Rtischev et al. | 395/2.79 |
| 5,642,519 | A | 6/1997 | Martin | 395/759 |
| 5,664,061 | A | 9/1997 | Andreshak et al. | 704/275 |
| 5,666,400 | A | 9/1997 | McAllister et al. | 379/67 |
| 5,668,929 | A | 9/1997 | Foster, Jr. | 704/273 |
| 5,671,225 | A | 9/1997 | Hooper et al. | 370/468 |
| 5,671,328 | A | 9/1997 | Fitzpatrick et al. | 395/2.55 |
| 5,719,921 | A | 2/1998 | Vysotsky et al. | 379/88 |
| 5,721,827 | A | 2/1998 | Logan et al. | 395/200.47 |
| 5,721,902 | A | 2/1998 | Schultz | 395/604 |
| 5,721,938 | A | 2/1998 | Stuckey | 395/754 |
| 5,726,984 | A | 3/1998 | Kubler et al. | 370/349 |
| 5,729,659 | A | 3/1998 | Potter | 395/2.79 |
| 5,732,216 | A | 3/1998 | Logan et al. | 395/200.33 |
| 5,737,495 | A | 4/1998 | Adams et al. | 395/615 |
| 5,748,841 | A | 5/1998 | Morin et al. | 395/2.66 |
| 5,748,974 | A | 5/1998 | Johnson | 395/759 |
| 5,752,232 | A | 5/1998 | Basore et al. | 704/275 |
| 5,752,246 | A | 5/1998 | Rogers et al. | 707/10 |
| 5,774,525 | A | 6/1998 | Kanevsky et al. | 379/88 |
| 5,774,841 | A | 6/1998 | Salazar et al. | 704/225 |
| 5,774,859 | A | 6/1998 | Houser et al. | 704/275 |
| 5,774,860 | A | 6/1998 | Bayya et al. | 704/275 |
| 5,777,571 | A | 7/1998 | Chuang | 341/176 |
| 5,794,050 | A | 8/1998 | Dahlgren et al. | 395/708 |
| 5,794,205 | A | 8/1998 | Walters et al. | 704/275 |
| 5,802,526 | A | 9/1998 | Fawcett et al. | 707/104 |
| 5,805,775 | A | 9/1998 | Eberman et al. | 395/12 |
| 5,809,471 | A | 9/1998 | Brodsky | 704/275 |
| 5,812,977 | A | 9/1998 | Douglas | 704/275 |
| 5,819,220 | A | 10/1998 | Sarukkai et al. | 704/243 |
| 5,819,225 | A | 10/1998 | Eastwood et al. | 704/275 |
| 5,821,508 | A | 10/1998 | Willard | 235/51 |
| 5,822,727 | A | 10/1998 | Garberg et al. | 701/243 |
| 5,826,267 | A | 10/1998 | McMillan | 707/9 |
| 5,832,063 | A | 11/1998 | Vysotsky et al. | 379/88 |
| 5,832,439 | A | 11/1998 | Cox, Jr. et al. | 704/275 |
| 5,855,002 | A | 12/1998 | Armstrong | 704/270 |
| 5,860,059 | A | 1/1999 | Aust et al. | 704/231 |
| 5,864,815 | A | 1/1999 | Rozak et al. | 704/275 |
| 5,864,819 | A | 1/1999 | De Armas et al. | 704/275 |
| 5,867,817 | A | 2/1999 | Catallo et al. | 704/255 |
| 5,874,939 | A | 2/1999 | Galvin | 345/156 |
| 5,884,265 | A | 3/1999 | Squitteri et al. | 704/275 |
| 5,885,083 | A | 3/1999 | Ferrell | 434/156 |
| 5,890,122 | A | 3/1999 | Van Kleeck et al. | 704/275 |
| 5,890,123 | A | 3/1999 | Brown et al. | 704/275 |
| 5,892,813 | A | 4/1999 | Morin et al. | 379/88.01 |
| 5,893,063 | A | 4/1999 | Loats et al. | 704/275 |
| 5,903,870 | A | 5/1999 | Kaufman | 704/275 |
| 5,915,001 | A | 6/1999 | Uppaluru | 379/88.22 |
| 5,917,891 | A | 6/1999 | Will | 379/88.03 |
| 5,920,841 | A | 7/1999 | Schottmuller et al. | 704/275 |
| 5,923,738 | A | 7/1999 | Cardillo, IV et al. | 379/93.25 |
| 5,929,850 | A | 7/1999 | Broadwin et al. | 345/327 |
| 5,930,341 | A | 7/1999 | Cardillo, IV et al. | 379/93.25 |
| 5,933,835 | A | 8/1999 | Adams et al. | 707/104 |
| 5,937,041 | A | 8/1999 | Cardillo, IV et al. | 379/93.25 |
| 5,946,050 | A | 8/1999 | Wolff | 348/553 |
| 5,953,700 | A | 9/1999 | Kanevsky et al. | 704/246 |
| 5,960,399 | A | 9/1999 | Barclay et al. | 704/270 |
| 5,963,940 | A | 10/1999 | Liddy et al. | 707/5 |
| 5,970,457 | A | 10/1999 | Brant et al. | 704/275 |
| 5,974,385 | A | 10/1999 | Ponting et al. | 704/275 |
| 5,991,365 | A | 11/1999 | Pizano et al. | 379/88.13 |
| 5,991,719 | A | 11/1999 | Yazaki et al. | 704/251 |
| 5,999,970 | A | 12/1999 | Krisbergh et al. | 709/217 |
| 6,003,072 | A | 12/1999 | Gerritsen et al. | 709/218 |
| 6,009,398 | A | 12/1999 | Mueller et al. | 704/275 |
| 6,009,470 | A | 12/1999 | Watkins | 709/231 |
| 6,012,030 | A | 1/2000 | French-St. George et al. | 704/275 |
| 6,018,711 | A | 1/2000 | French-St. George et al. | 704/275 |
| 6,021,371 | A | 2/2000 | Fultz | 701/200 |
| 6,026,388 | A | 2/2000 | Liddy et al. | 707/1 |
| 6,034,678 | A | 3/2000 | Hoarty et al. | 345/327 |
| 6,035,267 | A | 3/2000 | Watanabe et al. | 704/1 |
| 6,035,275 | A | 3/2000 | Brode et al. | 704/275 |
| 6,084,572 | A | 7/2000 | Yaniger et al. | 345/159 |
| 6,100,883 | A | 8/2000 | Hoarty | 345/327 |
| 6,173,279 | B1 | 1/2001 | Levin et al. | 707/5 |
| 6,181,334 | B1 | 1/2001 | Freemen et al. | 345/327 |
| 6,192,338 | B1 | 2/2001 | Haszto et al. | 704/257 |
| 6,198,822 | B1 | 3/2001 | Doyle et al. | 380/210 |

| | | | | |
|---|---|---|---|---|
| 6,204,843 | B1 | 3/2001 | Freemen et al. | 345/327 |
| 6,205,582 | B1 | 3/2001 | Hoarty | 725/93 |
| 6,215,484 | B1 | 4/2001 | Freemen et al. | 345/327 |
| 6,225,976 | B1 | 5/2001 | Yates et al. | 345/156 |
| 6,480,703 | B1 * | 11/2002 | Calderone et al. | 455/118 |
| 6,573,907 | B1 * | 6/2003 | Madrane | 715/719 |
| 6,785,653 | B1 * | 8/2004 | White et al. | 704/270.1 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 98/26595 | 6/1998 | 7/173 |
| WO | 99/30501 | 6/1999 | 7/173 |
| WO | 00/24198 | 4/2000 | 7/173 |

OTHER PUBLICATIONS

*Sprint Begins Voice-Activated E-Mail*; May 23, 1001; Associated Press-New York Times.

John Dowding, Jean Mark Gawron, Doug Appelt, John Bear, Lynn Cherny, Robert Moore, and Douglas Moran; *Gemini: a Natural Language System for Spoken-Language Understanding*.

*Info Wiz: An Animated Voice Interactive Information System*; http://www.ai.sri.com/~oaa/infowiz.html.

Robert Moore, Douglas Appelt, John Dowding, J. Mark Gawron, and Douglas Moran; *Combining Linguistic and Statistical Knowledge Sources in Natural-Language Processing for ATIS*.

Amanda Stent, John Dowding, Jean Mark Gawron, eleizabeth Owen Bratt, and Robert Moore; *The CommandTalk Spoken Dialogue System*.

John Dowding, Elizabeth Owen Bratt and Sharon Goldwater;*Interpreting Language in Context in CommandTalk* Feb. 5, 1999.

Robert Moore, John Dowding, Harry Bratt, J. Mark Gawron, Yonael Gorfu, and Adam Cheyer; *CommandTalk: A Spoken-Language Interface for Battlefield Simulations*; Oct. 23, 1997.

John Dowding, Robert Moore, Francois Andry, and Douglas Moran; *Interleaving Syntax and Semantics in an Efficient Bottom-Up Parser*.

Robert C. Bedichek; *The Meerkat Multicomputer: Tradeoffs in Multicomputer Architecture*; Dissertatioin Given and University of Washington, 1994.

James Karney; *A Sound Proposition Even Early on, There are Already Ways to Voice-enable a Site*; Jan. 15, 2001; Internet World.

Sarah Roberts-Witt; *Talking to the Web*; Jan. 15, 2001; Internet World.

Hand out from SRI International; *Simple Ui to Retrieve Favorites*.

Email dated Jan. 15, 2001; Subject *Fwd: Large Linux Cluster*.

Email: *Cray inc. Announces Plans for Alpha Linux Supercluster System*; Feb. 12, 2001.

Email: *Fwd: Re: One Voice Technologies*; Feb. 15, 2001.

Email: *Fwd: Ars Technica: Inside the KLAT2 Supercomputer—p. 1-*.

53 Page printout from: http://www.ai.sri.com CommandTalk.

Printout: http://www.speech.sri.com/demos/atis.html.

Bruce Meyerson. *Vice Recognition Still Selective*, Jan. 15, 2000, Yahoo! News Alerts.

*Where can I get an inVoca?*, http://invoca.com/home/htm.

*Integrated Audio-Graphics User Interface*., Apr. 1991, IBM Technical Disclosure Bulletin.

Stephanie Miles, *Will Microsoft's next OS run your TV?*, Sep. 5, 2000, Yahoo! Daily News.

* cited by examiner




Fig. 1 Prior Art




Fig. 2 Prior Art



1002
1000
1100
1200
1300
1400
HFCoax OPTICAL NODE
SPEECH RECOGNITION PROCESSOR SYSTEM
3200
HFCoax OPTICAL NODE
3002
1510
ANALOG TELEVISION
3100
DIGITAL TELEVISION
1512
VIDEO ON DEMAND
1514
INTERACTIVE PROGRAM GUIDE
1516
1518
3000
TELEPHONE SERVICES
INTERNET ACCESS


FIG. 3


512 MB
DDR SD-RAM
DUAL 800 MHz
64 BIT CPUs
PCI BRIDGE/
CPU CONTROL
512 MB
DDR SD-RAM
DUAL 800 MHz
64 BIT CPUs
PCI BRIDGE/
CPU CONTROL
512 MB
DDR SD-RAM
DUAL 800 MHz
64 BIT CPUs
PCI BRIDGE/
CPU CONTROL
512 MB
DDR SD-RAM
DUAL 800 MHz
64 BIT CPUs
PCI BRIDGE/
CPU CONTROL
3002
3200

FIG. 4


3100
3002
PCI BRIDGE
512K FLASH BOOT ROM
3110
1510
3130
3132
SCSI II RAID ARRAY DISK CONTROLLER
DUAL 800 MHz CPUs INPUT PROCESOR
512 MB DDR-RAM INPUT BUFFER
512K FLASH BOOT ROM
3120
DUAL 800 MHz CPUs OUTPUT PROCESOR
512 MB DDR-RAM OUTPUT BUFFER
VIDEO/FONT GENERATOR
VIDEO/FONT GENERATOR
VIDEO/FONT GENERATOR
VIDEO/FONT GENERATOR
QAM256 MODULATOR
QAM256 MODULATOR
QAM256 MODULATOR
QAM256 MODULATOR

FIG. 5


3000
RAID
3130
1510
3132
1518
1300
1516
1310
1514
1320
1512
1330
Plex Node 0,0 3110
Plex Node 0,1
Plex Node 0,2
Plex Node 0,3
Plex Node 1,0
Plex Node 1,1
Plex Node 1,2
Plex Node 1,3
Plex Node 2,0
Plex Node 2,1
Plex Node 2,2
Plex Node 2,3
Plex Node 3,0
Plex Node 3,1
Plex Node 3,2
Plex Node 3,3 3120
1400
1410
1420
1430

Fig. 6


3100
RAID
3130
1510
3132
3002
1518
1300
Plex Node 0,0 3110
Plex Node 0,1
Plex Node 0,2
Plex Node 0,3
1516
1310
Plex Node 1,0
Plex Node 1,1
Plex Node 1,2
Plex Node 1,3
1514
1320
Plex Node 2,0
Plex Node 2,1
Plex Node 2,2
Plex Node 2,3
1512
1330
Plex Node 3,0
Plex Node 3,1
Plex Node 3,2
Plex Node 3,3 3120
1400
1410
1420
1430

Fig. 7


3200
1300
1310
1320
1330
Plex Node 0,0
Plex Node 0,1
Plex Node 0,2
Plex Node 0,3
Plex Node 1,0
Plex Node 1,1
Plex Node 1,2
Plex Node 1,3
Plex Node 2,0
Plex Node 2,1
Plex Node 2,2
Plex Node 2,3
Plex Node 3,0
Plex Node 3,1
Plex Node 3,2
Plex Node 3,3
1400
1410
1420
1430
3002

Fig. 8




Fig. 9



2000
Start
2002
2004
receiving back channel to create received back channel
2012
2014
partitioning received back channel into multiplicity of received identified voice channels
2010
2022
2024
processing multiplicity of received identified voice channels to create multiplicity of identified speech content
2020
2032
responding to identified speech content to create identified speech content response, for each of identified speech contents
2030
2034
2008
Exit
2006


Fig. 10




Fig. 11A




Fig. 11B




Fig. 11C


2000
Start
2122
determining associated user site from received identified speech channel
2120
2132
2134
determining associated user site from identified speech content
2130
2142
2144
determining associated user site from identified speech content and speaker identification library
2140
2152
determining associated user site from identified speech content and speech recognition library
2150
2154
2162
determining associated user site from identification within speech channel
2160
2164
2126
Exit
2124

Fig. 12




Fig. 13A




Fig. 13B


Start
2112
2210
2212
assessing speech response to create financial response identified as to user site
2214
2216
displaying financial response to create displayed financial response at user site
2218
2220
confirming displayed financial response from user site to create financial commitment
2222
2224
billing user site based upon financial commitment
2226
2228
Exit

Fig. 14




Fig. 15A




Fig. 15B


Start
2112
2290
2292
assessing speech response based upon identified user to create financial consequence for identified user
2294
2296
displaying financial consequence to create displayed financial consequence at user site
2298
2300
confirming displayed financial consequence from user site based upon identified user to create financial consequence commitment
2302
2304
billing identified user based upon financial consequence commitment
2306
2308
Exit

Fig. 16




Fig. 17B




Fig. 17A




Fig. 18A




Fig. 18B




Fig. 19A




Fig. 19B




Fig. 19C




Fig. 19D




Fig. 20A




Fig. 20B




Fig. 20C



Metropolitan Headend 1410
1408
1402
1406
1404
Headend 100
Headend 1410
Headend 106
1302
1308
Node 120
Node 124
Node 1310
1304
1306
1200
Interface 170
Interface 174
Interface 178
1002-180
176
172
STB 1100-180
1000-180
STB 1100-182
STB 1100-184
STB 1100-190
STB 1100-192
STB 1100-194


Fig. 21


Metropolitan Headend 1410
1408
1402
1406
1404
Headend 100
Headend 1414
Headend 106
1302
1308
Node 120
Node 124
Node 126
1304
1306
1200
Interface 170
176
Interface 174
Interface 178
172
STB 1100-180
STB 1100-190
STB 1100-182
STB 1100-192
STB 1100-184
STB 1100-194

Fig. 22


1310
Content Engine 1340
System Management & Billing 1380
Multiplexor Engine 1360
Modulator Engine 1350
Speech Engine 1330
Transmitter 1324
Transceiver 1320
Receiver 1322
Network interface 1370
1344
1342
1384
1338
1382
1332
1336
1354
1364
1362
1352
1334
1326
1374
1376
1378
1202
1204
1372
1200
1312
1308
1306

Fig. 23


1310
1344
Content Engine 1340
1384
System Management & Billing 1380
1342
1354
1332
1392
1394
1396
Multiplexor Engine 1360
Modulator Engine 1350
Speech Engine 1330
Switch 1390
1364
1362
1352
1334
1398
1376
Transmitter 1324
1202
Transceiver 1320
1204
Receiver 1322
1328
Network interface 1370
1372
1200
1312
1308
1306

Fig. 24




Fig. 25 Prior Art


1414
Content Engine 1440
System Management & Billing 1480
Multiplexor Engine 1460
Modulator Engine 1450
Speech Engine 1430
Transmitter 1424
Transceiver 1420
Receiver 1422
Network interface 1470
1444
1442
1484
1438
1482
1432
1436
1454
1464
1462
1452
1434
1426
1474
1476
1202
1204
1472
1200
1412
1406
1404

Fig. 26


1410
Content Engine 1440
System Management & Billing 1480
Multiplexor Engine 1460
Modulator Engine 1450
Speech Engine 1430
Switch 1490
Transceiver 1420
Transmitter 1424
Receiver 1422
Network interface 1470
1444
1442
1484
1454
1432
1492
1494
1496
1464
1462
1452
1434
1478
1476
1202
1204
1428
1472
1200
1412
1406
1404

Fig. 27




Fig. 28A




Fig. 28B



1330
3200
1312
External gateway 1560
1326
Speech gateway 3100
1332
1334
Modulator interface 1570
1336
1338
Content interface 1574
1382
Secure interface 1578
1374
Speech network gateway 1582
Speech Processor Computer 1520
Memory 1530
Program system 2000
1532
1542
Mass storage 1540


Fig. 29


1330
3200
Speech Processor Computer 1590
memory 1596
2000
2004
2012
2022
2032
1595
1546
1591
1592
1593
1594
1548
Mass storage 1540
1544
1581
1582
1583
1584
Speech Processor Computer 1580
1585
memory 1586
3202
3204
Network gateway 1560
Speech content gateway 3100
3102
memory 3104
3206
3208
Modulator interface 1570
Secure interface 1578
1312
1374
1326
1336
1338
1332
1334
1382

Fig. 30


1430
3200
Speech Processor Computer Network 1650
1676
1652
1654
1656
1658
1678
1642
1644
1646
1648
Mass storage 1670
1674
Speech Processor Computer Network 1640
3202
3204
3206
3208
Network gateway 1610
Speech content gateway 3100
Modulator interface 1620
Secure interface 1630
1412
1474
1426
1436
1438
1432
1434
1482

Fig. 31




Fig. 32A




Fig. 32B Prior Art



1452
1454
Frequency conversion 1710
1762
1862
Amplifier detector 1760
Amplifier detector 1860
1752
1852
LPF2 1750
LPF2 1850
1772
1742
1872
1842
1744
1844
LO2 1770
Mixer2 1740
LO2 1870
Mixer2 1840
1732
1832
BPF1 1730
BPF1 1830
1762
1722
1862
1822
1724
1824
LO1 1760
Mixer1 1720
LO1 1860
Mixer1 1820
1718
1818
LPF1 1716
LPF1 1816
Power level sensor interface 1780
1714
1782
1712


Fig. 33


1452
1454
Frequency conversion 1710
1762
1862
Amplifier detector 1760
Amplifier detector 1860
1752
1852
LPF2 1750
LPF2 1850
1776
1742
1842
Dist2 1774
1744
1844
Mixer2 1740
Mixer2 1840
1772
LO2 1770
1732
1832
BPF1 1730
BPF1 1830
1766
1722
1822
Dist1 1764
1724
1824
Mixer1 1720
Mixer1 1820
1762
LO1 1760
1718
1818
LPF1 1716
LPF1 1816
Power level sensor interface 1780
1712
1714
1708

Fig. 34


9.5
9.4
9.3
9.2
9.1
9.0
CPU 8.0
CPU 8.1
CPU 8.2
CPU 8.3
CPU 8.4
CPU 8.5
CPU 8.6
CPU 8.7
CPU1 0.0 CPU2 0.1
CPU1 0.2 CPU2 0.3
CPU1 0.4 CPU2 0.5
CPU1 0.6 CPU2 0.7
CPU1 1.0 CPU2 1.1
CPU1 1.2 CPU2 1.3
CPU1 1.4 CPU2 1.5
CPU1 1.6 CPU2 1.7
CPU1 2.0 CPU2 2.1
CPU1 2.2 CPU2 2.3
CPU1 2.4 CPU2 2.5
CPU1 2.6 CPU2 2.7
CPU1 3.0 CPU2 3.1
CPU1 3.2 CPU2 3.3
CPU1 3.4 CPU2 3.5
CPU1 3.6 CPU2 3.7
CPU1 4.0 CPU2 4.1
CPU1 4.2 CPU2 4.3
CPU1 4.4 CPU2 4.5
CPU1 4.6 CPU2 4.7
CPU1 5.0 CPU2 5.1
CPU1 5.2 CPU2 5.3
CPU1 5.4 CPU2 5.5
CPU1 5.6 CPU2 5.7
CPU1 6.0 CPU2 6.1
CPU1 6.2 CPU2 6.3
CPU1 6.4 CPU2 6.5
CPU1 6.6 CPU2 6.7
CPU1 7.0 CPU2 7.1
CPU1 7.2 CPU2 7.3
CPU1 7.4 CPU2 7.5
CPU1 7.6 CPU2 7.7

Fig. 35

# SYSTEM AND METHOD OF VOICE RECOGNITION NEAR A WIRELINE NODE OF A NETWORK SUPPORTING CABLE TELEVISION AND/OR VIDEO DELIVERY

This application claims priority from Provisional Patent Application No. 60/210,440, entitled Method and Apparatus for Centralized Voice-Driven Natural Language Processing, filed 8 Jun. 2000.

This application is a continuation in part from application Ser. No. 09/679,115, entitled System and Method of a Multi-dimensional Plex Communication Network, filed 4 Oct. 2000;

Application Ser. No. 09/664,874, entitled Increased Bandwidth In Aloha-Based Frequency-Hopping Transmission Systems, filed 19 Sep. 2000 now Abandoned;

Application Ser. No. 09/661,486, entitled N-way Demultiplexor, filed 14 Sep. 2000; and

Application Ser. No. 09/708,315, entitled Common Carrier, Multiple Output RF Upconverter, filed 7 Nov. 2000 now U.S. Pat. No. 6,480,703.

## BACKGROUND OF THE INVENTION

1. Technical Field

This invention relates to speech recognition performed near a wireline node of a network supporting cable television and/or video delivery.

2. Background Art

Currently, speech operated functions using the latest speech recognition technologies are limited to a handful of applications, such as toys, appliances, some computers, speech dictation, cellular phones, and speech control of one's home. Most of these applications use speech recognition technology running on a computer or speech recognition chip technology. These speech recognition systems typically offer only a limited number of commands and the recognition efficiency is only fair and often require speech training.

There have been numerous patents issued regarding speech recognition. Many apply in a telephone context or other dial-up context such as an Automated Teller machine (ATM), including the following: Rabin, *Voice command control and verification system,* U.S. Pat. No. 6,081,782, issued Jun. 27, 2000, Basore, et al, *Voice activated device and method for providing access ro remotely retrieved data,* U.S. Pat. No. 5,752,232, issued May 12, 1998, and Kowalkowski, et al, *Voice-control integrated field support data communications system for maintenance, repair and emergency services,* U.S. Pat. No. 5,924,069, issued Jul. 13, 1999.

There is, however, another class of speech recognition technology referred to as natural language, which requires state of the art processing software and hundreds of megabytes of RAM to support. Natural language recognition is currently being used in high end systems, such as billing applications for utility companies and the New York Stock Exchange, because of its ability to recognize spoken words from any speech. Some natural language systems claim to be totally user independent and are also capable of recognizing speech in several different languages.

However, the problems of speech recognition at a centralized wireline node in a network supporting video delivery or cable television delivery have not been addressed by such prior art. For the purposes of the discussion herein, a centralized wireline node refers to a network node providing video or cable television delivery to multiple users using a wireline physical transport between those users at the node.



FIG. **1** depicts a typical network as found in a cable television and/or video delivery network employing a Hybrid Fiber-Coaxial (HFC) wiring scheme as disclosed in the prior art.

Each user site contains a Set Top Box, such as STB **180**, coupling to the network through a coaxial cable **172**, which interfaces **170** to a collective coaxial cable **160** which couples to a Node **126**. The interface **170** may include bi-directional signal amplification and possibly further include the filtering and/or frequency shifting of these signals.

The Node **126** is hierarchically coupled **128** to a Headend **104**, which in most cable television networks serves as the source of television programming and other signaling. The signals are sent through the Node **126** and couplings **160-170-172** to provide the STB **180** and others, with the television signaling. In certain large towns and cities, there may be a further hierarchical layer including a Metropolitan Headend **10** coupled **106** to Headend **104**. These higher layers of the network use fiber optics for the physical transport of couplings **102**, **106** and **108**, as well as for **122**, **126** and **128**.

The couplings between STB **180** and Node **126** support bi-directional communication. The couplings between STB **180**, Node **126** and Headend **104** may also support bi-directional communication. Such bi-directional communication allows the STB **180** to receive multiple television channels. This bi-directional communication allows STB **180** to signal at least limited information to the Node **126** and/or the Headend **104**. Such information in either case may support management of Pay-per-View and other services.

User site accounting information usually resides at the highest level of the network, which tends to be either the Headend **104** or Metropolitan Headend **10**.

In cable systems, several downstream data channels that send channel and synchronization information are often transmitted in a previously reserved band of frequencies. They are typically assigned for re-broadcasting FM channels over cable in the United States. Currently, most cable systems reserve some of the 88 to 108 MHz FM spectrum for set-top data transmission. The unused portion of that spectrum are left for barker channels or for additional video channels. The Open Cable Standard requires that the 70 to 130 MHz band be available for what's called Out-of-Band or (OOB) or Downstream transmission.

Most current cable systems use the popular HFC architecture so that the downstream video signals, digital or analog, are sent from the Headend to hubs or nodes via fiberoptic cable. At the receiving side of the node, the optical signal from the fiber gets converted to an electrical signal containing all of the analog, digital video RF carriers and program/service information. This signal, in turn, is amplified and distributed via coaxial cable to the appropriate subscribers connected to the node.

A major design objective for existing cable television set-top boxes was efficient downstream information delivery, i.e. from cable plant to subscriber. Provision for upstream data transmission, i.e. from subscriber to cable plant, is much more restrictive, supporting only limited bandwidth. As new classes of interactive services become available, efficient use of upstream transmission bandwidth grows in importance. For example, if it is necessary to pass

information from the subscriber to the cable headend (also known as the headend), sufficient upstream bandwidth must be made available.

One of the most popular digital set-top boxes, the General Instruments (now Motorola) DCT-2000, is a useful example. When this box was first deployed, upstream transmissions were restricted to user pay-per-view requests, and other simple, infrequent transmissions. As a consequence, the transmission format used for upstream transmissions was not required to be very efficient, and in fact, is not.

In this set-top box, the transmission hardware is capable of selecting twenty different 256K bps channels, each of which uses QPSK transmission coding. While the hardware is capable of frequency-hopping to avoid channels which are subject to interference, the scheme used is fairly static, with typical deployments only using two active upstream communications channels. This leads to an aggregate bandwidth of only 512K bps per cluster of set-top boxes converging in the network to a node, in cable television terms. The cable node typically supports between 500 and 2000 subscribers.

Upstream signals in the 5 to 40 MHz band from each subscriber connected to the node are collected, combined, and then sent to the Headend via either the same fiber used for the downstream video carriers, or a separate fiber.

Furthermore, the transmission control protocol used, referred to as Aloha, is one where an individual set-top box immediately transmits any pending request to the headend, without regard to whether or not the transmission channel is already in use. This transmission is repeated at regular intervals until the box receives an acknowledgement command from the headend, indicating successful receipt of the transmission.

This transmission control protocol is quite inefficient due to the number of collisions which ensue, e.g. simultaneous transmissions from different set-top boxes which interfere with one another, forcing all of the transmitters to repeat their transmissions again. This leads to typical channel utilization on the order of just 30%. As a consequence, the total bandwidth available for upstream transmission per node is only about 30% of 512K bps=~137K bps, on average.

Downstream control data transmission typically occurs in a separate frequency band from the upstream channels.

Typically, HFC networks employ an optical fiber from a central office, or Headend, to a neighborhood node. The fiber has forward and reverse transmission capability, which can alternatively be accommodated on separate fibers. Wavelength Division Multiplexing (WDM) can be used to implement both on a single fiber. At the node, coaxial cable connects the users through a shared frequency division multiplexing (FDM) scheme with contention resolution protocols used to manage upstream data flows.

Such communication schemes having both forward and backward paths, and which may or may not involve a user, are referred to as loops herein. An example of a loop is the communication between Headend **104** and Node **126**. Communication schemes having both forward and backward paths to multiple users are referred to as local loops. An example of a local loop is the communication between Node **126** and user site STBs **180**, **182** and **184**. Note that a loop may be constituted out of optical fiber or out of coaxial cable.

Hybrid-Fiber-Copper (HFCop) networks work in much the same manner, but substitute copper wire(s), often in twisted pairs, for coaxial cable. In such networks a local loop may further be constituted out of optical fiber, coaxial cable or twisted pairs.

Another alternative local loop configuration is commonly known as Switched Digital Video. It is a form of HFC coupling the fiber through a node to each user site with a distinct point-to-point coaxial cable. The node interfaces the user site coaxial cables with the optical fiber through a switch. The switch typically contains a network management unit which manages the switch, connecting the bandwidth service provider with multiple homes, today often in the range of five to 40 homes per switch.

The Synchronous Optical NETwork (SONET) scheme is also applied in the creation of high-speed networks for homes and businesses. This and similar communication schemes may be employed to deliver video streams to user sites.

FIG. **2** depicts a typical residential broadband network using local loop wiring of the network, as disclosed in the prior art.

As in FIG. **1**, each user site contains a Set Top Box, such as STB **180**, coupled to the network through a coaxial cable **172** which interfaces **170** to a collective coaxial cable **160** which is coupled to Node **126**. Interface **170** may include bi-directional signal amplification, and possibly further include the filtering and/or frequency shifting of these signals.

As in FIG. **1**, the couplings between STB **180** and Node **126** support bi-directional communication allowing the STB **180** to receive multiple television channels and allowing STB **180** to signal at least limited information to the Node **126**, which may well include management of Pay-per-View and other services. The couplings between STB **180**, Node **126** and Headend **104** may also support bi-directional communication allowing the STB **180** to receive multiple television channels and allowing STB **180** to signal at least limited information to the Headend **104**, which may well include management of Pay-per-View and other services.

FIG. **2** shows a loop coupling Headend **104** through coupling **130** to Node **120** through coupling **132** to Node **124** through coupling **134** to Node **126** which in turn couples **136** to Headend **104** forming the loop.

The hierarchical coupling of Node **126** with Headend **104** is carried out along distinct paths through this loop. Communication from Headend **104** to Node **126** follows a path **130-132-134**. Communication from Node **126** to Headend **104** follows the path **136**. The specific wiring schemes are dominated by the choice of physical transport, communication protocols and network level management. The description just given for FIG. **2** is provided as a simplified discussion of the basics of how high speed residential broadband networks incorporate loops and local loops supporting network level hierarchies.

There has been extensive research into the mechanics of speech recognition. The progress has been sufficient to allow speech trading by stock brokers using their desk top computers.

While these innovations have been substantial, they do not resolve several central questions of great importance to cable television, video delivery systems, and commerce. There is no present system providing speech recognition to a collection of users over a cable television network. There is no present system providing user identification based upon that speech recognition over a network that supports cable television and/or video delivery. There is no present system sufficient for real-time auctions and contracting to be conducted over a cable television and/or video delivery network, based on user identification through speech recognition.

## SUMMARY OF THE INVENTION

An embodiment of the invention provides speech recognition services to a collection of users over a network that supports cable television and/or video delivery. User identification based upon speech recognition is provided over a cable television and/or video delivery network. User identified speech contracting is provided over a cable television and/or video delivery network having sufficient bandwidth for real-time auctions and contracting.

The invention comprises a multi-user control system for audio visual devices that incorporates a speech recognition system that is centrally located in or near a wireline node, and which may include a Cable Television (CATV) Head-end. The speech recognition system may also be centrally located in or near a server farm a web-site hosting facility, or a network gateway.

In these embodiments of the invention, spoken commands from a cable subscriber are recognized and then acted upon to control the delivery of entertainment and information services, such as Video On Demand, Pay Per View, Channel control, on-line shopping, and the Internet. This system is unique in that the speech command which originates at the user site, often the home of the subscriber, is sent upstream via the return path (often five to 40 MHz) in the cable system to a central speech recognition and identification engine. The speech recognition and identification engine described herein is capable of processing thousands of speech commands simultaneously and offering a low latency entertainment, information, and shopping experience to the user or subscriber.

The system is capable of overlaying text on the subscriber's TV screen immediately after a word is recognized by the system as a verification of correct or incorrect recognition, thereby providing instant visual feedback and opportunity for acceptance or correction of speech messages.

The system can recognize and process speech so that the key words of spoken commands are recognized and displayed. This may be applied in navigation mode, in search context, or in other contexts and modes.

The system responds to a command with a visual indication of the spoken request. This visual feedback indicates recognition of key words may and be in the form of written text or icons.

The system may mask delays in upstream transmission or speech recognition. Upon depressing an optional talk button on the remote, a digital address may be appended to the beginning of the digital speech packets to be processed. The address tells the system not only the user site, but it also provides a mechanism for the system to begin generating masking screens or icons. Data are sent to the central location when the button on the microphone is depressed, alerting the system as to the user site and a potential input. This function allows the system to generate an icon or overlay to respond to the subscriber quickly. This function also supports site specific dictionaries, as well as data references to be loaded for speech recognition or user recognition.

At least two operations are performed at a server-center located at a central location: upstream recognition of speech commands and performing speech command protocol(s).

Low latency visual prompts are provided to support fast and accurate speech navigation. Thus, when a command is spoken and recognized the system returns the key word and optionally generates a list of visual prompts that guides the subscriber through the next navigation step. By using prompts, the system incorporates optimum recognition of the prompt words thus increasing the recognition accuracy and, at the same time, increasing satisfaction for user participation.

In this context of the invention, adaptive speech recognition is based on optimized word recognition by creating a subset of probable matches based on knowing what is in an entertainment database or the words on a Web page. This supports learning the user's habitual speech patterns.

Secure speech transactions provide a method of speech based contracting across a multimedia distribution system. Speech based contracting as used herein, refers to a process of generating and/or executing a contract, in which at least one step of that process is based upon the invention receiving, recognizing, and witnessing an identified user's speech.

Speech based contracting includes, but is not limited to, the following: a first identified user making an offer; a second identified user accepting an offer, which may or may not be acoustically presented; as well as the second identified user specifying acceptance particulars, such as payment arrangements and the number of units.

Speech based contacting also includes, but is not limited to, acknowledging receipt of goods or services of a tangible, and/or intangible nature, possibly involving real property, personal property and/or intellectual property, exercising options of the contract, as well as terminating a pre-existing contract. The acknowledgement of receipt may include, but is not limited to, a declaration of the condition of goods upon receipt or upon subsequent testing, which may include an estimate of damage.

Speech based contracting may also include at least one of the following: the second identified user making a counter-offer to the first identified user based upon the offer; and the first identified user responding to the counter offer. The response may include accepting the counter-offer, or making a second counter-offer to the second identified user.

Speech based contracting may also include the second identified user inviting offers. The invitation may or may not specify the first identified user and/or performance constraints such as time of delivery and/or the duration of the terms and/or optional terms which may be exercised after the contract has been accepted.

Speech based contracting may also include an identified user exercising one or more optional terms of a pre-existing contract. The exercise of the optional terms may further specify one or more amounts, delivery times, ranges of time and/or place during/over which a service may be performed or commodity delivered in accordance with the optional terms of the pre-existing contract.

The offer may originate at the offeror-user site, possibly involving speech, when it is sent to the central location and recognized at the central location, recorded, distributed, and presented to potential offeree user sites. The offer may be sent to the central location to be recorded and distributed to potential offeree user sites. The offeree may signal acceptance of the offer verbally at the offeree user site where the offeree is recognized. The system transmits the verbal acceptance to the central location, where it is recognized, recorded and then transmitted to the offeror.

Using the user site address accelerates speaker identification, increases reliability, enhances security and reduces latency in identifying a speaker. Using the user site address and user specific speech data references further accelerates speaker identification, increases reliability, enhances security, and reduces latency in identifying a speaker.

The invention supports automatic generation of serial-multiplexed video output streams, without additional video boards or multiplexers. The centrally located speech recog-

nition system employs extremely fast, efficient arrays of microprocessors, many of which may possess a frame buffer in locally accessible memory. Each microprocessor translates the frame buffer into an MPEG stream. Several MPEG streams are merged within a single microprocessor to form a multi-media stream for distribution to subscribers.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts a typical network hierarchy as found in a cable television or video delivery network employing a Hybrid Fiber-Coaxial (HFC) wiring scheme as disclosed in the prior art;

FIG. **2** depicts a typical residential broadband network using local loop wiring of the network as disclosed in the prior art;

FIG. **3** depicts a remote control unit **1000** coupled **1002** to set-top apparatus **1100**, communicating via a two-stage wireline communications system containing a wireline physical transport **1200** through a distributor node **1300**, and through a high speed physical transport **1400**, possessing various delivery points **1510** and entry points **1512**–**1518** to a tightly coupled server farm **3000**, with one or more gateways **3100**, and one or more tightly coupled server arrays **3200**, in accordance the invention;

FIG. **4** depicts a coupled server array **3200** of FIG. **3**;

FIG. **5** depicts a gateway **3100** of FIG. **3**;

FIG. **6** depicts the tightly coupled server farm **3000** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. **7** depicts a gateway **3100** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. **8** depicts a coupled server array **3200** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. **9** depicts a simplified block diagram using an array of processors as shown as **3200** in FIG. **3**;

FIG. **10** depicts a flowchart of a method using a back channel from a multiplicity of user sites containing a multiplicity of identified speech channels presented to a speech processing system at a wireline node in a network supporting cable television delivery in accordance with the invention;

FIG. **11**A depicts a detail flowchart of operation **2012** of FIG. **10** further partitioning of the received back channel;

FIG. **11**B depicts a detail flowchart of operation **2022** of FIG. **10** further processing the multiplicity of the received identified speech channels;

FIG. **11**C depicts a detail flowchart of operation **2032** of FIG. **10** further responding to the identified speech content;

FIG. **12** depicts a detail flowchart of operation **2000** of FIG. **10** further performing the method using the back channel from multiple user sites;

FIG. **13**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content;

FIG. **13**B depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the speech content;

FIG. **14** depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **15**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **15**B depicts a detail flowchart of operation **2252** of FIG. **15**A identifying the user;

FIG. **16** depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **17**A depicts the speech content response **2350** including current response menu **2352** and cumulative user site response **2354** in accordance with the invention;

FIG. **17**B depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **18**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **18**B depicts a detail flowchart of operation **2092** of FIG. **11**B further processing the multiplicity of the received speech channels;

FIG. **19**A depicts a simplified block diagram of a hand held remote **1000**, containing microphone **1060** and keypad **1020** supporting user input which is organized and processed by embedded controller **1050** for communication by wireless interface **1040** coupled **1002** to set-top apparatus **1100**, as shown in FIG. **3**;

FIG. **19**B depicts a simplified block diagram of set-top apparatus **1100** as shown in FIG. **3** showing coupling **1002** and first wireline physical transport **1200** further comprised of downlink coupling **1202** and uplink coupling **1204**;

FIG. **19**C further depicts set-top apparatus **1100** as shown in FIG. **19**B containing a set-top appliance **1120** coupled **1002** with hand held remote **1000** and coupled **1112** with set-top box **1120** possessing downlink coupling **1202** and uplink coupling **1204**;

FIG. **19**D further depicts set-top apparatus **1100** as shown in FIG. **19**B containing a set-top appliance **1120** coupled **1002** with hand held remote **1000** and possessing downlink coupling **1202** and uplink coupling **1204** as well as providing processed downlink coupling **1114** to set-top box **1110** and receiving initial uplink coupling **1112** from set-top box **1110**;

FIG. **20**A depicts a simplified block diagram of set-top appliance **1120** as shown in FIG. **19**C supporting coupling **1002** with hand held remote **1000** and coupling **1112** with set-top box **1110**;

FIG. **20**B depicts a simplified block diagram of set-top appliance **1120** as shown in FIG. **19**D supporting coupling **1002** with hand held remote **1000** and couplings **1112** and **1114** with set-top box **1110**;

FIG. **20**C depicts a block diagram further depicting accessibly coupled **1162** memory **1160** as shown in FIGS. **20**A and **20**B;

FIG. **21** depicts a remote control unit **1000-180** coupled **1002-180** to set-top apparatus **1100-180**, communicating via a two-stage wireline communications system containing a wireline physical transport **1200** through an augmented distributor node **1310** interfacing to a wireline communications loop including an augmented Headend **1410** further supporting a communications loop including augmented metropolitan Headend **1410**, in accordance with the invention;

FIG. **22** depicts a remote control unit **1000-180** coupled **1002-180** to set-top apparatus **1100-180**, communicating via a two-stage wireline communications system containing a wireline physical transport **1200** through a distributor node **126** interfacing to a wireline communications loop including an augmented Headend **1414** further supporting a communications loop including augmented metropolitan Headend **1410**, in accordance with the invention;

FIG. **23** depicts a detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. **21**;

FIG. **24** depicts an alternative detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. **21**;

FIG. **25** depicts a generic block diagram of a prior art Headend **104** as shown in FIG. **3**;

FIG. **26** depicts an augmented Headend **1410** of FIG. **21** or an augmented Headend **1414** of FIG. **22** or an augmented metropolitan Headend **1410** of FIGS. **21** or **22**, in accordance with the invention;

FIG. **27** depicts an alternative augmented Headend **1410** of FIG. **21** or an alternative augmented Headend **1414** of FIG. **22** or an alternative augmented metropolitan Headend **1410** of FIGS. **21** or **22**, in accordance with the invention;

FIG. **28**A depicts a block diagram of a speech engine **1330** as shown in FIG. **23**;

FIG. **28**B depicts a block diagram of a speech engine **1330** as shown in FIG. **24**;

FIG. **29** depicts a more detailed block diagram of a speech engine **1330** as shown in FIG. **28**A;

FIG. **30** depicts an alternative detailed block diagram of a speech engine **1330** as shown in FIG. **28**A;

FIG. **31** depicts a second alternative detailed block diagram of a speech engine **1330** as shown in FIG. **28**A;

FIG. **32**A depicts a block diagram of modulator engine **1350** of FIGS. **23** and **24**, and modulator engine **1450** of FIGS. **26** and **27**;

FIG. **32**B depicts a block diagram of a local oscillator as is known in the art for use as a local oscillator depicted in FIGS. **33** and **34** as LO1 **1760**, LO1 **1860**, LO2 **1770** or LO2 **1870**;

FIG. **33** depicts a detail block diagram of frequency conversion circuitry **1710** of FIG. **32**A;

FIG. **34** depicts an alternative detail block diagram of frequency conversion circuitry **1710** of FIG. **32**A; and

FIG. **35** depicts a detailed diagram of speech engine **1330** as shown in FIG. **23** or speech engine **1430** as shown in FIG. **27** containing two plex communications grids with dual, redundant gateways.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **3** depicts a remote control unit **1000** coupled **1002** to set-top apparatus **1100**. Set-top apparatus **1100** communicates via a two-stage wireline communications system containing a wireline physical transport **1200** to a distributor node **1300**. Set-top apparatus **1100** communicates through distributor node **1300** across a high-speed physical transport **1400** to a tightly coupled server farm **3000**, possessing various delivery points **1510** and entry points **1512**–**1518**. Tightly coupled server farm **3000** contains one or more gateways **3100**, and one or more tightly coupled server arrays **3200**.

As used herein, a server farm refers to a collection of at least two server components communicatively coupled to one another. The server components may or may not all be directly communicatively coupled to each other. A server component refers to at least a gateway, server array, server computer, database engine, or disk farm.

As used herein, gateway refers to at least one of the following: A gateway may perform protocol conversion between different types of networks or applications; gateways may support complete conversion of one protocol to another, or support one protocol from within another protocol; a gateway may perform conversion between two messaging or mail protocols; a gateway may act as a go-between for two networks with similar protocols, providing an entry/exit point for one network in the other network. Such gateways include proxy servers; a gateway may switch speech and data between a terrestrial network and an orbiting satellite communications system; and a gateway may perform network layer switching tasks between at least two networks, coordinating the delivery of information, usually in the form of messages, packets or data streams to various destinations in the networks.

As used herein, a server array refers to a multi-dimensional lattice or array of server computers, each with an associated multi-dimensional array address, and a communication grid supporting communication between server computers based upon the multi-dimensional array addresses of the source and destination server computers. A tightly coupled server array is a server array possessing a very low latency communication grid.

The invention may include a remote control unit **1000** fitted with a microphone. Remote control unit **1000** may be fitted with such features as a special noise canceling microphone and/or a push-to-talk button.

The microphone in the remote relays the subscriber's speech commands to the central speech recognition engine. The push-to-talk button may begin the process of speech recognition by informing the system that the subscriber is about to speak and also to provide immediate address information. Address information identifies the user site at which the speaking occurs.

The invention may also include an array of microphones that are operated in conjunction with a remote control **1000** that is coupled to the set top box **1100**. The microphone array may further provide an echo-canceling capability in receiving speech signals within the area of usage.

Note that there may be more than one remote control unit **1000** with one or more microphones, each remote control unit under the control of a distinct, identified user. Such situations are particularly useful in game playing settings, where different users may wish to make commands to the game simulation like "arm the photon torpedoes", etc.

A given residence may include more than one set-top box **1100**, each of which has a distinct address in the network delivering video content and/or cable television. Each constitutes a distinct user site and may be parameterized differently. By way of example, a first set-top box in a recreation area for children may allow identified users, who are children, to select programming on only certain channels. Whereas a second set-top box in a private area of adults, such as a parental bedroom, may be parameterized so that child identifier users have no privileges.

Speech commands from the subscriber may be preprocessed. The analog signals picked up from the microphone are converted to digital signals where they undergo additional processing before being transmitted to the speech recognition and identification engine located in the cable Headend or other centralized location. Such speech preprocessing may include encryption, compression, or conversion to an alternative form of speech representation.

The preprocessing function may also take place in the remote control **1000** itself before being transmitted to the set-top box **1100**, or set-top appliance **1100**. Coupling **1002** may use a wireline or wireless physical transport. Coupling **1002** may use a wireless transport, including, but not limited to, at least one of the infra-red, microwave, or radio fre-

quency spectrum, as well as ultrasonic signaling. Coupling **1002** may support bi-directional communication between remote control **1000** and set-top box or appliance **1100**. The communication may be predominantly or strictly from remote control **1000** to set-top box or appliance **1100**.

The speech signal from the remote **1000** may be a digitally modulated RF signal whose properties may comply with Part 15 of the FCC rules. Alternatively, the set-top box **1100**, or set-top appliance **1100**, receives the speech signal from the remote **1000** and performs the preprocessing function mentioned above.

The set-top box **1100**, or set-top appliance **1100** may also be used to transmit speech and subscriber address data to the centralized location or Headend for speech recognition and identification. The Radio Frequency (RF) signal from the remote **1000** is received by the set-top appliance **1100** and then remodulated for upstream transmission **1200** on the 5 to 40 MHz cable return path. If a commercial set-top box **1100** is used to transmit the upstream speech data, then the upstream channel allocation and transmission protocol are controlled by the bi-directional communication system which is resident in the set-top box.

In certain embodiments, a commercial set-top box **1100** may not be used to transmit the digitized speech data upstream. The set-top appliance **1100** is then responsible for receiving the upstream channel allocation and synchronization information. The data receiver in the set-top appliance **1100** can be tuned to any one of several downstream data channels to receive channel and synchronization information.

The set-top appliance **1100** is also capable of receiving and decoding data in the downstream path. This function is required to organize and synchronize the transmission of upstream data which may include user feedback. Downstream data can contain upstream channel allocation information and speech verification overlay information coded as text.

The set-top box **1100** may be used for both upstream and downstream communication for the described speech command function. The function of the set-top appliance **1100** may be to receive the RF signal from the remote control and then digitize and compress the speech signal and prepare it for upstream transmission.

New RF protocol standards, such as Blue Tooth, allow the remote control's RF signal to transmit the speech signal directly to the set-top box where again, the preprocessing can either be done in the remote control **1000** or executed from firmware within the set-top box **1100**. Note that infrared signaling may be employed to transmit the speech signal to the set-top box.

Set-top boxes **1100** that employ the DOCSIS type cable modems such as Open Cable set-top boxes or the so called Heavy Set-top boxes from such companies as Scientific Atlanta and General Instruments are capable of sending and receiving speech data using efficient data transmission protocols. The DOCSIS protocol also incorporates error detection and correction capabilities as well as other transmission enhancements such as pre-equalization for more efficient and error free transmission.

FIG. **4** depicts a coupled server array **3200** of FIG. **3**.

FIG. **5** depicts a gateway **3100** of FIG. **3**.

The system uses the subscriber's address information as a mechanism by which the centrally located AgileTV™ Speech Processor can fetch a particular subscriber's parameter file. The parameter file contains speech training parameter data, speech identification parameters and user profiles for each user at that address. This file can also contain parental control information in a residential setting and other specifics for that particular address, such as language preferences or movie preferences or even internet preferences.



The Addressed Subscriber Parameter File (ASPF) gives the system an extremely high probability of speech recognition and user identification. Such addressing supports secure transactions such as banking because the speech recognition and identification system has to only identify a few parameter files for any one physical address, resulting in a very high probability of recognizing a specific speaker's speech.

Financial transaction security, e.g. speech banking and e-commerce, can be realized with this system and, with the addition of speech encryption processing in the Speech Preprocessor, even higher levels of security can be attained. This directly supports a method of contracting based upon an offer presented to the user by the system, and a recognizable acceptance of the offer by the identified user. The method of contracting may further include storing the offer and acceptance as a recording mechanism for the contract.

The speech signal transmitted from a subscriber's set-top box, or set-top appliance, **1100** is received **1510** by the five to 40 MHz data receiving equipment within gateway **3100** in the central location. As used herein, a central location may include a node, Headend, or metropolitan Headend for a residential broadband network.

When the digitized speech signal comes from a commercial set-top box, such as a General Instruments or a Scientific Atlanta set-top, then the return path receiving equipment in the central location may be specific to that type of box. Therefore, the data coming from this equipment, which contain other upstream traffic, may be parsed in such a way that only the speech commands and address information from the subscriber are input to the speech recognition engine in the central location.

When the digitized speech signal sent upstream comes from another set-top appliance, the upstream data receiver in the central location may be a separate unit that receives only speech command signals from set-top appliances at the user sites. Using the set-top appliance as the upstream transmitter allows the use of custom upstream protocols such as FM, AM, PSK, or spread spectrum digital transmission. Digital transmission techniques such as QPSK or QAM can also be employed.

Upon receiving the digitized and preprocessed speech signal from the subscriber's set-top box or set-top appliance, the received upstream signal may be in the form of a data stream containing speech and address information. The data stream containing speech and address information may be Ethernet compatible. Because the AgileTV™ Voice Processing Unit (AVPU) is a high speed speech processing unit capable of processing the data from several nodes, the digital speech signals from each of these nodes may be combined in the AVPU input multiplexer. The combining of digital speech signals may result in a smaller number of high speed digital streams.

Upstream signals such as **1510** are received at the gateway **3100**. Speech and data signals may be received from commercial return path data receivers. Speech and data signals are also received and decoded by custom return path receivers using at least one of the following protocol options: FM or AM modulation/demodulation, FDMA, TDMA, FSK, PSK, or QPSK digital modulation/demodulation, Spread Spectrum modulation/demodulation, Telephony, cellular return, or Wireless.

The AVPU Engine may not be an application service, in and of itself. The system may provide new end user appli-

cations. The AVPU Engine may provide speech recognition and control services for existing applications, such as Interactive Program Guides, Video On Demand (VOD) services or access to the Internet or World Wide Web.

Near network system initialization time, applications such as Video On Demand or Interactive Program Guides, that request service access with the speech recognition services may be required first to register with the AVPU system. At least one standard program interface may then be used to enable each application to specify its complete menu hierarchy. The invention may use exactly one standard program interface to enable applications to specify their complete menu hierarchy.

A list structure specifies each application's menu hierarchy. This list structure may be a tree. It contains labels for each menu, along with the text of each button on each menu screen, information the system needs to provide speech navigation services independently through the menu hierarchy on behalf of the application. This menu hierarchy represents the static portion of the application's data.

In addition to the static menu structure, it may also be the responsibility of the application to inform the system of dynamic content, for example the names of movies in a Video On Demand system or of program names and times in an interactive program guide. Each time a user enters a menu context in which dynamic content appears, the application may inform the speech system of this context by passing a handle associated with the list of names that comprise the dynamic content. The speech system may combine the static menu content with the augmented dynamic content (see Similarity Searching below), to form a complete grammar. Also, application-independent keywords, such as HELP, may be combined with the static menu content and augmented dynamic content to form the complete grammar. This construct may then be passed to the speech system to maximize recognition accuracy.

Given that dynamic content, by definition varies, applications may be required to inform the system whenever the content changes. In an interactive TV guide application, for example, the application registers a new set of dynamic content every one-half hour. For a VOD system, this registration may be performed whenever the database of offered movies changes.

Once registration has been completed, and the system is being used, recognition of a spoken request may cause a signal to be sent back to the application. This signal informs the application to perform the requested action, and/or to update the contents of the screen as a result of the user's request. In this manner, the application can use the system's speech recognition services with minimal modifications to the application's code, while retaining the same graphical look and feel to which users have become accustomed.

In the subscriber's premises, a speech-enabled remote control may be employed, e.g. containing a microphone, as well as traditional universal remote control functionality. The remote control may further contain a Push-To-Talk (PTT) button. Conventional remote control functions are transmitted via infra-red (IR). The speech output may be wirelessly transmitted to a set top pod, module, or appliance located at the set-top box. The wireless transmission from the remote control may employ an electromagnetic physical transport layer or ultrasonic physical transport layer. The electromagnetic physical transport layer may use a radio frequency carrier or an infra-red carrier.

When the PTT button is pushed by the user, the remote control sends a PTT active command to the set top appliance. The appliance may then inform the set-top box to place an icon on the screen, or otherwise indicate to the user that the system is listening to them. Next, as the user speaks into the microphone, the speech is digitized, compressed, and transmitted to the set top appliance.

The set top appliance may perform any or all of the following: encrypt the speech sample to provide security; add subscriber address information; add a message length code; add error control coding to the assembled information. The error control coding may include a Cyclical Redundancy Code (CRC), enabling data transmission errors to be detected.

In homes with set-top boxes having the necessary features, the set top appliance may transmit speech information to the set-top box, which then transmits it to the central location as a series of packets.

Alternatively, the set top appliance may directly transmit the speech stream to the central location itself. This may continue until the set top appliance receives a PTT Release from the remote, indicating end of speech. This information is also transmitted to the central location, signaling end of spoken request.

Each individual consumer's interface, i.e. set-top box or set-top appliance, may have a unique address. The address of the individual consumer's interface may be determined during the manufacturing process. As speech packets are transmitted upstream, this address information may be appended to the speech packets. The address information enables rapid determination of the user site from which the speech sample is received. The address information may precede the speech packets. The address information improves the efficiency of at least some of the central location processing stages.

Assignment of an input buffer address to the speech sample may be based upon the user site address. This input buffer collects incoming speech packets until the final packet of a spoken request has been received. Recognition of the final speech packet receipt may be encoded in that speech packet. Final speech packet receipt recognition may include a delay in speech of greater than a predetermined amount of time. The speech delay amount may be one or more of at least the following: a globally defined constant, a user site defined constant, an identified user defined constant, or an application-defined constant for an application serviced by the speech recognition system. The final speech packet may be generated based upon the release of the PTT button in the remote control unit. The final speech packet may be generated at the remote control unit, set top pod, set top appliance, set top box, node, Headend or metropolitan Headend, or by the serviced application. The final speech packet may be generated by the serviced application based upon a time schedule, e.g. a fixed period in which participants may respond, a privilege scheme, and/or other application related scheme.

On-the-fly Cyclical Redundancy Code (CRC) error checking generation may be used. Each time a packet is read in, CRC in the processor registers may be computed as each byte is read, then the partial CRC is stored with the stored packet. The CRC may be stored at the end of the packet, at the beginning of the packet or in specifically designated locations within the packet. When the next packet arrives, the partial CRC is read from where it was stored, and the new packet data may be appended to the end of the previous packet, overwriting the temporary CRC. This continues until a complete speech sample has been received. This approach to CRC calculation cuts memory accesses in half compared to first storing the string, then making a second pass to generate the CRC.

Once a complete spoken request has been received, the speech input processor may use the sample's source address identifying a user site to target the speech data to a specific speech processing processor. This direct correspondence between the source address and a specific speech processor allows speech processors to cache user-specific parameters for the user sites they serve. The mapping of source addresses to speech processor reduces the bandwidth necessary to move user site-specific data to each speech processor. In other embodiments of the invention, a translation table may be used to allow speech to processor assignments to be changed dynamically in the event of a hardware or other failure, e.g. capacity overload, while retaining the efficiency advantages of directly mapping the speech channel to the processor.

To process a speech sample by the speech processor into speech content, the speech processor must first contain in its local memory a copy of the grammar definition associated with the user site. A grammar is a structure often containing the words which are most likely to be spoken, the order in which these words may appear, and the meaning of various sequences of words. This structure may be a hardware configuration, software program, data structure, or a combination of two or more of these.

Before transferring the new speech sample to a speech processor, the grammar associated with the speech sample is transferred to the target speech processor. The grammar transfer may use a simple Least Recently Used (LRU) queue. If the speech processor contains enough empty space in its memory, then the indicated grammar is transferred directly to the empty memory from mass storage. Mass storage may include, but is not limited to, a disk, disk farm, or Redundant Array of Independent Disks (RAID), a high bandwidth disk farm. If not, then the least-recently-used grammar entry may be discarded, and the new grammar information loaded into the vacated memory.

The next step in processing the speech sample ensures that the current parameters associated with this user site are already cached in the specific speech processor's RAM. If these parameters are not present, then the least-recently-used parameter cache entry may be evicted from the cache.

To do this, the oldest cache entry on this speech processor is first examined to see if it has been modified. If it has, the cache entry is stored to mass storage, and the cache slot is then declared vacant. Next, the user site speech parameters associated with the new speech sample are loaded into the vacated cache block. During the relatively long access times needed to load a new set of user site parameters from mass storage (and optionally to write the old parameters to the disk, etc.), the current speech sample may be held in the input buffer in a waiting state.

After the new household speech parameters are loaded into the targeted speech processor, the speech sample is moved into the work queue for the speech processor. This minimizes speech processor delay for processing other speech requests during disk accesses. Instead, the speech processor may process other speech samples associated with user sites whose parameters are already in the cache.

Once the speech parameters associated with a speech sample are available in the speech processor, the speech sample may be assigned to the speech processor by placing a description of the speech sample into the target speech processor's work queue. As speech samples are processed, they may be removed from the front of the work queue by the speech processor.

Eventually, the speech processor reaches the current input sample. The speech sample is transferred into the speech processor's local memory, and the status of this speech sample changed to Next. This transfer may occur in parallel with the processing of the prior speech sample, ensuring that speech processor utilization is maximized.

Once this transfer is complete, and the speech processor completes processing of the prior sample, the status of this speech sample changes to Current, and the speech recognition engine begins processing this sample.

Successful processing of a speech sample requires that both the proper grammar and the proper user site parameter information be simultaneously accessible by the speech processor.

The possibility exists in which a recently-loaded grammar or speech parameter file is erased prior to its use, in the process of loading the grammar or speech parameters for the current speech sample. To eliminate this condition, the total number of speech samples sitting in the waiting and working queues of a speech processor preferably should not exceed the number of cache entries in the speech processor.

The first step in recognizing the current speech sample may determine which individual person pronounced the current spoken request. The Speaker Identification software module running on the targeted speech processor compares the spoken characteristics of this speech sample with the characteristics of the speakers who have been previously identified in this user site.

In many spoken requests, the incoming speech sample matches the characteristics of a previously identified speaker. When this occurs, the speech sample is passed on to the next phase, speech recognition.

If the speech sample is not identified with an existing speaker, then a new user routine is invoked, enabling a new user to be associated with this household. This routine records the new individual's speech parameters into this user site's speech parameters, so that the new speaker may be identified during subsequent spoken requests. Optionally, the system may offer the user site manager the opportunity to erase or modify the new speaker parameters.

The inputs to the speech recognition software module may include a speech sample, an individual user's speech parameters, and the grammar to be recognized. The speech engine determines the most likely spoken request based on statistical analysis, and may return a text string corresponding to the spoken request. This matching process is probabilistic: along with the returned text string, the speech engine may also return a confidence measure, or percentage of match likelihood. The returned text string and confidence measure enables different applications to respond differently based on the calculated confidence in the recognition result.

For recognition results having a low cost to the user, such as a request to display listings for a particular movie, lower confidence criteria may be applied. For recognition results with a high cost to the user, such as a request to purchase a movie, higher confidence thresholds may be required. Furthermore, purchase verification may be requested.

When recognition accuracy is particularly low, the speech recognition engine may determine partial matches to more than one possible phrase, returning the text of several possible matches. This process enables an application or user to select from several alternative recognition results.

In cases where a transaction results in a charge to the user, the system may record the speech sample representing the purchase request onto mass storage. This speech sample recording is performed to provide verification that a purchase request was made, should a user dispute their intent to purchase. This further supports speech-based methods of contracting. Note that the recording may be compressed in

either a standard or non-standard manner, which may further include encryption technology.

Due to the statistical nature of speech recognition, spoken requests are occasionally mis-recognized. Recognition errors have been a primary hindrance to further exploitation of speech recognition systems. This system provides a mechanism by which the user receives rapid visual feedback regarding the recognition process. Soon after the speech recognition engine has returned a result, visual text corresponding to the recognized spoken request is displayed on the display, e.g. television, screen.

This rapid visual feedback may be accomplished by transmitting the recognized text string back to the set-top box. Software executing within the set-top box displays the text information in a special window on top or overlaying of the existing application display. In cases where limitations in the set-top box prevent the window from appearing on top of existing content, software executing within the set-top box may select an alternative feedback display, for example, a different channel containing a background field, and displays the overlay information on top of this background.

In cases where the recognition accuracy is particularly poor, and the speech engine returns several possible recognition results, this overlay display capability may be used to help refine the user's query. By displaying the text of the possible recognition results, the user can easily select from the returned list.

If none of the recognized text strings match the user's spoken request, the user may elect to start again. However, more commonly, one of the displayed strings match, or be likely to readily lead to the user's speech request with appropriate modification. When this is the case, the user can readily select from the displayed alternatives, enabling improved productivity in low-recognition situations.

One key feature which can be used with applications such as Pay-Per-View and Video-On-Demand, is similarity searching. When the system is scanning for dynamic content, i.e. movie titles and actor names, a similarity search feature may be available. This enables searches for names which are only partially matched, or which resemble the recognized phrase, without requiring precise specification of the exact title or name. The technique used to deliver similarity searching is to augment the dynamic content list specified by the application. Words similar in meaning, content, or spelling to words in the content list may be automatically added to the dynamic content list whenever the application informs the system of a content update. This enables the recognition grammar to be extended to support a broader array of matches without requiring bandwidth-intensive text searches each time a user's speech request has been received. Links between similar and target words may be maintained in the internal representation of the grammar, thereby providing direct access to target names. This further enhances system performance.

Note that as used herein, similarity databases may be constructed from at least one or more of the following database architectures: relational, SQL, knowledge-based, inferential knowledge bases including Horn clause and extended Horn clause fact bases, fuzzy versions of the above, as well as neural networks and combinations of these techniques. Also, manual additions may be made at the AgileTV™ central office.

The entire system may provide fault tolerance for robust performance. For individual components, such as speech processors and associated memory, the system may automatically recognize most component failures, and disable faulty processors.



In addition, many system installations may require multiple AgileTV™ Voice Processing Unit (AVPU) boxes **3000** to meet the performance needs of the subscriber base. To ensure maximum operating time, even the total failure of an AVPU engine may not be catastrophic. The remaining AVPU engines continue to service the incoming speech traffic at a reduced performance level. This failover is carried out by a negotiation protocol between the AVPU boxes.

In addition to these internal diagnostics functions, the system may also communicate continuously with a network operations center, enabling rapid identification of system errors, as well as rapid service dispatch to correct any problems.

A speech command preprocessor may perform the function of speech filtering, digitizing, data compression, encoding pauses in speech, and address insertion. Preprocessing speech commands at user sites results in a lower upstream data rate. This processing can be located in the remote **1000**, the Set-top appliance **1100**, or the set top box.

A Speech Packet Processor may be centrally located in or near a wireline node specifically to capture and prepare the upstream speech packets that are to be fed to the Speech Recognition Engine.

A speech processor system may be centrally located in or near a wireline node, which may include a Cable Television (CATV) central location. The speech recognition system may be centrally located in or near a server farm. The speech recognition system may be centrally located in or near a web-site hosting location. The speech recognition system may be centrally located in or near a gateway.

The speech recognition engine processes speech packets to create speech content and formulate the response to the speech content for each of the user sites.

The system also performs address decoding for routing and latency reduction. It also performs the function of decoding the pauses between words or sounds originally encoded on the preprocessor at the user site.

A method is provided for a very high level of security based on the ability of being able to precisely recognize a parent's speech or a child's speech based on a limited subset of choices. The ability to recognize an individual speaker with a very high probability of identifying the specific speaker is based on knowing the address of the user site.

A large capacity, centrally located, natural speech recognition engine can readily identify a specific speaker from among a small set of choices, allowing a parent to voice print and therefore control the type, or amount or timing of content a child may request. A child may be able to learn PIN numbers but cannot readily fool the voice print. Speaker recognition is particularly appealing in this parental control application, and can be applied with very high accuracy, due to the limited number of speakers per user site. Parents may control the specific viewing times, total time, or content that a child can watch television through this system and its use.

The operational discussion just presented regarding FIGS. **3**–**5** is applicable to the relevant operational system embodiments based upon any and all of the FIGS. **19**A to **24**, as well as, FIGS. **26** to **31**.

A parallel processor system supporting this sort of system is disclosed in U.S. Patent Application Ser. No. 60/210,440, entitled "System and Method of a Multi-dimensional Plex Communication Network", which describes plex processor networks and which is incorporated herein by reference.

A plex communications network has M orthogonal directions that support communications between an M dimensional lattice that may include N^M plex-nodes, where M is at least two and N is at least four. Each plex-node pencil in

a first orthogonal direction contains at least four plex-nodes and each plex-node pencil in a second orthogonal direction contains at least two plex-nodes. Each of the plex-nodes contains a multiplicity of ports.

A plex-node pencil refers to a 1-dimensional collection of plex-nodes differing from each other in only one dimensional component, i.e. the orthogonal direction of the pencil. By way of example, a nodal pencil in the first orthogonal direction of a two-dimensional array contains the plex-nodes differing in only the first dimensional component. A nodal pencil in the second orthogonal direction of a two-dimensional array contains the plex-nodes differing in only the second dimensional component.

The plex communications network is comprised of a communication grid interconnecting the plex-nodes. The communications grid may include N^(M−1) communication pencils, for each of the M directions. Each of the communication pencils in each orthogonal direction is coupled with a corresponding plex-node pencil containing a multiplicity of plex-nodes coupling every pairing of plex-nodes of the corresponding plex-node pencil directly.

Communication between two plex-nodes of a nodal pencil coupled with the corresponding communication pencil comprises traversal of the physical transport layer(s) of the communication pencil.

Such plex communications networks support direct communication between any two plex-nodes belonging to the same communication pencil. This supports communication between any two plex-nodes in at most M hops between plex-nodes.

FIG. **6** depicts a tightly coupled server farm **3000** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,0, Plex-node 1,0, Plex-node 2,0 and Plex-node 3,0. The communication pencil **400** in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,0 is coupled **402** to communication pencil **4100**. Plex-node 1,0 is coupled **404** to communication pencil **400**. Plex-node 2,0 is coupled **406** to communication pencil **400**. Plex-node 3,0 is coupled **408** to communication pencil **400**.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,1, Plex-node 1,1, Plex-node 2,1 and Plex-node 3,1. The communication pencil **410** in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,1 is coupled **412** to communication pencil **410**. Plex-node 1,1 is coupled **414** to communication pencil **410**. Plex-node 2,1 is coupled **416** to communication pencil **410**. Plex-node 3,1 is coupled **418** to communication pencil **410**.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,2, Plex-node 1,2, Plex-node 2,2 and Plex-node 3,2. The communication pencil **420** in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,2 is coupled **422** to communication pencil **420**. Plex-node 1,2 is coupled **424** to communication pencil **420**. Plex-node 2,2 is coupled **426** to communication pencil **420**. Plex-node 3,2 is coupled **428** to communication pencil **420**.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,3, Plex-node 1,3, Plex-node 2,3 and Plex-node 3,3. The communication pencil **430** in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,3 is coupled **432** to communication pencil **430**. Plex-node 1,3 is coupled **434** to communication pencil **430**. Plex-node 2,3 is coupled **436** to communication pencil **430**. Plex-node 3,3 is coupled **438** to communication pencil **430**.

Three of these ports on each plex-node are devoted to providing a direct interconnect to the other plex-nodes of its row through a collection of communication paths forming the communication pencil in the second orthogonal direction. These plex-nodes belong to the same row as the plex-nodes of the plex-node pencil in the second orthogonal direction.

A plex-node may have at least one additional port. At least one of the additional ports may be connected to an external network. Further, at least one of the additional ports may be connected to an external mass storage system. In other embodiments of the invention, at least one of the additional ports may be connected to an external database system.

A plex-node may contain at least one instruction processor. As used herein, an instruction processor includes but is not limited to instruction set processors, inference engines and analog processors. An instruction set processor refers to instruction processors changing state directly based upon an instruction, and which change an internal state by executing the instruction. The instruction may include, but is not limited to, direct or native instructions and interpreted instructions. An inference engine changes state when presented an instruction, which may include an assertion, an assumption, or an inference rule. Inference engines include, but are not limited to, Horn clause engines such as Prolog requires, constraint based systems and neural network engines. As referred to herein, analog processors include, but are not limited to, optical signal processors, CCD's, and resonant cavity devices responding to data and/or controls asserted in the analog domain.

Communication includes, but is not limited to, communication using a digital communications protocol. Communication also includes a messaging protocol using the digital communications protocol. Communications also includes a messaging protocol supporting TCP-IP, supporting the Internet, and/or supporting the World Wide Web.

Communications may also include at least one video stream protocol using a digital communications protocol. Communications may include at least one multi-media stream protocol using the video stream protocols including motion JPEG and/or at least one form of MPEG.

The invention may support Wavelength Division Multiplex (WDM) through the physical transport of the communication paths of the communication pencils.

Each plex-node may include a communication processor. Each plex-node may further include M communications processors. The ports of each communications processor may be connected to each one of the pencils supporting pencil communications processing.

FIG. **7** depicts a gateway **3100** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

In FIGS. **6** and **7**, upstream signals **1510** may be received at the Plex-node 0,0, performing functions similar in nature to processor node **3110** of FIGS. **3**, **4** and **5**. Plex-node 0,1 may couple **3142** to RAID **3130** subsystem, providing high-speed access to a high capacity disk farm. Various signals **1512** to **1518** may be generated by various plex-nodes. Note that because of the uniformity of the communication structure, there is great flexibility in choosing which plex-node generates which communication signals.

FIG. **7** also shows coupling **3002** to a speech recognition server array **3200**.

FIG. **8** depicts a coupled server array **3200** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

Each plex-node of FIG. **8** may include a plex communications network supporting a two or more dimensional array of internal plex-nodes, each including at least one instruction processor.

FIG. **9** depicts a simplified block diagram using an array of processors as shown as **3200** in FIG. **3**.

Consider an array of plex-nodes, where each plex-node uses multiple-processor IC's labeled CPU. Each CPU may possess three or more high speed serial protocol channels C**1**-**3**, a high speed interconnect bus B**1**, a low speed interconnect bus PCI and a local memory access bus R. Each CPU may include at least two processors. Each processor may be an instruction processor. Each CPU may be an integrated circuit. The integrated circuit may be a BCM12500 manufactured by Broadcom Corporation of Irvine, Calif.

CPU**1** and CPU**2** are locally coupled via at least one of the interconnect buses. Each CPU possesses locally accessible memory via an R bus. Each CPU may further access locally accessible memory via its own R bus. The R bus accessed memory may include DDR SDRAM (Double Data Rate Synchronous DRAM).

Three serial protocol channels for the first CPU of each CPU pair are dedicated to communication within each row of CPU pairs. Three serial protocol channels for the second CPU of each CPU pair are dedicated to communication within each column of CPU pairs.

Assume each CPU contains at least two processors. Assume each processor is operating at K billion integer operations/second and L billion floating point operations/second. Assume the high speed serial channels support a gigabit/second bidirectional transfer rates. The DDR DRAMs support M gigabyte/second access rates. This system provides 64*K billion integer operations, 64*L billion floating point operations, 128 gigabits/second interconnect communication bandwidth throughout the array through the high speed serial channels, as well as 64*M gigabytes/second local memory access. By decoupling the tasks running on each processor, making them independent and concurrent, this system architecture achieves the dream of Multiple-Instruction Multiple Datapath computing (MIMD), providing essentially linear speed up with the increase in processors for up to 64 processors.

Such architectures can support each processor generating a frame in a local frame buffer and rendering it into a motion video stream, which is merged into a multiplexed video content stream suitable for a variety of multi-media applications. This apparatus meets or exceeds the requirements of a number of teraflop-class computing applications, which today have no cost effective solution. Note that the processors may each be dual instruction processors housed in a single package.

Each of these arrays will process over 1K speakers concurrently and fit into a single rack mount enclosure. Standard 72 inch, tall racks could then hold 4 such speech engines, also known herein as an AVPU, supporting up to 140,000 subscribers. Each server contains at least dual, redundant, hot-swappable power supplies, and redundant, hot-swappable disks with automatic recovery for failed disk drives. The hot-swappable power supplies may further be half-sized, each supporting the power requirements of half the server engine.

Real-time, extensive diagnostics and continuous connectivity to a 24 hours per day, seven days per week (24×7) Network Operations Center insuring timely failure detection and service dispatch. In systems with more than one speech engine, the server automatically handles catastrophic failures gracefully. Even if an entire speech engine fails, the remaining ones pick up the workload.

FIG. **10** depicts a flowchart of a method that uses a back channel containing a multiplicity of identified speech channels for speech recognition at a wireline node in a network supporting video or cable television delivery in accordance with the invention. The back channel is from a multiplicity of user sites and is presented to a speech processing system at the wireline node in the network. The speech processing system performs the operations of the method.

Operation **2000** starts the operations of this flowchart. Arrow **2002** directs the flow of execution from operation **2000** to operation **2004**. Operation **2004** performs receiving the back channel to create a received back channel. Arrow **2006** directs execution from operation **2004** to operation **2008**. Operation **2008** terminates the operations of this flowchart.

Arrow **2010** directs the flow of execution from starting operation **2000** to operation **2012**. Operation **2012** performs partitioning the received back channel into a multiplicity of received identified speech channels. Arrow **2014** directs execution from operation **2012** to operation **2008**. Operation **2008** terminates the operations of this flowchart.

Arrow **2020** directs the flow of execution from starting operation **2000** to operation **2022**. Operation **2022** performs processing the multiplicity of the received identified speech channels to create a multiplicity of identified speech content. Arrow **2024** directs execution from operation **2022** to operation **2008**. Operation **2008** terminates the operations of this flowchart.

Arrow **2030** directs the flow of execution from starting operation **2000** to operation **2032**. Operation **2032** performs responding to the identified speech content to create an identified speech content response, for each of the multiplicity of the identified speech contents. Arrow **2034** directs execution from operation **2032** to operation **2008**. Operation **2008** terminates the operations of this flowchart.

Portions of the flowchart of FIG. **10** related to operations **2022** and **2032** may operate a speech processing system coupled to a wireline node in a network. The wireline node provides multiple received identified speech channels to the speech processing system. The received identified speech channels are based upon a received back channel at the wireline node from multiple user sites coupled to the network. The network supports video delivery to the user sites and/or cable television delivery to the user sites.

The speech processing system may include at least one computer. Operations **2022** and **2032** may be implemented as program steps of a program system operating at least part of the computers included in the speech processing system. Implementations of these operations as program steps may reside in memory accessibly coupled to at least one computer in the speech processing system.

Note that operations **2002** and **2012** may be implemented in hardware and/or implemented as program steps used in operating computers located at the wireline node. Such computers may or may not be part of the speech processing system.

At least one, and possibly all, of the identified speech channels may have an associated user site.

FIG. **11**A depicts a detail flowchart of operation **2012** of FIG. **10** further partitioning the received back channel.

Arrow **2070** directs the flow of execution from starting operation **2012** to operation **2072**. Operation **2072** performs partitioning the received back channel into a multiplicity of received identified speech channels from the associated user site. Arrow **2074** directs execution from operation **2072** to operation **2076**. Operation **2076** terminates the operations of this flowchart.

FIG. **11**B depicts a detail flowchart of operation **2022** of FIG. **10** further processing the multiplicity of the received identified speech channels.

Arrow **2090** directs the flow of execution from starting operation **2022** to operation **2092**. Operation **2092** performs processing the multiplicity of the received identified speech channels from the associated user site to create multiple identified speech contents. Arrow **2094** directs execution from operation **2092** to operation **2096**. Operation **2096** terminates the operations of this flowchart.

FIG. **11**C depicts a detail flowchart of operation **2032** of FIG. **10** further responding to the identified speech content.

Arrow **2110** directs the flow of execution from starting operation **2032** to operation **2112**. Operation **2112** performs responding to the identified speech content from the associated user site to create the identified speech content response for the associated user site. Arrow **2114** directs execution from operation **2112** to operation **2116**. Operation **2116** terminates the operations of this flowchart.

FIG. **12** depicts a detail flowchart of operation **2000** of FIG. **10** further performing the method using the back channel from multiple user sites.

Arrow **2120** directs the flow of execution from starting operation **2000** to operation **2122**. Operation **2122** performs determining the associated user site from the received identified speech channel. Arrow **2124** directs execution from operation **2122** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Arrow **2130** directs the flow of execution from starting operation **2000** to operation **2132**. Operation **2132** performs determining the associated user site from the identified speech content. Arrow **2134** directs execution from operation **2132** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Arrow **2140** directs the flow of execution from starting operation **2000** to operation **2142**. Operation **2142** performs determining the associated user site from the identified speech content and a speaker identification library. Arrow **2144** directs execution from operation **2142** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Arrow **2150** directs the flow of execution from starting operation **2000** to operation **2152**. Operation **2152** performs determining the associated user site from the identified speech content and a speech recognition library. Arrow **2154** directs execution from operation **2152** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Arrow **2160** directs the flow of execution from starting operation **2000** to operation **2162**. Operation **2162** performs determining the associated user site from an identification within the speech channel. Arrow **2164** directs execution from operation **2162** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Note that the determination of the associated user site may be provided by an identification within the speech channel. By way of example, a technician may be recognizable at many user sites, and may identify the user site as Room 432 or 10 Main Street in the process of activities at that user site.

The invention can include at least one of the operations **2120**, **2132**, **2142**, **2152** and **2162**.



FIG. **13**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to identified speech contents.

Arrow **2170** directs the flow of execution from starting operation **2112** to operation **2172**. Operation **2172** performs processing the identified speech content response to create the identified user site response. Arrow **2174** directs execution from operation **2172** to operation **2176**. Operation **2176** performs sending the identified user site response to the identified user site. Arrow **2178** directs execution from operation **2176** to operation **2180**. Operation **2180** terminates the operations of this flowchart.

FIG. **13**B depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content.

Arrow **2190** directs the flow of execution from starting operation **2112** to operation **2192**. Operation **2192** performs assessing the speech content response identified as to the user site to create a financial consequence identified as to the user site. Arrow **2194** directs execution from operation **2192** to operation **2196**. Operation **2196** performs billing the user site based upon the financial consequence. Arrow **2198** directs execution from operation **2196** to operation **2200**. Operation **2200** terminates the operations of this flowchart.

FIG. **14** depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2210** directs the flow of execution from starting operation **2112** to operation **2212**. Operation **2212** performs assessing the speech response to create a financial consequence identified as to the user site. Arrow **2214** directs execution from operation **2212** to operation **2216**. Operation **2216** performs displaying the financial consequence to create a displayed financial consequence at the user site. Arrow **2218** directs execution from operation **2216** to operation **2220**. Operation **2220** performs confirming the displayed financial consequence from the user site to create a financial commitment. Arrow **2222** directs execution from operation **2220** to operation **2224**. Operation **2224** performs billing the user site based upon the financial commitment. Arrow **2226** directs execution from operation **2224** to operation **2228**. Operation **2228** terminates the operations of this flowchart.

FIG. **15**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2250** directs the flow of execution from starting operation **2112** to operation **2252**. Operation **2252** performs identifying a user based upon the speech content identified with the user site to create an identified user. Arrow **2254** directs execution from operation **2252** to operation **2256**. Operation **2256** terminates the operations of this flowchart.

FIG. **15**B depicts a detail flowchart of operation **2252** of FIG. **15**A further identifying the user.

Arrow **2270** directs the flow of execution from starting operation **2252** to operation **2272**. Operation **2272** performs fetching a user profile list based upon the user site and the user profile list containing at least one user profile. Arrow **2274** directs execution from operation **2272** to operation **2276**. Operation **2276** performs identifying the user based upon the speech content and based upon the user profile list to create an identified user. Arrow **2278** directs execution from operation **2276** to operation **2280**. Operation **2280** terminates the operations of this flowchart.

FIG. **16** depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2290** directs the flow of execution from starting operation **2112** to operation **2292**. Operation **2292** performs assessing the speech response based upon the identified user

to create a financial consequence for the identified user. Arrow **2294** directs execution from operation **2292** to operation **2296**. Operation **2296** performs displaying the financial consequence to create a displayed financial consequence at the user site. Arrow **2298** directs execution from operation **2296** to operation **2300**. Operation **2300** performs confirming the displayed financial consequence from the user site based upon the identified user to create a financial commitment. Arrow **2302** directs execution from operation **2300** to operation **2304**. Operation **2304** performs billing the identified user based upon the financial commitment. Arrow **2306** directs execution from operation **2304** to operation **2308**. Operation **2308** terminates the operations of this flowchart.

FIG. **17**A depicts the speech content response **2350**, including the current response menu **2352** and the cumulative user site response **2354**, in accordance with the invention.

The speech content response may include a current response menu and a cumulative user site response identified as to the user site for at least one of the user sites.

FIG. **17**B depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2330** directs the flow of execution from starting operation **2112** to operation **2332**. Operation **2332** performs responding to the speech contents based upon the current response menu and based upon the cumulative user site response to create a new cumulative user site response. Arrow **2334** directs execution from operation **2332** to operation **2336**. Operation **2336** terminates the operations of this flowchart.

Arrow **2340** directs the flow of execution from starting operation **2112** to operation **2342**. Operation **2342** performs assessing the speech contents based upon the current response menu and based upon the cumulative user site response to create a new current response menu. Arrow **2344** directs execution from operation **2342** to operation **2336**. Operation **2336** terminates the operations of this flowchart.

At least one of operations **2332** or **2342** may be performed.

FIG. **18**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2370** directs the flow of execution from starting operation **2112** to operation **2372**. Operation **2372** performs responding to the speech content, identified as to the user site, based upon a natural language, to create a speech content response of the speech content identified as to user site. Arrow **2374** directs execution from operation **2372** to operation **2376**. Operation **2376** terminates the operations of this flowchart.

FIG. **18**B depicts a detail flowchart of operation **2092** of FIG. **11**B further processing the multiplicity of the received speech channels.

Arrow **2390** directs the flow of execution from starting operation **2092** to operation **2392**. Operation **2392** performs processing the received speech channels from the user site based upon a natural language for the user site to create the speech content identified as to the user site. Arrow **2394** directs execution from operation **2392** to operation **2396**. Operation **2396** terminates the operations of this flowchart.

FIG. **19**A depicts a simplified block diagram of a hand held remote **1000**, containing microphone **1060** and keypad **1020** supporting user input organized and processed by embedded controller **1050** for communication by wireless interface **1040** coupled **1002** to set-top apparatus **1100**, as shown in FIG. **3**.



FIG. **19**B depicts a simplified block diagram of set-top apparatus **1100** as shown in FIG. **3** showing coupling **1002** and first wireline physical transport **1200** comprised of downlink coupling **1202** and uplink coupling **1204**.

Note that microphone **1060** may include more than one audio-sensor and/or a microphone array of two or more microphone units.

FIG. **19**C further depicts set-top apparatus **1100** as shown in FIG. **19**B containing a set-top appliance **1120** coupled **1002** with hand held remote **1000**. Set-top appliance **1120** is coupled **1112** with set-top box **1110** possessing downlink coupling **1202** and uplink coupling **1204**.

FIG. **19**D further depicts set-top apparatus **1100** as shown in FIG. **19**B containing a set-top appliance **1120** coupled **1002** with hand held remote **1000** and possessing downlink coupling **1202** and uplink coupling **1204**. Set-top appliance **1120** provides processed downlink coupling **1114** to set-top box **1110** and receives initial uplink coupling **1112** from set-top box **1110**.

Regarding FIG. **19**A–**19**D, the following observations may be made.

The invention supports uni-directional communication via coupling **1002**, supporting communicative transfer from the remote **1000** via coupling **1002** to set-top apparatus **1100**.

The invention supports bi-directional communication via coupling **1002**. Note that noise-canceling microphones **1060** may use bi-directional communication on coupling **1002**. Noise cancellation may be performed within set-top apparatus **1100**, by at least one of the set-top box **1110** and set-top appliance **1120**.

Wireless interface **1040** interacts with coupling **1002**. Coupling **1002** may use a wireless transport, including, but not limited to, at least one of infra-red, microwave or radio frequency spectrum regions, as well as ultrasonic signaling. Embedded controller **1050** controls **1042** wireless interface **1040**. Embedded controller **1150** communicates via **1042** with wireless interface **1040** to direct communication across coupling **1002**.

FIG. **20**A depicts a simplified block diagram of set-top appliance **1120** as shown in FIG. **19**C supporting coupling **1002** with hand held remote **1000** and coupling **1112** with set-top box **1110**.

Computer **1150** is coupled **1132** to remote interface **1130** and also coupled **1142** to set-top box interface **1140**. Computer **1150** executes a program system including program steps residing in accessibly coupled **1162** memory **1160**.

The program system executed by computer **1150** includes program steps maintaining hand held remote **1000** communication through remote interface **1130** and maintaining set-top box **1120** communication through set-top box interface **1140**.

Remote interface **1130** couples **1002** with hand held remote **1000** (not shown in FIG. **20**A).

Remote interface **1130** incorporates the necessary device or devices to provide communications using the embodiment's physical transport layer.

Set-top box interface **1140** couples **1112** with set-top box **1120**, as shown in FIG. **19**C. Coupling **1112** may use a wireline or wireless physical transport. Coupling **1112** may use a wireless transport, including, but not limited to, at least one of the infra-red, microwave or radio frequency spectrum, as well as ultrasonic signaling. Set-top box interface

**1140** incorporates the necessary device or devices to provide communications using the embodiment's physical transport layer.

FIG. **20**B depicts a simplified block diagram of set-top appliance **1120** as shown in FIG. **19**D supporting coupling **1002** with hand held remote **1000** and couplings **1112** and **1114** with set-top box **1110**.

Set-top box interface **1140** provides processed downlink coupling **1114** to set-top box **1110** and receives initial uplink coupling **1112** from set-top box **1110** as shown in FIG. **19**D. Set-top box interface **1140** incorporates the necessary device or devices to provide these communications.

FIG. **20**C depicts a block diagram further depicting accessibly coupled **1162** memory **1160** as shown in FIGS. **20**A and **20**B.

Accessibly coupled **1162** memory **1160** may contain RAM memory **1180** coupled **1182** to computer **1150**. Accessibly coupled memory **1160** may include more than one RAM memory **1180**. Distinct RAM memories **1180** may be distinctly coupled to computer **1150**. One or more RAM memories **1180** may act as a cache memory for computer **1150**.

Accessibly coupled **1162** memory **1160** may contain non-volatile memory **1190** coupled **1192** to computer **1150**. Accessibly coupled memory **1160** may include more than one non-volatile memory **1190**. Distinct non-volatile memories **1190** may be distinctly coupled to computer **1150**. A non-volatile memory may be organized as file management system.

Note that the coupling **1182** of RAM memory **1180** may be distinct from coupling **1192** of non-volatile memory **1190** with computer **1150**. Either RAM memory and/or non-volatile memory components may be packaged with computer **1150**.

FIG. **21** depicts a remote control unit **1000-180** coupled **1002-180** to set-top apparatus **1100-180**. Set-top appliance **1100-180** communicates via a one- or two-stage wireline communications system containing a wireline physical transport **1200** to an augmented distributor node **1310**. The communications traverse augmented distributor node **1310** interfaced to a wireline communications loop including an augmented Headend **1410**. The network may further support a communications loop including augmented metropolitan Headend **1410**.

As used herein, the adjective augmented is used to refer to a node incorporating at least one embodiment of the invention.

Augmented node **1310** may control and support optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems" by Calderone and Foster, both inventors of this application and commonly assigned to AgileTV, and incorporated herein by reference.

Augmented node **1310** may provide cached content such as popular videos for a VOD service.

Speech processing may be performed in many situations at augmented node **1310**.

Augmented Headend **1410** and augmented metropolitan Headend **1410** provide speech processing capabilities. Augmented Headend **1410** may be used to handle speech processing for nodes **120** and **124**. Augmented metropolitan Headend **1410** may be used to handle speech processing for Headends **100** and **106**. Headends **100** and **106**, and nodes **120** and **124** are not augmented by this invention.

Alternatively, augmented Headend **1410** may control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems". Node **1310** may support the optimized upstream communication. Upstream communication from augmented node **1310** and from augmented Headend **1410** may employ the same upstream communications protocol, or different upstream communications protocol.

Note that metropolitan Headend **1410** may not be involved in the optimized upstream communication scheme.

Alternatively, metropolitan Headend **1410** may be involved in the optimized upstream communication scheme. Augmented metropolitan Headend **1410** may further control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems". Augmented Headend **1410** may support the optimized upstream communication between node **1310** and set-top apparatus **1100-180**. Node **1310** may then carry out the optimized upstream communication. Upstream communication from augmented node **1310** and from augmented Headend **1410** may employ the same upstream communications protocol, or different upstream communication protocols.

Note that in certain network installations, there may be no metropolitan Headend, augmented or otherwise. Further, in certain network installations, there may only be one Headend.

FIG. **22** depicts a remote control unit **1000-180** coupled **1002-180** to set-top apparatus **1100-180**, communicating via a two-stage wireline communications system containing a wireline physical transport **1200** to a distributor node **126**. Distributor node **126** interlaces to a wireline communications loop including an augmented Headend **1414**. The network may further support a communications loop including augmented metropolitan Headend **1410**, in accordance with the invention.

Augmented Headend **1414** may control and support optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems" by Calderone and Foster, both inventors of this application and commonly assigned to AgileTV, incorporated herein by reference.

Augmented Headend **1414** may provide cached content such as popular videos for a VOD service. Speech processing may be performed in many situations at augmented Headend **1414**

Augmented metropolitan Headend **1410** may further provide speech processing capabilities. Augmented metropolitan Headend **1410** may be used to handle speech processing requirements for Headends **100** and **106**, which are not augmented by this invention.

The couplings between STB **1100-180**, Node **126** and Headend **1410** may also support bi-directional communication allowing the STB **1100-180** to receive multiple television channels and allowing STB **1100-180** to signal at least limited information to augmented Headend **1410**, which may well include management of Pay-per-View and other services.

Alternatively, augmented metropolitan Headend **1410** may control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems. Augmented Headend **1414** may then support the optimized upstream communication. Upstream communication from augmented node **126** and

from augmented Headend **1410** may employ the same upstream communications protocol, or a different upstream communications protocol.

Note that metropolitan Headend **1410** may not be involved in the optimized upstream communication scheme.

Alternatively, metropolitan Headend **1410** may be involved in the optimized upstream communication scheme. Augmented metropolitan Headend **1410** may further control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems. Augmented Headend **1410** may support the optimized upstream communication between node **126** and set-top apparatus **1100-180**. Node **126** may then carry out the optimized upstream communication. Upstream communication from node **126** and from augmented Headend **1410** may employ the same upstream communications protocol, or different upstream communication protocols.

Note that in certain network installations, there may be no metropolitan Headend, augmented or otherwise. Further, in certain network installations, there may only be one Headend.

FIG. **23** depicts a detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. **21**.

Note that there may be one transport **1200**. Transceiver **1320** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIG. **21**.

There may be multiple transports **1200** corresponding to wireline circuits servicing combinations of at least one of the interfaces **170**, **174** and **178**, as shown in FIGS. **1**, **2**, **21** and **22**. Transceiver **1320** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIGS. **21** and **22**. Note that transceiver **1320** may provide multiple uplinks **1204**. Transceiver **1320** may provide multiple downlinks **1202**.

Transceiver **1320** may include transmitter **1324** providing downlink **1202** communications to wireline physical transport **1200**. Multiple downlinks **1202** may be provided by transmitter **1324**. Alternatively, multiple downlinks **1202** may be provided by more than one transmitter **1324**.

Transceiver **1320** may include receiver **1322** providing uplink **1204** communications from wireline physical transport **1200**. Multiple uplinks **1204** may be provided by receiver **1322**. Alternatively, multiple uplinks **1204** may be provided by more than one receiver **1322**.

Wireline physical transport **1200** may further include separate uplink physical transport **1204** and downlink physical transport **1202**. Various embodiments of the invention may include multiple uplink physical transports **1204**. Various embodiments of the invention may include multiple downlink physical transports **1202**. There may be a difference in the number of uplink physical transports **1204** and the number of downlink physical transports **1202**.

Note that there may be a difference in the number of transmitters **1324** and the number of receivers **1322**.

By way of example, referring to FIG. **21**, one downlink stream **1202** may be sent to interface **170**, and a second downlink stream, not shown in FIG. **21** or FIG. **23**, may be sent to interface **174**. One uplink stream **1204** may be received from interface **170**, and a second uplink stream, not shown in FIG. **21** or FIG. **23**, may be received from interface **174**.

Hereafter, the discussion focuses on a single transmitter **1324** providing as many downlinks **1202** and on a single receiver **1322** providing as many uplinks **1204** as required. This is done strictly to simplify the discussion and is not meant to imply any limitation on the invention.

Uplink **1204** communication includes a back channel. This back channel includes multiple identified speech channels from multiple user sites (STBs) **1100**, as shown in FIGS. **21** and **22**. Receiver **1322** provides **1326** a back channel to speech engine **1330**. Speech engine **1330** performs at least the operations of FIG. **10**.

Speech engine **1330** further communicatively interacts **1374** with network interface **1370**. Network interface **1370** couples **1372** to other network components. Network coupling **1372** may further include a predominantly input coupling **1306** and a predominantly output coupling **1308**.

Network interface **1370** may communicatively interact **1376** with local system management and billing **1380**. Local system management and billing **1380** may include systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Local system management and billing **1380** may further maintain systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Local system management and billing **1380** may include a cache of systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Receiver **1322** provides **1326** a back channel to speech engine **1330**. Speech engine **1330** performs at least the operations of FIG. **10**. Speech engine **1330** further communicatively interacts **1374** with network interface **1370**.

Speech engine **1330** may communicatively interact **1382** with system management and billing **1380**. Speech engine **1330** may send **1382** system management and billing **1380** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits, and parental safeguards. Speech engine **1330** may send **1382** system management and billing **1380** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech engine **1330** may receive **1382** from system management and billing **1380** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech engine **1330** may receive **1382** from system management and billing **1380** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1370** or other external communications networks **1312**.

System management and billing **1380** may further include interfaces to other external communications networks. Such circuitry is not the subject of this invention and is not discussed further herein.

Similarly, the mechanism of contract acceptance between system management and billing **1380** and financial engines is not the subject of this invention and is not discussed further herein.

Speech engine **1330** may receive **1338** from content engine **1340** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Content status information may include a list of content items cached through the network. Content status informa-

tion may further include a list of content items cached at the node. Cached content items may include Interactive Program Guide (IPG) listings for some period of time. Cached content items may include one or more video sequences provided through Video On Demand (VOD) or Pay-Per-View services.

Content engine **1340** communicatively interacts **1378** with network interface **1370**. Content engine **1340** may provide at least one locally generated multi-media stream **1342** to Multiplexor engine **1360** as well as at least one multi-media stream **1344** received **1378** through network interface **1370**. Content engine **1340** may modify multi-media stream **1344** received **1378** from network interface **1370** through network input **1306**. Content engine **1340** may stimulate **1378** network interface **1370**, altering network output **1308** from network interface **1370**.

Content engine **1340** may have more than one registered application server each presenting static menu content and dynamic content. A speech processor within speech engine **1330** may be presented a grammar based upon the static and dynamic content of multiple registered application servers. The merged services may be presented to the users as specialized, multi-application service menus provided by the speech engine **1330** to the users.

Speech engine **1330** may generate one or more channels of speech response content through coupling **1332** to modulator engine **1350**. Modulator engine **1350** may further provide **1334** status and reliability information to speech engine **1330**. Speech response content channels presented through coupling **1332** may be digital. Speech response content channels may be presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed onto coupling **1332** by speech engine **1330**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing. Modulator engine **1350** may demultiplex multiple multiplexed channels received through coupling **1332**. Modulator engine **1250** may convert one or more demultiplexed channels into modulated channels, or modulated collections of channels, presented **1352** and **1354** to multiplexor engine **1360**.

Multiplexor engine **1360** accepts the multiple locally generated channels **1352**, **1354** and **1342** as well as the locally received, and possibly modified, external stream **1344** to create at least one merged stream **1362**. Multiplexor engine **1360** may create more than one merged stream, e.g. **1364**.

Transmitter **1324** receives at least one merged stream **1362** from multiplexor engine **1360** to generate at least one downlink stream **1202** of physical transport **1200**. Transmitter **1324** may receive more than one merged stream **1364** from multiplexor engine **1360**.

Speech engine **1330** may further interact **1312** with an external network. Such an interaction may involve at least one wireline physical transport layer. The wireline physical layer may support at least one or a combination of communication protocols using optical, infra-red and radio frequency regions of the electromagnetic spectrum. Network interactions **1312** may support message passing protocols, including, but not limited to, TCP-IP. Network interactions **1312** may further support communications with the Internet and World Wide Web.

FIG. **24** depicts an alternative detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. **21**.



Receiver **1322** provides a back channel to speech engine **1330** through interactions **1328** with switch **1390** delivering **1392** the back channel to speech engine **1330**.

Speech engine **1330** communicatively interacts **1374** with network interface **1370** by the speech engine **1330** interacting **1392** with switch **1390** which interacts **1398** with network interface **1370**.

Network interface **1370** may communicatively interact with local system management and billing **1380** by communicatively interacting **1398** with switch **1390**, which communicatively interacts **1396** with system management and billing **1380**.

Speech engine **1330** may communicatively interact **1382** with system management and billing **1380** by communicatively interacting **1392** with switch **1390**, which communicatively interacts with system management and billing **1380**.

Speech engine **1330** may receive content status information from content engine **1340** by content engine **1340** interacting **1394** with switch **1390**, which delivers **1392** the content status information to speech engine **1330**.

Content engine **1340** communicatively interacts with network interface **1370** by content engine **1340** communicatively interacting with switch **1390** and network interface **1370** communicatively interacting with switch **1390**.

Switch **1390** may support digital interfaces. Switch **1390** may include a circuit switch. The circuit switch may support Ethernet protocols. Switch **1390** may include an ATM switch. Switch **1390** may support analog interfaces. Such analog interfaces may include wavelength division multiplexing. Switch **1390** may be composed of more than one switch.

The invention may include various combinations of direct interconnections and switch networks as shown in FIGS. **23** and **24**.

FIG. **25** depicts a generic block diagram of a prior art Headend **104** as shown in FIG. **3**.

Uplink **138** communication includes a back channel.

This back channel includes multiple response channels from multiple user sites STBs, as shown in FIGS. **1** and **2**. Receiver **1422** provides **1427** a back channel to content engine **1440**.

Network interface **1470** may communicatively interacts **1476** with Headend system management and billing **1480**. Headend system management and billing **1480** may include systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend.

Headend system management and billing **1480** may further maintain systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend.

Headend system management and billing **1480** may include a cache of systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend.

System management and billing **1480** may further include interfaces to other external communications networks. Such circuitry is not the subject of this invention and is not discussed further herein.

Content status information may include a list of content items cached through the network. Content status information may further include a list of content items cached at the node. Cached content items may include Interactive Program Guide (IPG) listings for some period of time. Cached content items may include one or more video sequences provided through Video On Demand (VOD) or Pay-Per-View services.

Content engine **1440** communicatively interacts **1478** with network interface **1470**. Content engine **1440** may provide at least one locally generated multi-media stream **1442** to Multiplexor engine **1460** as well as at least one multi-media stream **1444** received **1478** through network interface **1470**. Content engine **1440** may modify multi-media stream **1444** received **1478** from network interface **1470** through network input **1406**. Content engine **1440** may stimulate **1478** network interface **1470**, altering network output **1408** from network interface **1470**.

Content engine **1340** may include, but is not limited to, one or more standard components of a head-end, OTA Receivers: Over The Air Receivers and Satellite receivers and Set-Top Box Controller. A Set-Top Box Controller is the transmission equivalent of the Headend receiver. This box sends commands from the head-end to the individual user's set-top box. Those commands may include change channel, set decryption key to the following, enable the set-top box to present a pay channel.

Multiplexor engine **1460** accepts the multiple locally generated channels **1452**, **1454** and **1442** as well as the locally received, and possibly modified, external stream **1444** to create at least one merged stream **1462**. Multiplexor engine **1460** may create more than one merged stream, e.g. **1464**.

Transmitter **1424** receives at least one merged stream **1462** from multiplexor engine **1460** to generate at least one downlink stream **132** of physical transport **1200**. Transmitter **1424** may receive more than one merged stream **1464** from multiplexor engine **1460**.

FIG. **26** depicts an augmented Headend **1410** of FIG. **21** or an augmented Headend **1414** of FIG. **22** or an augmented metropolitan Headend **1410** of FIGS. **21** or **22**, in accordance with the invention.

Note that there may be one transport **1200**. Transceiver **1420** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIG. **21**.

There may be multiple transports **1200** corresponding to wireline circuits servicing combinations of at least one of the interfaces **170**, **174** and **178**, as shown in FIGS. **1**, **2**, **21** and **22**. Transceiver **1420** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIGS. **21** and **22**. Note that transceiver **1420** may provide multiple uplinks **1204**. Transceiver **1420** may provide multiple downlinks **1202**.

Transceiver **1420** may include transmitter **1424** providing downlink **1202** communications to wireline physical transport **1200**. Multiple downlinks **1202** may be provided by transmitter **1424**. Alternatively, multiple downlinks **1202** may be provided by more than one transmitter **1424**.

Transceiver **1420** may include receiver **1422** providing uplink **1204** communications from wireline physical transport **1200**. Multiple uplinks **1204** may be provided by receiver **1422**. Alternatively, multiple uplinks **1204** may be provided by more than one receiver **1422**.

Wireline physical transport **1200** may further include separate uplink physical transport **1204** and downlink physical transport **1202**. Various embodiments of the invention may include multiple uplink physical transports **1204**. Various embodiments of the invention may include multiple downlink physical transports **1202**. There may be a difference in the number of uplink physical transports **1204** and the number of downlink physical transports **1202**.

Note that there may be a difference in the number of transmitters **1424** and the number of receivers **1422**.

As earlier, the discussion focuses on a single transmitter **1424** providing as many downlinks **1202** and on a single receiver **1422** providing as many uplinks **1204** as required. This is done strictly to simplify the discussion and is not meant to imply any limitation on the invention.

Uplink **1204** communication includes a back channel. This back channel includes multiple identified speech channels from multiple user sites (STBs) **1100**, as shown in FIGS. **21** and **22**. Receiver **1422** provides **1426** a back channel to speech engine **1430**. Speech engine **1430** performs at least the operations of FIG. **10**.

Speech engine **1430** further communicatively interacts **1474** with network interface **1470**. Network interface **1470** couples **1472** to other network components. Network coupling **1472** may further include a predominantly input coupling **1406** and a predominantly output coupling **1408**.

Network interface **1470** may communicatively interact **1476** with Headend system management and billing **1480**. Headend system management and billing **1480** may include systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend node.

Headend system management and billing **1480** may further maintain systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend node.

Headend system management and billing **1480** may include a cache of systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend node.

Speech engine **1430** may communicatively interact **1482** with system management and billing **1480**. Speech engine **1430** may send **1482** system management and billing **1480** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech engine **1430** may send **1482** system management and billing **1480** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech engine **1430** may receive **1482** from system management and billing **1480** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech engine **1430** may receive **1482** from system management and billing **1480** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1470**, or other external communications networks.

System management and billing **1480** may further include interfaces to other external communications networks. Such circuitry is not the subject of this invention and is not discussed further herein.

Similarly, the mechanism of contract acceptance between system management and billing **1480** and financial engines is not the subject of this invention and is not discussed further herein.

Speech engine **1430** may receive **1438** from content engine **1440** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Content status information may include a list of content items cached through the network. Content status information may further include a list of content items cached at the node. Cached content items may include Interactive Pro-

gram Guide (IPG) listings for some period of time. Cached content items may include one or more video sequences provided through Video On Demand (VOD) or Pay-Per-View services.

Content engine **1440** communicatively interacts **1478** with network interface **1470**. Content engine **1440** may provide at least one locally generated multi-media stream **1442** to Multiplexor engine **1460** as well as at least one multi-media stream **1444** received **1478** through network interface **1470**. Content engine **1440** may modify multi-media stream **1444** received **1478** from network interface **1470** through network input **1406**. Content engine **1440** may stimulate **1478** network interface **1470**, altering network output **1408** from network interface **1470**.

Speech engine **1430** may generate one or more channels of speech response content through coupling **1432** to modulator engine **1450**. Modulator engine **1450** may further provide **1434** status and reliability information to speech engine **1430**. Speech response content channels presented through coupling **1432** may be digital. Speech response content channels may be presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed onto coupling **1432** by speech engine **1430**. The multiplexing mechanism onto channel **1432** may perform time division multiplexing. Modulator engine **1450** may demultiplex multiple multiplexed channels received through coupling **1432**. Modulator engine **1250** may convert one or more channels into modulated channels or modulated collections of channels then presented **1452** and **1454** to multiplexor engine **1460**.

Multiplexor engine **1460** accepts the multiple locally generated channels **1452**, **1454** and **1442** as well as the locally received, and possibly modified, external stream **1444** to create at least one merged stream **1462**. Multiplexor engine **1460** may create more than one merged stream, e.g. **1464**.

Transmitter **1424** receives at least one merged stream **1462** from multiplexor engine **1460** to generate at least one downlink stream **1202** of physical transport **1200**. Transmitter **1424** may receive more than one merged stream **1464** from multiplexor engine **1460**.

FIG. **27** depicts an alternative augmented Headend **1410** of FIG. **21** or an alternative augmented Headend **1414** of FIG. **22** or an alternative augmented metropolitan Headend **1410** of FIGS. **21** or **22**, in accordance with the invention.

Receiver **1422** provides a back channel to speech engine **1430** through interactions **1428** with switch **1490** delivering **1492** the back channel to speech engine **1430**.

Speech engine **1430** communicatively interacts **1474** with network interface **1470** by the speech engine **1430** interacting **1492** with switch **1490** which interacts **1498** with network interface **1470**.

Network interface **1470** may communicatively interact with Headend system management and billing **1480** by communicatively interacting **1498** with switch **1490**, which communicatively interacts **1496** with system management and billing **1480**.

Speech engine **1430** may communicatively interact **1482** with system management and billing **1480** by communicatively interacting **1492** with switch **1490**, which communicatively interacts with system management and billing **1480**.

Speech engine **1430** may receive content status information from content engine **1440** by content engine **1440** interacting **1494** with switch **1490**, which delivers **1492** the content status information to speech engine **1430**.

Content engine **1440** communicatively interacts with network interface **1470** by content engine **1440** communicatively interacting with switch **1490** and network interface **1470** communicatively interacting with switch **1490**.

Switch **1490** may support digital interfaces. Switch **1490** may include a circuit switch. The circuit switch may support Ethernet protocols. Switch **1490** may include an ATM switch. Switch **1490** may support analog interfaces. Such analog interfaces may include wavelength division multiplexing. Switch **1490** may be composed of more than one switch.

The invention may include various combinations of direct interconnections and switch networks as shown in FIGS. **23** and **24**.

Note that a single computer may perform the operations of the speech engine as shown in FIG. **10**. The computer performs these operations as controlled by a program system including program steps residing in accessibly coupled memory.

FIG. **28**A depicts a block diagram of a speech engine **1330** as shown in FIG. **23**.

Receiver **1322** provides **1326** a back channel to speech processor computer **1520**. Speech processor computer **1520** further communicatively interacts **1374** with network interface **1370**.

Speech processor computer **1520** may communicatively interact **1382** with system management and billing **1380**. Speech processor computer **1520** may send **1382** system management and billing **1380** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1520** may send **1382** system management and billing **1380** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech processor computer **1520** may receive **1382** from system management and billing **1380** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1520** may receive **1382** from system management and billing **1380** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1370** or other external communications networks **1312**.

Speech processor computer **1520** may receive **1338** from content engine **1340** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Speech processor computer **1520** may generate one or more channels of speech response content through coupling **1332** to modulator engine **1350**. Modulator engine **1350** may further provide **1334** status and reliability information to speech processor computer **1520**. Speech response content channels presented through coupling **1332** may be digital. Speech response content channels may be presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed onto coupling **1332** by speech processor computer **1520**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing. Modulator engine **1350** may demultiplex multiple multiplexed channels received through coupling **1332**. Modulator engine **1250** may convert one or more demultiplexed channels into modulated channels or modulated collections of channels then presented **1352** and **1354** to multiplexor engine **1360**.

Speech processor computer **1520** may further interact **1312** with an external network. Such an interaction may involve at least one wireline physical transport layer. The wireline physical layer may support at least one or a combination of communication protocols using optical, infra-red and radio frequency regions of the electromagnetic spectrum. Network interactions **1312** may support message passing protocols, including, but not limited to, TCP-IP. Network interactions **1312** may further support communications with the Internet and World Wide Web.

Speech processor computer **1520** communicatively couples with mass storage **1540**. Mass storage **1540** may include, but is not limited to, a disk, disk farm, or RAID. Mass storage **1540** may be organized by a file management system, or by one or more database management systems, or by a combination of file management and at least one database management system.

FIG. **28**B depicts a block diagram of a speech engine **1330** as shown in FIG. **24**.

Receiver **1322** provides a back channel to speech processor computer **1520** through interactions **1328** with switch **1390** delivering **1392** the back channel to speech engine **1520**.

Speech processor computer **1520** communicatively interacts **1374** with network interface **1370** by the speech processor computer **1520** interacting **1392** with switch **1390** which interacts **1398** with network interface **1370**.

Speech processor computer **1520** may communicatively interact **1382** with system management and billing **1380** by communicatively interacting **1392** with switch **1390**, which communicatively interacts with system management and billing **1380**.

Speech processor computer **1520** may receive content status information from content engine **1340** by content engine **1340** interacting **1394** with switch **1390**, which delivers **1392** the content status information to speech processor computer **1520**.

As in FIG. **24**, switch **1390** may support digital interfaces. Switch **1390** may include a circuit switch. The circuit switch may support Ethernet protocols. Switch **1390** may include an ATM switch. Switch **1390** may support analog interfaces. Such analog interfaces may include wavelength division multiplexing. Switch **1390** may be composed of more than one switch.

The operational discussions found in FIGS. **3**, **4**, **5** and **28**A are directly applicable to systems implementing the invention and resembling the block diagram of FIG. **28**B. They will not be presented regarding FIG. **28**B. This is done simply to clarify the disclosure and is not intended in any way to limit the scope of the claims.

The invention may include various combinations of direct interconnections and switch networks as shown in FIGS. **23** and **24**.

FIG. **29** depicts a more detailed block diagram of a speech engine **1330** containing gateway **3100** and tightly coupled server array **3200** as shown in FIG. **28**A.

Server array **3200** includes at least speech processor computer **1520** communicatively coupled with at least speech gateway **3100**.

Receiver **1322** provides **1326** a back channel to speech processor computer **1520** via speech gateway **3100**. Speech gateway **3100** may further cache speech utterances from various user sites for speech processor computer **1520**.

Speech processor computer **1520** further communicatively interact **1374** with network interface **1370** via speech network gateway **1582**.

Speech processor computer **1520** may communicatively interact **1382** with system management and billing **1380** via secure interface **1578**. Speech processor computer **1520** may send **1382** via secure interface **1578** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1520** may send **1382** via secure interface **1578** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech processor computer **1520** may receive **1382** via secure interface **1578** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1520** may receive **1382** via secure interface **1578** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1370** or other external communications networks **1312**.

Speech processor computer **1520** may receive **1338** from content engine **1340** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Speech processor computer **1520** may generate one or more channels of speech response content through coupling **1332** to modulator engine **1350**. Modulator engine **1350** may further provide **1334** status and reliability information to speech processor computer **1520**. Speech response content channels presented through coupling **1332** may be digital. Speech response content channels may be presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed onto coupling **1332** by speech processor computer **1520**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing.

Speech processor computer **1520** may further interact **1312** with an external network. Such an interaction may involve at least one wireline physical transport layer, each using at least one of optical, infra-red and radio frequency regions of the electromagnetic spectrum. Network interactions **1312** may support message passing protocols, including, but not limited to, TCP-IP and may further support communications with the Internet and World Wide Web.

FIG. **30** depicts an alternative detailed block diagram of a speech engine **1330** as shown in FIG. **28**A.

Speech engine **1330** includes server array **3200**. Server array **3200** includes at least speech processor computer **1580** and speech processor computer **1590**. At least one of speech processor computer **1580** and speech processor computer **1590** communicatively couples with speech gateway **3100**.

Receiver **1322** provides **1326** a back channel to server array **3200** via speech content gateway **3100**. Speech content gateway **3100** may further cache speech utterances from various user sites for server array **3200**.

Speech content gateway **3100** may further include a computer accessibly coupled **3102** with memory **3104**. Speech content gateway **3100** may be controlled by a program system containing program steps residing in memory **3104** for at least one of the operations of FIG. **10**.

Speech processor computer **1580** and/or **1590** may communicatively interact **1382** with system management and billing **1380** via secure interface **1578**. Speech processor computer **1580** and/or **1590** may send **1382** via secure

interface **1578** requests for user account information, including, but not limited to, requests for credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1580** and/or **1590** may send **1382** via secure interface **1578** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech processor computer **1580** and/or **1590** within server array **3200** may receive **1382** via secure interface **1578** credit information, authorization profiles for channel viewing, credit limits, parental safeguards as well as confirmation of acceptance of contracts from financial engines.

Acceptance of contracts from external financial engines may be received in a number of different ways, including speech processor computer **1580** and/or **1590** interacting through network gateway **1560** with network interface **1374** and/or other external communications networks **1312**.

Either speech processor computer **1580** or **1590** within server array **3200** may receive **1338** from content engine **1340** content status information.

Either speech processor computer **1580** or **1590** within server array **3200** may generate one or more channels of speech response content through modulator interface **1570** coupling **1332** to modulator engine **1350**. Modulator engine **1350** may provide **1334** status and reliability information through modulator interface **1570** to at least one of speech processor computer **1580** and **1590** within server array **3200**. Speech response content channels presented through modulator interface **1570** to coupling **1332** may be digital, presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed through modulator interface **1570** onto coupling **1332** by server array **3200**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing. The multiplexing mechanism may be performed by modulator interface **1570**.

At least one speech processor computer **1580** and **1590** within server array **3200** may communicatively interact **1374** with network interface **1370** via network gateway **1560**.

At least one speech processor computer **1580** and **1590** within server array **3200** may interact **1312** with an external network involving at least one wireline physical transport layer. The wireline physical layer may support one or a combination of communication protocols using optical, infra-red and radio frequency regions of the electromagnetic spectrum. Network interactions **1312** may support message passing protocols, including but not limited to, TCP-IP, possibly including communications with the Internet and World Wide Web.

Speech processor computer **1580** and/or **1590** communicatively couples with mass storage **1540**. Mass storage **1540** may include, but is not limited to, a disk, disk farm, or RAID organized by a file management system and/or by one or more database management systems.

Speech processor computer **1580** and/or Speech processor computer **1590** may perform at least some of the operations of FIG. **10** and be directed by program system **2000** containing program steps residing in memory **1586** and/or **1596** accessibly coupled **1585** and/or **1595** to the respective speech processor computer.

Speech processor computer **1580** may perform the same operations of FIG. **10** as speech processor computer **1590**, possibly processing speech from different user sites.

Speech processor computer **1580** may perform different operations of FIG. **10** than speech processor computer **1590**. By way of example, speech processor computer **1580** may perform receiving the back channel **2004** and partitioning the back channel into the multiple received identified speech channels **2012**. Speech processor computer **1590** may perform processing the multiple received identified speech channels to create multiple identified speech contents **2022** and responding to the multiple identified speech contents **2032**.



Speech engine **1330** may be controlled by a program system **2000** implementing the operations of FIG. **10** distributed as program steps residing in at least one of the memories **3104**, **1586** and **1596**. Each of the operations **2004**, **2012**, **2022**, and **2032** may be implemented as program steps residing in memories **3104**, **1586** and **1596**.

By way of example, speech content gateway **3100** receives the back channel **2004**. Speech processor computer **1580** partitions the back channel into the multiple received identified speech channels **2012**. Speech processor computer **1590** processes the multiple received identified speech channels to create multiple identified speech contents **2022** and responds to the multiple identified speech contents **2032**.

By way of an alternative example, speech content gateway **3100** receives the back channel **2004** and partitions the back channel into the multiple received identified speech channels **2012**. Speech processor computers **1580** and **1590** each process the multiple received identified channels to create multiple identified speech contents **2022** and respond to the multiple identified speech contents **2032**. Speech processor computers **1580** and **1590** perform these operations upon different identified speech channels based upon allocation decisions performed by speech content gateway **3100**. To process a speech sample by the allocated speech processor computer into speech content, the processor computer must first contain in its local memory a copy of the grammar definition associated with the user site.

FIG. **31** depicts a second alternative detailed block diagram of a speech engine **1430**.

Server array **3200** at least includes speech processor computer networks **1640** and **1650**. At least one computer contained in speech processor computer network **1640** and/or **1650** communicatively couples with speech gateway **3100**.

At least one computer contained in speech processor computer network **1640** and/or **1650** performs at least some of the operations of FIG. **10** and may be directed by program system **2000** containing program steps residing in memory accessibly coupled to that computer.

Speech processor computer network **1640** may perform different operations of FIG. **10** than speech processor computer network **1650**. By way of example, speech processor computer network **1640** processes the multiple received identified speech channels to create multiple identified speech contents **2022**. Speech processor computer network **1650** responds to the multiple identified speech contents **2032**.

Speech engine **1430** may be controlled by a program system implementing FIG. **10**, distributed as program steps residing in memories accessibly coupled to at least one computer in one or more of the following: speech content gateway **3100**, speech processor computer network **1640** and/or speech processor computer network **1650**. Each of the operations **2004**, **2012**, **2022**, and **2032** may be implemented as program steps residing in at least one of these memories.

By way of example, one or more computers in the speech content gateway **3100** receive the back channel **2004** and partition the back channel into the multiple received identified speech channels **2012**. Computers in speech processor

computer networks **1640** and/or **1650** process the multiple received identified speech channels to create multiple identified speech contents **2022** and respond to the multiple identified speech contents **2032**. Computers in the speech processor computer networks perform these operations upon identified speech channels based upon allocation decisions performed by speech content gateway **3100**.

At least one computer in speech processor computer network **1640** and/or **1650** communicatively interacts **1482** with system management and billing **1480** via secure interface **1630**. That computer(s) may send **1382** via secure interface **1630** requests for user account information as well as commands regarding authorization levels of other users, such as children within a user's household. The user account information may include, but is not limited to, credit information, authorization profiles for channel viewing, credit limits, parental safeguards, user passwords, and confirmation of commitments. A computer in speech processor computer network **1640** and/or **1650** may receive **1482** via secure interface **1630** credit information, authorization profiles for channel viewing, credit limits, parental safeguards, as well as confirmation of acceptance of contracts from financial engines.

Acceptance of contracts from external financial engines may be received in a number of different ways, including through at least one computer in speech processor computer network **1640** and/or **1650** interacting through network gateway **1560** with network interface **1474** or with other external communications networks **1412**.

At least one computer in speech processor computer network **1640** and/or **1650** may receive **1438** from content engine **1440** content status information.

At least one computer in speech processor computer network **1640** and/or **1650** generates one or more channels of speech response content through modulator interface **1620** coupling **1432** to modulator engine **1450**. Modulator engine **1450** may provide **1434** status and reliability information through modulator interface **1620** to at least one computer in speech processor computer network **1640** and/or **1650**.

At least one computer in speech processor computer network **1640** and/or **1650** communicatively interact **1474** with network interface **1470** via network gateway **1610**. At least one computer in speech processor computer network **1640** and/or **1650** may interact **1412** with an external network.

Note that AgileTV™ Voice Processing Unit (AVPU) boxes **3000** may be included in speech engine **1430** and/or in speech processor computer network **1640** and/or **1650**.

FIG. **32**A depicts a block diagram of modulator engine **1350** of FIGS. **23** and **24**, and modulator engine **1450** of FIGS. **26** and **27**.

Speech engine **1330** or **1450** generates one or more channels of speech response content through coupling **1332** or **1432** to modulator engine **1350** or **1450**, respectively. For the sake of simplifying the discussion, from the discussion of FIG. **32**A focuses on its application in FIGS. **23** and **24**. This is done strictly to clarify the discussion and is not meant to limit the scope of the claims.

Modulator engine **1350** may provide **1334** status and reliability information to speech engine **1330**. Speech response content channels presented through coupling **1332** may be digital, presented as bits or clusters of bits.

Multiple channels are multiplexed onto coupling **1332** by speech engine **1330**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing. Modulator engine **1350** demultiplexes the multiple multiplexed channels received through coupling **1332**, converting one or more demultiplexed channels into modulated channels or modulated collections of channels presented **1352** and **1354** to multiplexor engine **1360**.

Note that the invention may target specific layers of a residential broadband network serving at least cable television needs for a user community. Modulator engine **1350** may satisfy specific requirements for a wireline node serving a Hybrid Fiber/Coaxial HFCOax node. Modulator engine **1450** may satisfy specific requirements for a wireline node serving a Headend or serving a metropolitan Headend.

Modulator engine **1350** may include modulator input and control circuit **1700** receiving one or more channels of speech response content through coupling **1332** and possibly providing **1334** status and reliability information to speech engine **1330**.

Modulator input and control circuit **1700** may perform operations as disclosed in application Ser. No. 09/661,486, entitled N-way Demultiplexor, docket number AGLE0008, filed 14 Sep. 2000, and incorporated herein by reference.

Modulator input and control circuit **1700** generates at least one channel code stream **1702** provided to modulator circuit **1706**. Modulator circuit **1706** uses the channel code stream **1702** to generate an intermediate frequency channel stream **1712** presented to frequency conversion circuit **1710**.

By way of example, FIG. **32**A depicts modulator input and control circuit **1700** generating a second channel code stream **1704** presented to modulator circuit **1706**. Modulator circuit **1706** uses this second provided channel code stream **1704** to generate a corresponding intermediate frequency channel stream **1714** presented to frequency conversion circuit **1710**.

Frequency conversion circuit **1710** receives at least one intermediate frequency channel stream **1712** and generates a frequency channel output stream **1352** presented to multiplexor engine **1360**, as shown in FIGS. **23** and **24**. Similarly in FIGS. **26** and **27**, frequency conversion circuit **1710** receives at least one presented intermediate frequency channel stream **1712** and generates a frequency channel output stream **1452** presented to multiplexor engine **1460**.

Frequency conversion circuit **1710** may receive a second presented intermediate frequency channel stream **1714** and generate a second frequency channel output stream **1354** presented to multiplexor engine **1360**, as shown in FIGS. **23** and **24**. Similarly in FIGS. **26** and **27**, frequency conversion circuit **1710** may receive a second presented intermediate frequency channel stream **1714** and generate a second frequency channel output stream **1454** presented to multiplexor engine **1460**.

Frequency conversion circuit **1710** may provide feedback **1708** to modulator input and control **1700**, which may be part or all of the status and reliability information **1334** provided to speech engine **1330**.

Alternatively feedback **1708** may be status and reliability information **1334** directly provided to speech engine **1330**, rather than through modulator input and control **1700**. This alternative has not been diagramed to simplify the discussion, but is not intended to limit the scope of the claims.

Modulator circuit **1706** generates intermediate frequency channel stream **1712** using provided channel code stream **1702**.

Intermediate frequency channel stream **1712** may include presentation of a sinusoidal waveform represented as a digital stream, or as an analog stream. Presented channel code stream **1702** may include phase control information and/or include frequency control information include ampli-

tude control information. The frequency control information may further regard an intermediate frequency carrier.

Control information may be presented in a separate channel stream.

The intermediate frequency channel stream generation mechanism may support coherent detection and use of the intermediate frequency carrier in a downstream user site receiver. The intermediate frequency channel stream generation mechanism may support modulation mechanisms, including at least, Phase Shift Keying (PSK), Frequency Shift Keying (FSK), Amplitude Shift Keying (ASK), Continuous Phase Modulation (CPM), hybrid combinations, Offset Quadrature PSK (OQPSK), Minimum Shift Keying (MSK), Quadrature Amplitude Modulation (QAM), Coded Orthogonal Frequency Division Multiplexing (COFDM) and Vestiginal Side Band (VSB), in particular 8 level VSB (8-VSB).

The intermediate frequency channel stream generation mechanism may support noncoherent detection in downstream user site receivers of the intermediate frequency carrier and/or detection mechanisms not requiring a carrier reference. The intermediate frequency channel stream generation mechanism may support modulation mechanisms, including at least, Differential Phase Shift Keying (DPSK), Frequency Shift Keying (FSK), Amplitude Shift Keying (ASK), and certain hybrid schemes of these mechanisms not requiring a carrier reference.

Intermediate frequency channel stream **1712** may include presentation of a wavelet function represented as a digital stream or as an analog stream, which may further include dilation control information and/or temporal offset control information and/or amplitude control information.

Intermediate frequency channel stream **1712** may include presentations of both sinusoidal and wavelet functions.

The invention may include multiple frequency conversion circuitry instances **1710** and multiple modulator circuitry instances **1706** in modulator engine **1350** with possibly different numbers of instances of frequency conversion circuitry **1710** and of modulator circuitry **1706**.

The invention may include multiple frequency conversion circuitry instances **1710** and modulator circuitry instances **1706** in modulator engine **1450** with possibly different numbers of instances of frequency conversion circuitry **1710** and of modulator circuitry **1706**.

Demultiplexing a 2.5 gigabit per second bit stream leaving the speech engine **1330** or **1430** may be performed by a preprocessor CPU creating two 16 bit streams. The preprocessor CPU may be part or all of a Broadcom BCM 12500 integrated circuit converting the Ethernet links, with approximately three gigabit bits per second, into two 16 bit 150–160 MHz digital streams.

Modulator input and control **1700** may include two preprocessor CPUs parsing the dual 16 bit interface streams into 96 channels of data, or alternatively, include this function performed by hardware.

Modulator circuitry **1706** may include multiple modulators and may include multiple instances of multiple channel modulators, which may implement an octal QAM (Quadrature Amplitude Modulator).

Clusters of 8 channels of data may be sent to each Octal QAM for conversion to a intermediate frequency signal presented to an associated multi-channel frequency upconverter **1710** to generate 8 discrete channels sharing the same output frequency. Each channel output is supplied to one or more nodes to the exclusion of other nodes.

One system wide channel may be devoted to the audio-video feedback of the speech recognition system, of which there are 96 instances of that single channel which are then multiplexed into 96 different fiber transmission lines, each with a unique speech recognition related television channel.

This is exploited much more efficiently than any known prior art. Because all these frequency up conversions target the same frequency band, the frequency conversion mechanism for multiple channels can share several critical components, such as local reference oscillators, which must otherwise be instantiated for each channel separately.

By performing the frequency conversion mechanism upon blocks of channels, an optimization is available in neighborhoods with extensive Internet usage. In such situations, a neighborhood may be allocated a second TV channel for Internet presentation. By reconfiguring one block of frequency converters to that second channel, up to 8 neighborhoods could receive a second television channel.

Configuring these frequency conversion mechanisms as a frequency agile block changes the channel frequency bands of all the channels of the frequency agile block simultaneously.

The cost savings are dramatic. Regarding reliability issues: there are far fewer parts, a simpler design and less heat, all tending to increase reliability.

There may be a hierarchy of multiplexors operating within content engine **1340** or **1440**. System wide channels are multiplexed in the one set of multiplexors within the content engine **1340** or **1440**. Node specific channels may be multiplexed in a second set of multiplexors within the content engine **1340** or **1440**, which may be within a multiplexor engine such as **1460**.

In a cable TV system using a VOD server, 8 to 16 channels per node are often used for delivery of video on demand. These node specific channels are multiplexed in a second set of multiplexors within the content engine **1340** or **1440** and may be further multiplexed in multiplexor engine **1460**.

Each NTSC television channel has approximately 6 MHz of bandwidth, which through the use of the QAM64 modulators, delivers 27 M bps. The 2.5 Gigabit per second being delivered supports about 4500 Internet users.

FIG. **32**B depicts a block diagram of a local oscillator as is known in the art for use as a local oscillator depicted in FIGS. **33** and **34** as LO**1** **1760**, LO**1** **1860**, LO**2** **1770** or LO**2** **1870**.

The first Local Oscillator (LO**1**) **1760** or **1860** may operate at a fixed frequency **1762** in the range from 900 MHz to 1100 MHz. A second Local Oscillator (LO**2**) **1770** or **1870** may operate **1772** in a variable range from 1 to 2 GHz, depending on the desired output frequency range.

The Local Oscillators each comprise a voltage controlled oscillator, a frequency synthesizer and a loop filter. The frequency synthesizer requires a frequency reference. The output of the voltage controlled oscillator is amplified to create local oscillator output, which in various instances is labeled **1762**, **1772**, **1862** and **1872**.

The frequency synthesizers are required to meet the demanding phase noise, frequency stability and frequency settability requirements of a modern digital cable television network. A substantial portion of the circuitry in the typical Upconverter **1710** is dedicated to the synthesizers of the local oscillators **1760**, **1770**, **1860** and **1870**.

Specific applications in cable television require a common frequency but with multiple RF outputs such as broadcasting node specific video content or data over multiple nodes using a fixed channel frequency the current practice is to rely on individual RF modulators/Upconverters **1710** per node. Using individual modulator/Upconverters consumes a large

amount of equipment rack space which, for many nodes, including most CATV headends, is a rare commodity.

FIG. **33** depicts a detail block diagram of frequency conversion circuitry **1710** of FIG. **32**A.

A substantial portion of the circuitry in the typical Upconverter is dedicated to the synthesizers of the local oscillators **1860** and **1870**.

The invention includes methods implementing a Common Carrier, Multiple Output RF Upconverter **1710**, which include at least one of two methods by which to distribute Local Oscillator signals. The distribution methods provide a local oscillator signal from one local oscillator to multiple upconverter sections simultaneously, eliminating the frequency synthesizers and Voltage Controlled Oscillators typically required for each individual upconverter section. Eliminating these frequency synthesizers and local oscillators substantially reduces the board space and component count normally required for these functions.

By providing a distributed LO, only two LO synthesizers and VCO's are required per board where a board might support anywhere from 2 to 12 or more, upconverter sections.

FIG. **34** depicts an alternative detail block diagram of frequency conversion circuitry **1710** of FIG. **32**A.

For the purposes of simplifying the discussion, the two methods of distributing local oscillator signals will be discussed as associated with the first and second local oscillator, respectively. This is done strictly to simplify the discussion and is not meant to limit the scope of the claims. The first distribution mechanism may be used to distribute the second local oscillator signal(s). The second distribution mechanism may be used to distribute the first local oscillator signal(s).

The first mechanism **1764** distributes the local oscillator signal using hybrid splitters **1766** where the RF output of each tap **1724** and **1824** is fed to the respective frequency conversion sections.

A second mechanism **1774** distributing local oscillator signals uses a distributive signal splitting scheme comprised of a series of hybrid directional couplers equally spaced along a signal distribution path. The Local Oscillator signal from the tap of each coupler is then fed to the LO input **1744** and **1844** of each upconverter section. At the 950 to 1100 MHz LO frequencies mentioned above, a directional coupler may be implemented using circuit board traces **1776** in specific geometric pattern, eliminating the need for additional physical components.

Both methods require the LO signals from the splitters or the directional couplers undergo amplification immediately after splitting using a common Monolithic Microwave Integrated Circuit (MMIC) and/or may be incorporated into mixers **1720**, **1740**, **1820** and **1840**.

The Local Oscillator signal levels fed to the mixers are adjusted through the use of resistive attenuators to accommodate the LO drive level specified by the mixer manufacturer. For passive type mixers, the LO drive levels range from +13 dBm to +17 dBm. For active mixers such as a Gilbert Cell based devices, the LO drive levels vary widely, according to the configuration of the mixer. Many Gilbert Cell type mixers incorporate a LO amplifier, thereby requiring very low external LO drive levels, typically in the range from −10 dBm to +2 dBm.

The Common Carrier, Multiple Output type upconverter differs from the conventional CATV upconverter in that typically, conventional Upconverters are set up to output a separate frequency for each upconverter unit. In contrast, The Common Carrier, Multiple Output Upconverter outputs the same frequency for each upconverter unit.

The Intermediate Frequency (IF) inputs **1712** and **1724** to the Common Carrier, Multiple Output Upconverter may be either a 44 MHz or a 43.75 MHz (Center Frequency) Intermediate Frequency. The bandwidth of the IF is typically 6 MHz for U.S. applications and 7 to 8 MHz for international applications. The 55 MHz Low Pass Filters **1716** and **1816** serve two functions. First, they remove any second or third harmonics generated in the amplifier chain or D/A converter as in the case of QAM modulation in **1706**. Second, they serve as de-glitching filters for applications that use a D/A converter to generate the 44 MHz IF such as a QAM modulator **1706**.

The filtered 44 MHz IF **1718** and **1818** at the output of the 55 MHz filter **1716** and **1816** is fed to the RF input of the First Mixer **1720** and **1820** where it is mixed with the first Local Oscillator **1760**. By way of example, assume the frequency of the First Local Oscillator **1760** is 903 MHz. The output **1722** and **1822** of First Mixer **1720** and **1820** contain an upper and lower sideband around this Local Oscillator frequency. These sidebands, located at 44 MHz above and 44 MHz below the 903 MHz Local Oscillator frequency, are amplified and fed to the 947 MHz bandpass filter BPF**1** **1730** and **1830**. The 947 MHz bandpass filter **1730** and **1830** passes the 903+44 MHz (947 MHz) upper sideband and rejects the 903−44 MHz (859 MHz) lower sideband.

The filtered output **1732** and **1832** from 947 MHz filter **1730** and **1830** is fed into the RF input of second mixer **1740** and **1840** where it is mixed with the Local Oscillator **1770**. The second Local Oscillator **1770** includes a wide bandwidth VCO controlled by a frequency synthesizer. The Second Local Oscillator **1770** may operate from 1.0 GHz to a little over 1.8 GHz with a frequency step size of 250 KHz. Output **1742** and **1842** from the second mixer **1740** and **1840** contains several frequency products, including the upper and lower sidebands.

The upper sideband is formed by adding 947 MHz to the frequency of the Second Local Oscillator **1770**. If the frequency of the Second Local Oscillator **1770** is set to 1000 MHz, then the frequency of the upper sideband coming from the Second Mixer **1750** and **1850** is 947 MHz+Frequency of the Second Local Oscillator **1770** (1000 MHz) or 1947 MHz.

This sideband, which is unwanted, may be filtered out by the 950 MHz Lowpass filter **1750** and **1850** and is not seen at the RF output **1452** and **1454** of the frequency conversion circuitry. The frequency of the lower sideband, which is desired, is determined by the frequency of the second LO (1000 MHz) −947 MHz producing an output frequency of 53 MHz, which easily passes through the 950 MHz Lowpass filter.

If the frequency of the Second Local Oscillator **1770** was increased to 1807 MHz, then the lower sideband from the second mixer **1740** and **1840** would be 860 MHz, still able to pass through the 950 MHz Lowpass output filter **1750** and **1850**. The outputs **1752** and **1852** from the 950 MHz Lowpass filter **1750** and **1850** are amplified in amplifier detector **1760** and **1860** to obtain the desired output level and sent **1452** and **1454** to the output connector. The amplifier detector may further include tapping off a small portion of the output power, using a directional coupler, to facilitate power measurement **1762** and **1862**.

The Common Carrier, Multiple Output method differs from the conventional upconverter in at least the following ways. In the Common Carrier system, a single first Local

Oscillator and second Local Oscillator drive each upconverter section in a multiple upconverter system. This is accomplished by splitting the Local Oscillator signal into as many lines as needed to drive the mixer in each section. After splitting the LO signal N times, the LO power is reduced and requires amplification to bring the level up for the respective mixer. By splitting both first and second Local Oscillator signals in this manner, the number of upconverter sections for a given board size can be increased dramatically.

Splitting the Local Oscillator can also be achieved using directional couplers. To maintain essentially consistent LO power along the distribution path, the directional coupler method uses couplers with varying tap values. Couplers closest to the VCO's have the highest tap values (Highest tap attenuation) and the couplers closest to the end have the lowest tap values.

The operations of the vertical chains of mixers and filters are essentially the same as described in FIG. **33**.

In the first frequency conversion section of upconverter **1710** of both FIGS. **33** and **34**, the second Local Oscillator (LO**2**) **1770** may comprise a wide bandwidth Voltage Controlled Oscillator, providing the frequency setting agility to span the 50 to 860 MHz frequency range mentioned above. Both Local Oscillators **1760** and **1770** may require high stability frequency synthesizers to meet phase noise, frequency stability and frequency settability requirements of a modern digital cable television network, by way of example.

Consider the second frequency conversion section of FIG. **34**. Received intermediate frequency channel stream **1714** may be filtered **1816** to present a filtered intermediate frequency signal **1818** to Mixer**1** **1820**.

Unlike FIG. **33**, there is no first Local Oscillator (LO**1**) **1860** in the second frequency conversion section typically operates at a fixed frequency **1862** in the range from 900 MHz to 1100 MHz.

Unlike FIG. **33**, there is no second Local Oscillator (LO**2**) **1870** operates **1872** in the range from 1 to 2 GHz, depending on the desired output frequency range.

Substantial circuitry of this Upconverter section is released from supporting the local oscillators **1860** and **1870**, of FIG. **33**.

FIG. **35** depicts a detailed diagram of speech engine **1330** as shown in FIG. **23** or speech engine **1430** as shown in FIG. **27** containing two plex communications grids with dual, redundant gateways.

The numbering scheme is consistent with plex.cpp, an appendix to application Ser. No. 09/679,115, entitled "System and Method of a Multi-dimensional Plex Communication Network", docket number AGLE0003, filed 14 Oct. 2000, which is incorporated by reference herein.

ROM and mass storage is coupled to CPU 8.0, which is associated with node 0.0 of the first plex network. CPU 8.0 is reserved for certain control and security activities, such as maintaining the mass storage system and its interface, as well as initializing the rest of the plex communication grid to which it is coupled. Mass storage may include RAID mass storage systems.

Note that CPU 8.0 is coupled with both CPU**1** 0.0 and CPU**2** 0.1. This coupling may be achieved by various mechanisms, including but not limited to, a bridge circuit interface to a bus tightly coupling CPU**1** and CPU**2**, implementing a bus standard such as LDT or PCI.

Similar couplings are shown for the following: CPU 8.1 coupled with CPU**1** 1.2 and CPU**2** 1.3. CPU 8.2 coupled with CPU**1** 2.4 and CPU**2** 2.5. CPU 8.3 coupled with CPU**1** 3.6 and CPU**2** 3.7. CPU 8.4 coupled with CPU**1** 4.0 and CPU**2** 4.1. CPU 8.5 coupled with CPU**1** 5.2 and CPU**2** 5.3.



CPU 8.6 coupled with CPU**1** 6.4 and CPU**2** 6.5. CPU 8.7 coupled with CPU**1** 7.6 and CPU**2** 7.7.

ROM and mass storage are redundantly coupled to CPU 8.4, associated with the second plex network. This removes the possibility of a failure in the coupling between either the ROM or mass storage causing systemic failure in the speech engine as a whole. Software running on CPU 8.0 and CPU 8.4 may further support fail-over in the event of a failure of either CPU.

CPUs 8.0 and 8.4 act as dual, redundant secure interface gateways.

The control processors of the AgileTV™ engines may be treated differently by the message routing algorithms: No messages may be routed through the control processors, CPU 8.0 and 8.4, headed for a different destination. The CPU 8.0 and 8.4 IO lines may support internal management functions within the node of the cable network, specifically management and billing. This is advantageous for security, making it harder for hacker attacks to penetrate to the management and billing communications, since such attacks will not be able to directly communicate with CPU 8.0 and 8.4 or their IO lines.

Alternatively, special classes of communications may route through the control processor with defined protocols. Other types of communications may transit the node to which the control processor belongs, but may not terminate at the control processor. While it is common for large-scale networks to be partitioned, this partitioning approach is novel, providing very well characterized data paths for both management and billing communications.

It is advantageous that the control processor owns the disk resources, so that sensitive information such as credit card information does not go through less secure components of the plex network. Sensitive information goes directly from the disk resource through the control processor to the billing application.

Security may be heightened by use of at least one encryption standard including the AES algorithm recently proposed by the US government.

Input processors (8.1 and 8.5) perform the following: receiving incoming speech packets; buffering the received speech packets; detecting last packet of the received packet sequence to create a complete packet-sequence; and translating the received packet sequence to create a complete audio utterance.

The content gateway includes processors 8.1 and/or 8.5. After registering the application with the AgileTV™ engine, static menu content and dynamic content are provided to the AgileTV™ engine. A speech processor within the AgileTV™ engine sends messages to an application server within the content engine through the content gateway, indicating the current user location in the menu structure and the requested user actions. This triggers events in a real-time event driven program operating system executing within the application server.

CPUs 8.1 and 8.5 may also run a job assignment manager. The job assignment manager may further behave much like a finite state machine.

The IO and control CPUs, 8.1 to 8.7, may be seen as separate from the plex array of processors, or as components of specialized plex-nodes within the plex. The invention may include placing control and IO CPUs as a row of processing resources arranged on a diagonal of the array. The array may be square. Boot ROMs, RAID interfaces, additional communication and image processing capabilities may be additionally coupled to one or more of the IO and control CPUs.

A service modem may connect to a line outside the building of a node or head-end. Each installation may have this modem as a final backup communication channel to a remote service center. CPUs 8.0 and 8.4 may also have the dual modems on a telephone line connected to a remote service center.

CPUs 8.1 and 8.5 are input CPUs communicating the head-end receivers, local content servers such as VOD servers and IPG servers.

CPUs 8.2 and 8.6 are Internet interface processors providing firewall capability.

CPUs 8.3 and 8.7 drive the AgileTV™ modulator system **1350** or **1450** as shown in FIGS. **23**, **24**, **26** and **27**.

External network interfaces **1312** and **1412** may include External OC-48 (2.5 Gigabit) and/or Gigabit Ethernet Internet lines. This is a central linkage to the Internet supporting 100M bit Ethernet or other communications protocol.

AgileTV™ engine **3000**, **1330**, and **1430** may include two planes of processors, connected by tunnels, each processor plane containing a row of processors coupled by the tunnels and positioned about the diagonal of each processor plane. A diagonal as used herein refers to a collection of locations within an array of at least two dimensions which collective contain nodes coupled to every pencil in every orthogonal pencil ###

Carrier class reliability of 99.999% is the baseline reliability for the plex communications networks. Simulation analyses by one of the inventors confirm that the redundancy inherent in multiple communication pencils intersecting at a plex-node provides significant fault tolerance. These simulations, using the plex.cpp program, indicate that for up to 25 system element failures, there were no message routing failures for 42 out of 43 experiments. The independent power supplies driving dual, plex planes further support these reliability objectives, since if one power supply fails, only half of the system fails. The other half of the system continues to perform, though performance is reduced.

A scaling methodology including another reliability mechanism is desirable. It is achieved at no appreciable increase in the usual systems overhead issues, latency, bandwidth, creating communication bottlenecks or adding significant additional computational loads to the network node components. Another IO processor is added for inter-engine plex-ing to couple multiple plex network hierarchies by the following method: Pick a plex-node, add an inter-processor communication interface internal to the plex-node and an another IO processor coupled to the inter-processor communications interface. The inter-processor communications interface may support a bus, which may be an LDT-compliant bus.

Putting two of these IO processors into the network shown in FIG. **35** supports another 6 gigabit Ethernet fibers. This supports a 4 by 4 plex of AgileTV™ engines or speech engines. Plex-nodes of this plex network would each contain an AgileTV™ engine or speech engine, containing two planes of 4 by 4 plex networks of plex-nodes each having at least two CPU's. Each CPU may contain at least dual instruction processors.

Such a system supports extremely large computing requirements, such as quantum mechanical modeling of long chain hydrocarbons, or a video server for a population such as a district of a city, e.g. Brooklyn.

The 4 by 4 plex of AgileTV™ speech engines readily fits into an 8 ft (2.6 meter) by 10 ft (3.3 meter) closet by 8 foot (2.6 meter) ceiling. The system is estimated to handle speech recognition for 560,000 cable subscribers with more than 30,000 users talking, with 20–30 gigabits bandwidth exchanged for the user community being served by such cable television systems. The system would exceed the raw compute performance of ASCI White, the world's fastest supercomputer installed at Lawrence Livermore Laboratories in the year 2000.

The AgileTV™ engine provides MPEG throttling techniques enabling support of more users than would otherwise be possible without such intelligent bandwidth management.

The AgileTV™ engine further supports designating a specific subset of plex-nodes, and coupling each plex-node of the subset to at least one additional processor. This provides communication to additional communication pencils connecting to other systems components, which may be additional plex communication networks of processor plex-nodes and may also enhance the security of multiple applications through partitioning.

Communication pencils intersecting at a plex-node provide a hierarchical connection methodology supporting arbitrarily large collections of concurrent computing resources. The communication delay to traverse such a system may grow on the order of the logarithm of the number of computing resource plex-nodes interconnected by these communication pencils.

The methodology using these innovations provides a remarkably large amount of computing resources coupling to almost any communications protocol.

The application of this methodology to cable television networks, with extremely limited upstream communication bandwidth, enables speech recognition over cable television, in turn enabling a breakthrough in user friendliness unattainable in the home entertainment environment today.

The further application of this methodology supporting user site addressing and the identification of user speech associated with the user site aids the responsiveness of such systems.

An internet browser may execute on a processor in the AgileTV™ engine, decomposing the browser view into pixel frames, which are processed into a MPEG stream, and sent to the frequency up converters, etc.

Consider speech actuated interactive game playing. Large motion video sequences may be placed on a game server. The playing of the appropriate motion video sequences may be controlled by speech commands using the game server as a local VOD server to the head-end node, communicating through a sufficiently high-speed and responsive communication mechanism, which could be the Internet.

Interactive gambling is supported across cable television networks.

Interactive shopping, based upon shopping content placed on a VOD server and activated through the speech recognition responses of the AgileTV™ engine, is supported.

Interactive auctioning is supported across cable television networks.

Interactive speech communications applications are supported across cable television networks.

The preceding embodiments of the invention have been provided by way of example and are not meant to constrain the scope of the following claims.

The invention claimed is:

**1**. A method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network supporting at least one of cable television delivery and video delivery, comprising the steps of:

receiving said back channel to create a received back channel;

partitioning said received back channel into a multiplicity of received identified speech channels;

processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content; and

responding to said identified speech content to create an identified speech content response that is unique, for each of said multiplicity of identified speech contents.

**2**. The method of claim **1**,

wherein at least one of said identified speech channels has an associated user site; and

wherein the step partitioning said received back channel is further comprised of the step of:

partitioning said received back channel into a multiplicity of said received identified speech channels from said associated user site;

wherein the step processing said multiplicity of said received identified speech channels is further comprised the step of:

processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech contents; and

wherein the step responding to said identified speech content is further comprised the step of:

responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

**3**. The method of claim **2**,

further comprising at least one member of the collection containing the steps of:

determining said associated user site from said received identified speech channel;

determining said associated user site from said identified speech content;

determining said associated user site from said identified speech content and a speaker identification library;

determining said associated user site from said identified speech content and a speech recognition library; and

determining said associated user site from an identification within said speech channel.

**4**. The method of claim **2**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

processing said identified speech content response to create said identified user site response; and

sending said identified user site response to said identified user site.

**5**. The method of claim **2**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

assessing said speech content response identified as to said user site to create a financial consequence identified as to said user site; and

billing said user site based upon said financial consequence.

**6**. The method of claim **2**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

assessing said speech response to create a financial consequence identified with said user site;

displaying said financial consequence to create a displayed financial consequence at said user site;

confirming said displayed financial consequence from said user site to create a financial commitment; and

billing said user site based upon said financial commitment.

**7**. The method of claim **6**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

identifying a user based upon said speech content identified as to said user site to create an identified user.

**8**. The method of claim **7**,

wherein the step identifying said user is comprised of the steps of:

fetching a user profile list based upon said user site, said user profile list containing at least one user profile;

identifying said user based upon said speech content and based upon said user profile list to create an identified user.

**9**. The method of claim **8**,

wherein the step assessing said speech response is further comprised of the step of:

assessing said speech response based upon said identified user to create a financial consequence for said identified user.

**10**. The method of claim **2**,

wherein said speech content response is comprised of a current response menu and a cumulative user site response is identified as to said user site for at least one of said user sites.

**11**. The method of claim **10**,

wherein the step responding to said identified speech content from said associated user site further comprising at least one member of the collection comprising the steps of:

responding to said speech content based upon said current response menu and based upon said cumulative user site response to create a new cumulative user site response; and

assessing said speech content based upon said current response menu and based upon said cumulative user site response to create a new current response menu.

**12**. The method of claim **2**,

wherein the step responding to said identified speech content from said associated user site is further comprised of the step of:

responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech content identified with said user site.

**13**. The method of claim **2**,

wherein the step processing said multiplicity of said received speech channels is further comprised for at least one of said user sites is further comprised of the step of:

processing said received speech channels from said user site based upon natural language for said user site to create said speech content identified as to said user site.

**14**. A program system controlling at least part of a speech recognition system coupled to a wireline node in a network, said program system comprising the program steps of:

processing a multiplicity of received identified speech channels to create a multiplicity of identified speech content; and

responding to said identified speech content to create an identified speech content response that is unique to each of said multiplicity of identified speech contents;

wherein said speech recognition system is provided said multiplicity of received identified speech channels based upon a received back channel at said wireline node from a multiplicity of user sites coupled to said network;

wherein each of said program steps reside in memory accessibly coupled to at least one computer included in said speech recognition system;

wherein said at least one computer communicatively couples through said wireline node to said multiplicity of user sites; and

wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

**15**. The program system of claim **14**,

wherein at least one of said identified speech channels has an associated user site; and

wherein the program step processing said multiplicity of said received identified speech channels is further comprised of the program step of:

processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech content; and

wherein the program step responding to said identified speech content is further comprised of the program step of:

responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

**16**. The program system of claim **15**,

further comprising at least one member of the collection containing the program steps of:

determining said associated user site from said received identified speech channel;

determining said associated user site from said identified speech content;

determining said associated user site from said identified speech content and a speaker identification library;

determining said associated user site from said identified speech content and a speech recognition library; and

determining said associated user site from an identification within said speech channel.

**17**. The program system of claim **15**,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:

processing said identified speech content response to create said identified user site response; and

sending said identified user site response to said identified user site.

**18**. The program system of claim **15**,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:



assessing said speech content response identified as to said user site to create a financial consequence identified as to said user site; and

billing said user site based upon said financial consequence.

**19**. The program system of claim **15**,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:

assessing said speech response to create a financial consequence identified as to said user site;

displaying said financial consequence to create a displayed financial consequence at said user site;

confirming said displayed financial consequence from said user site to create a financial commitment; and

billing said user site based upon said financial commitment.

**20**. The program system of claim **19**,

wherein the program step responding to said identified speech contents from said associated user site is comprised of the program steps of:

identifying a user based upon said speech content identified as to said user site to create an identified user.

**21**. The program system of claim **20**,

wherein the program step identifying said user is comprised of the program steps of:

fetching a user profile list based upon said user site, said user profile list containing at least one user profile;

identifying said user based upon said speech content and based upon said user profile list to create an identified user.

**22**. The program system of claim **21**,

wherein the program step assessing said speech response is further comprised of the program step of:

assessing said speech response based upon said identified user to create a financial consequence for said identified user.

**23**. The program system of claim **15**,

wherein said speech content response is comprised of a current response menu and a cumulative user site response identified as to said user site for at least one of said user sites.

**24**. The program system of claim **23**,

wherein the program step responding to said identified speech contents from said associated user site is further comprised of at least one member of the collection comprising the program steps of:

responding to said speech contents based upon said current response menu and based upon said cumulative user site response to create a new cumulative user site response; and

assessing said speech contents based upon said current response menu and based upon said cumulative user site response to create a new current response menu.

**25**. The program system of claim **15**,

wherein the program step responding to said identified speech content from said associated user site is comprised, for at least one of said user sites, of the program step of:

responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech contents identified as to said user site.

**26**. The program system of claim **15**,

wherein the program step processing said multiplicity of said received speech channels is further comprised, for at least one of said user sites, of the program step of:

processing said received speech channels from said user site based upon natural language for said user site to create said speech content identified as to said user site.

**27**. A system supporting speech recognition in a network, said system comprising:

a speech recognition system coupled to a wireline node in said network for receiving a back channel from a multiplicity of user sites coupled to said network, further comprising

a back channel receiver, for receiving said back channel to create a received back channel;

a speech channel partitioner, for partitioning said received back channel into a multiplicity of received identified speech channels; and

a processor network executing a program system comprised of program steps residing in memory accessibly coupled to at least one computer in said processor network;

wherein said program system is comprised of the program steps of:

processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content;

responding to said identified speech content to create an identified speech content response, for each of said multiplicity of said identified speech contents; and

wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

**28**. The system of claim **27**,

wherein at least one of said identified speech channels has an associated user site; and

wherein partitioning said received back channel is further comprised of:

partitioning said received back channel into a multiplicity of said received identified speech channels from said associated user site;

wherein the program step processing said multiplicity of said received identified speech channels is further comprised of the program step of:

processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech content; and

wherein the program step responding to said identified speech content is further comprised of the program step of:

responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

**29**. The system of claim **28**,

wherein said program system is further comprised of at least one of the collection comprising the program steps of:

determining said associated user site from said received identified speech channel;

determining said associated user site from said identified speech content;

determining said associated user site from said identified speech content and a speaker identification library;

determining said associated user site from said identified speech content and a speech recognition library; and

determining said associated user site from an identification within said speech channel.

**30**. The system of claim **28**,

wherein the program step responding to said identified speech contents from said associated user site is comprised of the program steps of:

processing said identified speech content response to create said identified user site response; and

sending said identified user site response to said identified user site.

**31**. The system of claim **28**,

wherein the program step responding to said identified speech contents from said associated user site is comprised of the program steps of:

assessing said speech content response identified as to said user site to create a financial consequence identified as to said user site; and

billing said user site based upon said financial consequence.

**32**. The system of claim **28**,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:

assessing said speech response to create a financial consequence identified as to said user site;

displaying said financial consequence to create a displayed financial consequence at said user site;

confirming said displayed financial consequence from said user site to create a financial commitment; and

billing said user site based upon said financial commitment.

**33**. The system of claim **32**,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:

identifying a user based upon said speech content identified as to said user site to create an identified user.

**34**. The system of claim **33**,

wherein the program step identifying said user is comprised of the program steps of:

fetching a user profile list based upon said user site, said user profile list containing at least one user profile;

identifying said user based upon said speech content and based upon said user profile list to create an identified user.

**35**. The system of claim **34**,

wherein the program step assessing said speech response is further comprised of the program step of:

assessing said speech response based upon said identified user to create a financial consequence for said identified user.

**36**. The system of claim **28**,

wherein said speech content response is comprised of a current response menu and a cumulative user site response identified as to said user site for at least one of said user sites.

**37**. The system of claim **36**,

wherein the program step responding to said identified speech content from said associated user site is further

comprised of at least one member of the collection comprising the program steps of:

responding to said speech content based upon said current response menu and based upon said cumulative user site response to create a new cumulative user site response; and

assessing said speech contents based upon said current response menu and based upon said cumulative user site response to create a new current response menu.

**38**. The system of claim **28**,

wherein the program step responding to said identified speech content from said associated user site is comprised, for at least one of said user sites, of the program step of:

responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech contents identified as to said user site.

**39**. The system of claim **28**,

wherein the program step processing said multiplicity of said received speech channels is further comprised, for at least one of said user sites, of the program step of:

processing said received speech channels from said user site based upon natural language for said user site to create said speech content identified as to said user site.

**40**. The system of claim **28**,

wherein said network includes a wired residential broadband network servicing at least part of said multiplicity of user sites.

**41**. The system of claim **40**,

wherein said wired residential broadband network is a fiber-to-the-curb residential broadband network.

**42**. The system of claim **40**,

wherein said wired residential broadband network is a fiber-to-the-home residential broadband network.

**43**. The system of claim **40**,

wherein said wired residential broadband network is a switched-digital-video residential broadband network.

**44**. The system of claim **40**,

wherein said wireline node is located proximate to a node in said wired residential broadband network.

**45**. The system of claim **40**,

wherein said wireline node is located proximate to a Headend in said wired residential broadband network.

**46**. The system of claim **40**,

wherein said wireline node is located proximate to a central office in said wired residential broadband network.

**47**. The system of claim **27**,

wherein said speech recognition system further comprises a two-dimensional plex communication network communicatively coupled with a two-dimensional array of plex-nodes.

**48**. The system of claim **47**,

wherein at least one of said plex-nodes is comprised of at least one computer communicatively coupled through said two-dimensional plex communication network to at least one of said multiplicity of user sites;

wherein said computer executes at least one of said program steps residing in memory accessibly coupled to said computer.

**49**. The system of claim **47**,

wherein said back channel receiver is implemented in a first of said plex-nodes.



**50**. The system of claim **47**,

wherein said speech channel partitioner is implemented in a second of said plex-nodes.

**51**. The system of claim **47**,

wherein said two-dimensional communicatively coupled plex-node array and plex communications network contains said processor network.

**52**. The system of claim **47**,

wherein said processor network contains said two-dimensional communicatively coupled plex-node array and plex communications network.

**53**. A method of operating at least part of a speech recognition system coupled to a wireline node in a network, comprising the steps of:

processing a multiplicity of received identified speech channels to create a multiplicity of identified speech content; and

responding to said identified speech content to create an identified speech content response that is unique to each of said multiplicity of identified speech contents;

wherein said speech recognition system is provided said multiplicity of received identified speech channels based upon a received back channel at said wireline node from a multiplicity of user sites coupled to said network;

wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

**54**. The method of claim **53**,

wherein at least one of said identified speech channels has an associated user site; and

wherein the step processing said multiplicity of said received identified speech channels is further comprised of the step of:

processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech content; and

wherein the step responding to said identified speech content is further comprised of the step of:

responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

**55**. The method of claim **54**,

wherein the step responding to said identified speech content from said associated user site is comprised of the steps of:

assessing said speech response to create a financial consequence identified as to said user site;

displaying said financial consequence to create a displayed financial consequence at said user site;

confirming said displayed financial consequence from said user site to create a financial commitment; and

billing said user site based upon said financial commitment.

**56**. The method of claim **55**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

identifying a user based upon said speech content identified as to said user site to create an identified user.

**57**. The method of claim **56**,

wherein the step identifying said user is comprised of the steps of:

fetching a user profile list based upon said user site, said user profile list containing at least one user profile;

identifying said user based upon said speech content and based upon said user profile list to create an identified user.

**58**. The method of claim **57**,

wherein the step assessing said speech response is further comprised of the step of:

assessing said speech response based upon said identified user to create a financial consequence for said identified user.

**59**. The method of claim **54**,

wherein said speech content response is comprised of a current response menu and a cumulative user site response identified as to said user site for at least one of said user sites.

**60**. The method of claim **59**,

wherein the step responding to said identified speech contents from said associated user site is further comprised of at least one member of the collection comprising the steps of:

responding to said speech contents based upon said current response menu and based upon said cumulative user site response to create a new cumulative user site response; and

assessing said speech contents based upon said current response menu and based upon said cumulative user site response to create a new current response menu.

**61**. The method of claim **54**,

wherein the step responding to said identified speech content from said associated user site is comprised, for at least one of said user sites, of the step of:

responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech contents identified as to said user site.

**62**. The method of claim **54**,

wherein the step processing said multiplicity of said received speech channels is further comprised, for at least one of said user sites, of the step of:



processing said received speech channel from said user site based upon natural language for said user site to create said speech content identified as to said user site.

**63**. The method of claim **54**,

further comprising at least one member of the collection containing the steps of:

determining said associated user site from said received identified speech channel;

determining said associated user site from said identified speech content;

determining said associated user site from said identified speech content and a speaker identification library;

determining said associated user site from said identified speech content and a speech recognition library; and

determining said associated user site from an identification within said speech channel.

**64**. The method of claim **54**,

wherein the step responding to said identified speech content from said associated user site is comprised of the steps of:

processing said identified speech content response to create said identified user site response; and

sending said identified user site response to said identified user site.

**65**. The method of claim **54**,

wherein the step responding to said identified speech content from said associated user site is comprised of the steps of:

assessing said speech content response identified as to said user site to create a financial consequence identified as to said user site; and

billing said user site based upon said financial consequence.

**66**. The method of claim **54**,

wherein each of said identified speech channels has an associated user site.

* * * * *

US007260538B2

(12) **United States Patent**
**Calderone et al.**

(10) **Patent No.: US 7,260,538 B2**
(45) **Date of Patent: Aug. 21, 2007**

(54) **METHOD AND APPARATUS FOR VOICE CONTROL OF A TELEVISION CONTROL DEVICE**

(75) Inventors: **Theodore Calderone**, San Carlos, CA (US); **Mark J. Foster**, Palo Alto, CA (US); **Harry William Printz**, San Francisco, CA (US); **James Jay Kistler**, San Jose, CA (US)

(73) Assignee: **Promptu Systems Corporation**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 719 days.

(21) Appl. No.: **10/338,591**

(22) Filed: **Jan. 7, 2003**

(65) **Prior Publication Data**

US 2003/0167171 A1 Sep. 4, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/346,899, filed on Jan. 8, 2002.

(51) **Int. Cl.**
*G10L 15/00* (2006.01)

(52) **U.S. Cl.** .................................... **704/275**; 348/14.05

(58) **Field of Classification Search** ................ 704/275; 348/14.05

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,267,323 | A * | 11/1993 | Kimura | 381/110 |
| 5,774,859 | A * | 6/1998 | Houser et al. | 704/275 |
| 5,832,439 | A | 11/1998 | Cox | |
| 6,253,174 | B1 * | 6/2001 | Ishii et al. | 704/231 |
| 6,397,186 | B1 * | 5/2002 | Bush et al. | 704/274 |
| 6,415,257 | B1 | 7/2002 | Junqua | |
| 7,006,974 | B2 * | 2/2006 | Burchard et al. | 704/275 |

* cited by examiner

*Primary Examiner*—Daniel Abebe
(74) *Attorney, Agent, or Firm*—Michael A. Glenn; Glenn Patent Group

(57) **ABSTRACT**

A method and apparatus is disclosed for remotely processing voice commands for controlling a television. A voice command is uttered by a user into a microphone contained in a remote control. The voice command is digitized, modulated, compressed, and wirelessly transmitted to a wireless receiver connected to a set-top box. The voice command is then transmitted to a cable head-end unit for voice and word recognition processing. Once the command function is determined, the function is transmitted back to the set-top box where the set-top box performs the command. The microphone is activated and deactivated by pressing and releasing a push-to-talk (PTT) switch. The PTT activates other functions by being turned, double-clicked and toggled up and down, left and right.

**41 Claims, 6 Drawing Sheets**




110
Remote Control
120
Receiver
130
Set-Top Box
140
Node
150
Head-end Receiver
160
Speech recognition processing
170

FIG. 1


210
Keypad
211
CPU
214
IR Transmitter
120,130
Receiver or STB
460
Head End
212
ROM
RAM
213
Voice Command
221
Mic
222
Pre-amp
223
FM/IR Modulator
224
IR or RF Transmitter
225
Sub-audible Generator
220
PTT Button

FIG. 2


301
303
302
320
311
312

FIG. 3


460
410
Audio Diplexor
Sub-audible Signal
422
411
421
Voice Command
Sub-audible Decoder
170
Speech Recognition Processing

FIG. 4


512
513
ROM
RAM
510
Keypad
CPU
511
523
Mod
514
IR or RF Transmitter
550
DSP Carrier
Voice Command
521
Mic
522
Pre-Amp
525
A/D
520
PTT Button

FIG. 5


610
660
DSP Receiver
612
Address decoder
Voice Command
622
621
Header/ Footer Info
611
D/A
670
Speech recognition processing

FIG. 6




FIG. 7




FIG. 9




FIG. 8


110
912
911
913
914
915
916

FIG. 10


221
222
223
224
Mic
Pre-amp
FM/IR Modulator
IR or RF Transmitter
Receiver or STB
120,130
225
Sub-audible Generator
110
Instant ON-Delayed OFF
220
PTT Button

FIG. 11

# METHOD AND APPARATUS FOR VOICE CONTROL OF A TELEVISION CONTROL DEVICE

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims priority to U.S. Provisional Patent Application No. 60/346,899 filed on Jan. 8, 2002.

## BACKGROUND OF THE INVENTION

1. Technical Field

The invention relates generally to voice controlled electronic devices. More particularly, the invention relates to a voice-controlled set-top box and remote control for performing television related processes.

2. Description of the Prior Art

Speech recognition systems are capable of recognizing words spoken by human beings. Isolated word recognition systems have been developed to recognize and discriminate isolated words, i.e. words separated by a pause, which have been trained into the systems. Such s speech recognition device is summarized in D. Raj Reddy, *Speech Recognition by Machine: A Review*, Proceedings of the IEEE, April 1976, pages 501-531. Connected word recognition systems are capable of recognizing and discriminating individual words from spoken phrases.

It is also known to use voice recognition systems to control system variables of various active systems. Speech recognition control system and method, U.S. Pat. No. 4,605,080, Lemelson, Aug. 12, 1986, discloses a weighing scale involving calculating functions that include an automatic control system that can accept spoken words as input. A speech recognition system is used for processing and analyzing speech signals output by a microphone. The microphone is connected to a speech recognition computer that outputs and applies select command control signals to effect desired control functions. It is disclosed to control conveyors to place labels on containers automatically using the speech recognition system. The apparatus may be controlled to stop and start, slow down or speed up by an operator speaking the appropriate voice commands into a microphone.

Voice controlled welding system, U.S. Pat. No. 4,641,292, Tunnell , et al., Feb. 3, 1987 discloses an apparatus and method for permitting human voice control of a welding system. It is disclosed that a human operator is provided with an audio transmitter by which the operator adjusts the welding power supply through voice commands. The voice commands are issued by the operator and transmitted through a receiver to a voice recognition unit. The received signal is interpreted by a computer that is electrically connected to deliver power control signals to the welding power supply, and thereby adjusts the power delivered to the welding head. The operator may also issue voice commands to start and stop an internal combustion engine that drives the welding power supply, when such an engine is used.

A problem with the prior art voice recognition systems is that they require a sophisticated voice recognition system in close proximity to the user, requiring individual units which is quite costly. What is needed is a centralized voice command processing system such services a multitude of users.

A problem with television remote controls is their ever-increasing size. As remote controls become more sophisticated, more and more functions are added. As more functions are added, more buttons are added, causing the



aforementioned increase in size. Remote controls are now approaching a practical limit. Moreover, remote control manufacturers have standard template designs for their remote controls. The standard designs dictate where the buttons are located, as well what functions will exist. What is needed is a way to add functions to an existing remote control without greatly increasing its size and without interfering with existing manufacturer designs.

A problem with voice command remote control systems is that they are activated when a sound input reaches a pre-determined amplitude. Often, ambient noise reaches the pre-determined level and the system is unintentionally activated. This leads to inadvertent input and a misuse of processing power because the speech recognition unit attempts to process the noise. What is needed is way to activate and deactivate a voice command system that is not substantially affected by ambient noise.

## SUMMARY OF THE INVENTION

A method and apparatus is disclosed for remotely processing voice commands for controlling a television. A voice command is uttered by a user and is received by a microphone contained in a television set-top box remote control. The voice command is modulated and wirelessly transmitted to a wireless receiver connected to the set-top box. Either before or after this transmission, it is digitized and compressed. Examples of compression algorithms used are low bit-rate encoding and conversion into cepstrals. The voice command is then transmitted, for example, to a central processing station located at a cable television head-end unit. A computer at the cable head-end unit processes the voice command for voice command recognition. Once the voice command is determined a command function is created. The command function is transmitted back to the set-top box where the set-top box performs the command function. Alternatively, the set-top box just passes on the command and the head end performs or carries out the command.

The microphone is activated by the depression of a push-to-talk (PTT) button or by word activation. Releasing the PTT button deactivates the microphone. Optionally, the PTT button can be turned to adjust the gain control on the microphone and can be toggled to activate wireless phone functions of the remote control. Double pressing the PTT button activates other functions, for example a help menu for television viewing.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram illustrating elements of the voice control television system according to the invention;

FIG. **2** is a diagram illustrating a remote control for transmitting an analog voice command according to the invention;

FIG. **3** is a graph illustrating a voice command and noise;

FIG. **4** is a diagram illustrating a head-end unit for processing an analog voice command according to the invention;

FIG. **5** is a diagram illustrating a remote control for transmitting a digital voice command according to the invention;

FIG. **6** is a diagram illustrating a head-end unit for processing a digital voice command according to the invention;

FIG. **7** is a diagram illustrating a remote control that transmits a voice command through a keypad transmitter and a dedicated voice transmitter according to the invention;

FIG. **8** is a diagram illustrating a control receiver according to the invention;

FIG. **9** is a diagram illustrating a frontal view of a remote control with a multi-function push-to-talk button according to the invention;

FIG. **10** is a diagram illustrating a side view of a remote control with a multi-function push-to-talk button according to the invention; and

FIG. **11** is a diagram illustrating a remote control with an instant-on delay-off circuit according to the invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. **1** is an operational diagram illustrating a preferred embodiment of the voice control system which, for purposes of example, is an interactive television voice control system. Those skilled in the art will appreciate that other systems may be used in connection with the invention herein, such as information browsing system and representational process control systems.

A remote control **110** receives voice commands from a user through a microphone preferably located within the remote control **110**. The remote control wirelessly transmits the voice commands to a wireless receiver (RECEIVER) **120** that converts the wireless signal to a wired signal. The wireless transmission is typically infrared. Ultrasonic, radio, or other wireless transmissions are also contemplated.

The RECEIVER **120** transmits the voice command to a television controller such as a set-top box **130**. Transmissions between the RECEIVER and the set-top box may be unidirectional or bi-directional. The RECEIVER **120** transmits to the set-top box **130** when the RECEIVER **120** receives a transmission from the remote control **110**. Alternatively, the RECEIVER transmits to the set-top **130** after a specified period of time has elapsed when the RECEIVER **120** is not receiving a transmission from the remote control **110**. The set-top box **130**, RECEIVER **120** and remote control **110** may be capable of both receiving and transmitting data simultaneously. The functions of the RECEIVER **120** may also be incorporated into the television set-top box **130**.

In a preferred embodiment, the RECEIVER **120** is connected and transmits to the set-top box **130** through a serial, USB, or other connection. In another preferred embodiment, the RECEIVER **120** communicates to the set-top box **130** through the modem interface using a modem emulator and modem protocols. Set-top boxes, such as the DCT-2000 produced by Motorola of Schaumburg, Ill., provide such a modem interface. In another embodiment, the RECEIVER **120** communicates wirelessly to the set-top box **130**. A wireless receiving interface receives wireless transmission from the RECEIVER **120** and transmits the transmissions to the set-top box **130**. This may occur, for example, by means of a physical connection.

The RECEIVER **120** contains a buffer that stores the voice commands. Alternatively, the buffer is a separate unit from the RECEIVER **120**, or is contained in the set-top box **130** or the remote control **110**. Voice transmissions are either analog or digital, and are typically modulated. Modulation types include amplitude modulation, frequency modulation, pulse-position modulation (PPM), and pulse code modulation (PCM). Modulation is performed at any of the remote control **110**, the set-top box **130**, or the RECEIVER **120**. A



compression scheme may be used to compress the voice command. The compression is performed at any of the remote control **110**, the set-top box **130**, the RECEIVER **120** or at a head-end unit **160**. It is also contemplated that a dedicated component may be provided that performs analog-to-digital conversions.

The voice commands are transmitted from the set-top box **130** to a node **140**, a head-end receiver **150** and to a head end unit **160** along a cable television uplink, where speech recognition processing **170** is performed. In the preferred embodiment, speech recognition processing includes user voice identification and word recognition. Word recognition includes probability or semantic analysis checking especially where a voice command contains multiple words. The probability checking checks that the words logically go together.

The central processing station is designed to handle a multitude of voice command inputs from a multitude of cable television users. After the voice command is processed, the central processing station **160** sends a corresponding command function to the cable set-top box **130** or other system component where the command is then performed.

FIG. **2** illustrates one embodiment of the remote control, where an analog signal is transmitted from the remote control to a head end unit **460** for processing. The remote control **110** may include a keypad **210** that allows a user to perform such tasks as entering numerical values, adjusting the volume, and changing the channels. The keypad entries are processed by a CPU **211** that has a ROM **212** and RAM **213** electronically coupled to it. The CPU functions are typically either hardware implemented or an embedded software solution. The processed keypad entries are transmitted by infrared **214** to a RECEIVER **120**, or to a set-top box **130** that can receive infrared transmissions.

A push-to-talk (PTT) button **220** activates the microphone **221** on the remote control, as well as activating a pre-amp **222**, modulator **223**, transmitter **224**, and optionally, a sub-audible generator **225**. The PTT button **220** brackets the voice command by indicating a beginning when depressed, and an end when released. The bracketing of the speech provides a higher signal to noise ratio because unintended noise at the beginning and end of the transmissions are eliminated. When the PTT button **220** is released, the microphone **221**, pre-amp **222**, modulator **223**, transmitter **224** and sub-audible generator **225** are deactivated optionally after a suitable delay.

A voice command received by the microphone **221**, is processed by the pre-amp **222**, modulated **223**, and transmitted **224** to the receiver **120** or set-top box **130**. If the transmitter **224** is a radio frequency (RF) transmitter, then the modulator **223** is, for example, an FM modulator. If the transmitter **224** is an infrared transmitter, then the modulator **223** is an infrared modulator.

If present, the sub-audible generator **225** produces a sub-audible tone. The voice command and sub-audible signal are combined in the pre-amp **222**. The voice command and sub-audible signal may also be combined in either in the set-top box **130** or in the RECEIVER **120**. The sub-audible tone indicates to the receiver or head-end unit **460** that the microphone is on air and that the user is producing voice commands. Alternatively, the on-air status of the microphone may be detected by other means, such as carrier detection. The combined signal is transmitted to the RECEIVER **120** or to a set-top box **130** that can receive wireless transmissions.

FIG. **3** is graph that illustrates a voice command **303** and noise **301**, **302** that precedes and comes after the voice command. In a typical voice activated system, the microphone is activated when an audible sound reaches predetermined amplitude **320**. Thus, in an amplitude activated system, the noise **301**, **302** and voice command **303** all activate the microphone. However, with a PTT button, only the depression **311** of the button activates the microphone, and the release **312** of the button deactivates the microphone. Thus the microphone does not receive the unwanted noise **301**, **302**.

FIG. **4** illustrates a head-end unit **460** for processing an analog voice command. An audio diplexor **410** receives the transmissions and divides the signal into the voice command **421** and the sub-audible signal **422**. A sub-audible decoder **411** processes the sub-audible signal **422**. The sub-audible signal **422** contains information, such as the source of the transmission, and also indicates that the transmission is active. The head-end unit processes **170** the voice command and decoded sub-audible signal information, and determines a command function

FIG. **5** illustrates a remote control that transmits a digital signal to a head-end unit **660** for processing. Keypad entries **510** are processed by a CPU **511** to which a ROM **512** and RAM **513** is electronically coupled. The processed keypad entries are modulated **523** and transmitted **514** by infrared or RF to a digital server provider (DSP) carrier **550**.

A PTT button **520** activates a microphone **521**, pre-amp **522**, and analog-to-digital converter **525**. The microphone **521** receives a voice command and transmits it to a pre-amp **522**. The pre-amp **522** transmits the voice command to the analog-to-digital converter **525** where the voice command is converted from analog to digital. The digital voice command is transmitted to the CPU **511** where header and footer information is added. A unique digital signature in the header identifies the remote control. Header information is typically stored in the ROM **512**. The CPU **511** transmits the digital command to a digital service provider (DSP) carrier **550** either through an infrared or RF transmitter. The DSP carrier **550** is part of either the wireless receiver, the set-top box or may be a separate unit.

In considering FIG. **2** and FIG. **5**, it is noted that a hybrid system is also envisioned, in which the remote control transmits analog speech to the receiver where it is digitized and sent in digital format to the head-end.

FIG. **6** illustrates a head-end unit **660** for processing a digital voice command. A digital DSP receiver **610** receives the digital signal and transmits the signal to an address decoder **612**. The address decoder separates and interprets the header and footer information **621** from the digital voice command **622**. The voice command portion **622** of the signal is transmitted to a digital-to-analog converter **611**. The digital-to-analog converter **611** transmits the analog voice command to a speech recognition processor **670** where it analyzed for voice command recognition, and a command function is derived.

A transmission is cepstral analyzed for the purposes of facilitating the computer analysis of speech for voice recognition. Cepstral analysis is a method of feature extraction that is known in the art. Cepstral analysis, or feature extraction, is performed on a digitized speech signal and results in a representation of the signal that characterizes the relevant features of the speech. It can be regarded as a data reduction procedure that retains vital characteristics of the speech and eliminates undesirable interference from irrelevant characteristics of the digitized signal, thus easing the decision-making process of a computer. An example of a preferred method of cepstral analysis is disclosed in Wang, Method of training neural networks used for speech recognition, U.S. Pat. No. 5,509,103, Apr. 16, 1996.

Typically, a remote control contains an existing infrared transmission method for transmitting keypad entries to a set-top box. Using the existing infrared transmitter alone is insufficient for voice commands as the transmission rate is approximately 1200 baud. Thus, a dedicated transmission method is used to transmit the voice commands from the remote control to the receiver.

Examples of transmission methods include infrared, FM radio, AM radio and ultrasonic. In one embodiment, a high digital signal rate is used for the transmissions, such as burst transmissions. In another embodiment, a high data rate is achieved by sending multiple signals simultaneously in the form of a multiplexed signal.

In a preferred embodiment, Bluetooth transceivers are used to facilitate communication between the remote control **110** and the RECEIVER **120**. Bluetooth defines a universal radio interface in the 2.45 GHz Industrial-Scientific-Medical (ISM) frequency band. Specific portions of this bandwidth are available on an essentially global basis. Thus, Bluetooth-capable systems operate internationally. Bluetooth permits disparate electronic devices or systems to communicate with each other via short-range communications. A group of two or more devices in local communications with each other using Bluetooth, form a Bluetooth network, referred to as a piconet. A piconet comprises up to eight Bluetooth devices, with one device serving as the master and the remaining devices acting as slaves in the piconet. A given Bluetooth device in a given piconet may alternately participate in other piconets, with a group of piconets referred to as a scatternet.

While those skilled in the art may understand and practice the present invention absent detailed presentation of Bluetooth specifications, the papers *Bluetooth—The universal radio interface for ad hoc, wireless connectivity*, by Jaap Haartsen, Ericsson Review No. 3, 1998, pp. 110-117, and *Ericsson's Bluetooth Modules*, by Arfwedson and Sneddon, Ericsson Review No. 4, 1999, pp. 198-205, provide substantial detail regarding the implementation and operation of Bluetooth transceivers. Additional Bluetooth technical specifications may be obtained by accessing a Bluetooth Special-Interest-Group (SIG) website at http://www.bluetooth.com.

FIG. **7** illustrates another preferred embodiment where a voice command is simultaneously transmitted over both a dedicated voice transmitter **710** and an existing keypad transmitter **720**. Transmitting with both the dedicated and existing transmitter increases the baud rate of the transmission. In one embodiment, the voice command transmission is divided between the two transmitters.

In another embodiment, where the remote control transmits an analog signal, the existing keypad transmitter **720** transmits the sub-audible PTT signal, while the dedicated voice transmitter **710** transmits the voice command.

In another embodiment, the transmitters transmit at different frequencies. The RECEIVER has two receivers. One receiver receives transmissions at the dedicated voice transmitter frequency, while the other receiver receives transmissions at the existing keypad transmitter frequency.

In yet another embodiment the transmitters transmit at the same frequency. Each transmission is out of phase with the other. A single receiver at the RECEIVER receives both signals. Each signal has a header that defines how the transmissions are constructed, and how they should be combined.

The remote control **110** may have the ability for bi-directional communication with the RECEIVER **120**. If so, the bi-directional communication allows the transmission of information from the RECEIVER **120** to the remote control **110**. The bi-directional communication may be accomplished by using the Bluetooth standard when radio transceivers are used, and by TWIRP, produced by SolutioNet, Ltd. of Williston, Vt., when infrared receivers and transmitters are used. Transmissions sent to the remote control are typically command functions. The command functions are used to control remote control functions such as the gain control.

The command functions may also be used to control the functions of other electrical devices. In one embodiment, the remote control relays command functions to electrical devices that are already capable of being controlled by a wireless control, for example, a stereo. In this example, the command functions include turning the stereo on and off, adjusting the volume, switching stereo functions and changing radio stations. Alternatively, the command functions may be relayed via a wired "IR blaster" transmitter connected to theremote or set-top box.

FIG. **8** illustrates another embodiment where the command functions control electrical devices that do not have an existing wireless control method. The remote control transmits command functions to a control receiver **810** that is connected in-line between an electrical device such as a light **830** and a power outlet **820**. The command functions turn the power on and off to the device. For example, a user wishes to turn a light on. The user would say into the remote control, "lights on." The head-end unit would process the voice command and send a control function back to the remote control or IR blaster. The remote control transmits the control function to the control receiver **810** where it switches the power on to the light **830**.

In another preferred embodiment a word recognition unit activates the microphone upon the speaking of a specific word. For example, when the word "agile" is spoken, the microphone is turned on. Once turned on, the microphone stays on continuously during speech, and turns off five seconds after the last word is spoken. The word recognition unit is typically constructed of a voice processor and a buffer. The unit is activated when the amplitude of speech reaches a predetermined level, similar to voice activation devices found in tape recorders. In this way, the remote control uses less power because the word recognition unit is not always on. Also, to reduce costs and weight, a low level processor is used with limited speech recognition. However, as processor speeds increase, and die sizes are cast smaller, more powerful processors may be used.

In another embodiment of the invention, low-bit rate audio encoding is used for non-repudiation purposes. Non-repudiation provides a method to guarantee that a party to a transaction cannot falsely claim that they did not participate in a transaction. Traditionally, handwritten signatures are used to ensure this. When a consumer writes a check, presenting a driver's license ensures the identity of the writer, i.e. authentication, while the signature on the check ensures that the consumer was in fact present and agreed to write the check, i.e. non-repudiation. When a user utters a voice command, the low-bit rate encoding is used to mark the transaction. Such marking is typically used when a user orders a pay-per-view event or other transaction involving goods or services for a fee. The low bit-rate recording serves as a non-memory intensive way of recording the user's voice command.

Non-repudiation is also performed by identifying the source of the voice command through an identification code that is attached in the header of a voice command. A user may also be required to enter on the remote control keypad an identifying code, such as the user's home phone number or "PIN" number.

FIGS. **9** and **10** illustrate another preferred embodiment of the invention, where multiple functions are associated with the PTT button **910**. The primary function of the PTT button is to engage and disengage a command pathway for a voice command from the user to the head-end unit. Other functions are also activated by manipulation of the PTT button.

An on-screen help menu is activated by double clicking the PTT button **910** in rapid succession to provide, for example, a help screen. The help screen typically provides information on how to use the system and also provides program information.

Optionally, the PTT button **910** may also adjust the sensitivity of the microphone. A clockwise turn **911** of the button increases the sensitivity while a counter-clockwise turn **912** decreases it. The sensitivity can be decreased to a degree such that the microphone is muted. An indicator **950** is located on the remote control or receiver can be used to indicate the amplitude of a user's voice command. The indicator lets a user know whether his voice command meets the minimum amplitude required for an accurate and process able recording. The PTT button **910** also functions as a shift button. Thus, depressing the PTT button **910** along with pressing keypad buttons **960** on the remote control, gives the keypad buttons **960** a secondary function.

Optionally, the remote control may also functions as a wireless phone. Toggling the PTT button upward **913** turns the phone on, and a user is able to dial a phone number using the remote control keypad. Toggling the button downward **914** turns off the phone. After a user releases the PTT button from its toggled position, the PTT button returns to a middle, default position. The microphone **970** functions as a phone receiver and a speaker **920** on the remote control allows the user to hear a phone transmission. The RECEIVER functions **120** as the base station for wireless phone functions. The RECEIVER **120** connects to a phone jack using a standard telephone wire. The wireless phone transmissions are transmitted to the receiver using the same communication pathways that the voice commands use.

In one embodiment of the invention, infrared repeaters are used to improve the performance of an infrared remote control. Infrared repeaters are placed throughout the operating environment of the remote control and RECEIVER. When a user uses a keypad function, it is natural for a user to point the remote control at the RECEIVER of the set-top box making the need for infrared repeaters unnecessary. However, when speaking into the remote control, a user's tendency is to place his mouth in close proximity to the microphone on the remote control. In most cases the infrared transmitter is not aimed towards the RECEIVER. The placement of the infrared repeaters ensures that the RECEIVER receives the infrared transmission from the remote control.

In a preferred embodiment the PTT button is a metal switch that activates the microphone transmission functions by engaging mechanical contacts. Switches of this type suffer from bounce. Hardware and software solutions exist for debouncing the switch. One example of a hardware debouncing solution is a circuit that has an RC time constant that swamps out the bounce. A typical software solution runs a routine that kills time long enough to allow the contacts to stop bouncing. These examples are not meant to be exhaustive but merely illustrative of what exists in the art.

Often, a user releases the PTT button prior to finishing a voice command. FIG. **11** illustrates a timing circuit **1110** with an analog remote control transmitter. The timing circuit keeps the microphone **221**, sub-audible generator **225**, preamp **222**, modulator **223**, and transmitter **224** activated for a period of time after the user has released the PTT button **220**. The period of time is typically from one hundred milliseconds to one second. The timing circuit is activated only when the PTT button is depressed for more than some minimal time. This enables fast clicks of the PTT button to control other functions.

Although the invention is described herein with reference to the preferred embodiment, one skilled in the art will readily appreciate that other techniques and applications may be substituted for those set forth herein without departing from the spirit and scope of the present invention. Accordingly, the invention should only be limited by the claims included below.

The invention claimed is:

**1**. A method for providing voice recognition processing at a cable television head-end unit for a plurality of voice controlled television cable set-top boxes in a cable television network, comprising the steps of:

a television remote control receiving user-activated indication of a voice command;

receiving said voice command through a microphone associated with said television remote control;

said television remote control wirelessly transmitting a signal representing said voice command to a cable set-top box;

said cable set-top box transmitting a signal representing said voice command via cable television link to a remotely located head-end unit;

processing said voice command at said head-end unit;

the head-end unit deriving a set-top-box-compatible command function corresponding to said voice command;

the head-end unit transmitting said command function to said cable set-top box via the cable television link;

performing said command function at said cable set-top box.

**2**. A method for providing voice recognition processing at a cable television head-end unit for a plurality of television controllers in a cable television network, comprising the steps of:

a television remote control receiving indication of a voice command by user operation of an activation feature associated with the television remote control;

receiving said voice command through a microphone associated with said television remote control;

said television remote control wirelessly transmitting a signal representing said voice command to a television controller;

said television controller transmitting a signal representing said voice command via cable television link to a remotely located cable head-end unit;

the head-end unit deriving a controller-compatible command function corresponding to said voice command;

the head-end unit transmitting said command function to said controller via the cable television link; and

the controller performing said command function.

**3**. The method of claim **2**, wherein the activation feature comprises a push-to-talk switch and activation of said push-to-talk switch comprises any of:

pressing said push-to-talk switch, double pressing said push-to-talk switch, turning said push-to-talk switch clockwise and/or counterclockwise, and toggling said push-to-talk switch.

**4**. The method of claim **2**,

where the activation feature comprises a push-to-talk switch, and the steps further comprise, responsive to operation of the push-to-talk switch, performing functions including any of:

activating said microphone, deactivating said microphone, activating a help menu, deactivating a help menu, activating a telephone, deactivating said telephone, adjusting the gain on said microphone, muting said microphone and performing a shift function.

**5**. The method of claim **2**,

where user operation of the activation feature comprises making one or more predetermined utterances to operate a voice-activation feature of the remote control.

**6**. The method of claim **2**, wherein said remote control comprises a wireless transmitter employing any of the following wireless communication formats:

infrared, ultrasonic, radio frequency transmission, burst transmission, a multiplexed signal, a transmission device that conforms to a Bluetooth Specification, and an infrared repeater.

**7**. The method of claim **2**,

where the television remote control includes a keypad and a first transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the signal representing the voice command to the television controller employs a second transmitter separate from the first transmitter.

**8**. The method of claim **2**,

where the television remote control includes a keypad and a transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the signal representing the voice command to the television controller employs the transmitter;

where the steps further comprise distinguishing between signals representing the voice commands and the signals representing user entries upon the keypad by one or more of the following: using transmissions of same frequency and different phase, using different frequencies, using different header or footer information, including a sub-audible signal in one or both signals.

**9**. The method of claim **2**,

where the steps further comprise:

the television remote control adding information to the signal representing the voice command transmitted to the television controller, said information contained in locations comprising any of:

header data, footer data, a sub-audible signal.

**10**. The method of claim **9** wherein said information comprises any of:

source of said voice command, identity of a user, on air signal, off air signal, beginning of a voice command, and end of a voice command.

**11**. The method of claim **2**, further comprising converting signals representing said voice command into cepstrals, the converting step performed by any of:

said remote control, said television controller, a wireless transmission receiver that receives signals from said remote control.

**12**. The method of claim **2**, performing non-repudiation measures comprising any of:

deriving a low bit rate codec of said voice command, determining the source of said voice command, analyzing said voice command for the identity of the user, and requiring the input of a code.

13. The method of claim 2, further comprising:

automatically delaying deactivation of the activation feature for a period of time after user activation of the activation feature.

14. The method of claim 2, further comprising the step of:

the head-end unit transmitting further command functions to the television controller for relay to the television remote control;

responsive to receiving the further command functions, the television controller wirelessly forwarding the further command functions to the remote control.

15. The method of claim 14,

further comprising:

responsive to receiving the further command functions, the remote control performing any of: adjusting the gain control of said microphone and muting said microphone.

16. The method of claim 14, further comprising the step of:

responsive to receiving the further command functions, the remote control wirelessly transmitting said command function to a wirelessly operated device.

17. The method of claim 2, where the step of deriving the controller-compatible command function includes any of: word recognition, semantic analysis.

18. An apparatus for providing voice recognition processing at a cable television head-end unit for a plurality of voice controlled television cable set-top boxes in a cable television network, comprising:

a television remote control including: activation means for receiving user-activated indication of a voice command, microphone means for receiving the voice command, and transmission means for wirelessly transmitting a signal representing the voice command to a cable television controller;

a cable television controller including receiver means for receiving the signal representing the voice command from the television remote control and transmitter means for transmitting a signal representing the voice command via cable television link to a remotely located head-end unit;

a head-end unit including processing means for deriving cable-television-controller-compatible command functions corresponding to signals representing the voice commands received from the cable television controllers, and transmission means for transmitting signals representing the command functions back to respective cable television controllers;

where the cable television controller additionally includes second receiver means for receiving the signals representing the command functions from the head-end unit via the cable television link, and where the cable television controller includes means responsive to receipt of the command functions for executing the command functions.

19. An apparatus for providing voice recognition processing at a cable television head-end unit for a plurality of television controllers in a cable television network, comprising:

a television remote control including: activation feature to receive user indication of a voice command, a microphone to receive the voice command, and a transmitter to wirelessly transmit a signal representing the voice command to a cable set-top box;

a cable set-too box including a receiver to receive the signal representing the voice command from the television remote control and a transmitter to transmit a signal representing the voice command via cable television link to a remotely located head-end unit;

a head-end unit to derive set-top-box-compatible command functions corresponding to signals representing voice commands received from the cable set-top-boxes and transmit signals representing the command functions back to respective cable set-too boxes;

where the cable set-top box additionally includes a second receiver to receive signals representing the command functions from the head-end unit via the cable television link, the cable set-top box responsive to receipt of the signals representing the command functions to execute the command functions.



20. The apparatus of claim 19, wherein said activation feature comprises a push-to-talk switch activated by any of:

pressing said push-to-talk switch, double pressing said push-to-talk switch, turning said push-to-talk switch clockwise and counterclockwise, and toggling said push-to-talk switch.

21. The apparatus of claim 19,

where the activation feature comprises a push-to-talk switch with functions comprising any of:

activating said microphone, deactivating said microphone, activating a help menu, deactivating a help menu, activating a telephone, deactivating said telephone, adjusting the gain on said microphone, muting said microphone, and performing a shift function.

22. The apparatus of claim 19,

where the activation feature is operated by receipt of one or more predetermined utterances.

23. The apparatus of claim 19, wherein said remote control comprises a wireless transmitter employing any of the following wireless communication formats:

infrared, ultrasonic, radio frequency transmission, burst transmission, a multiplexed signal, a transmission device that conforms to a Bluetooth Specification, and an infrared repeater.

24. The apparatus of claim 19,

where the television remote control includes a keypad and a first transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the signal representing the voice command to the cable set-top box employs a second transmitter separate from the first transmitter.

25. The apparatus of claim 19,

where the television remote control includes a keypad and a transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting a signal representing the voice command to the cable set-top box employs the transmitter;

where the television remote control is configured to distinguish the signals representing the voice commands and the signals representing user entries upon the keypad by one or more of the following: using transmissions of same frequency and different phase, using different frequencies, using different header or footer information, including a sub-audible signal in one or both signals.

26. The apparatus of claim 19,

where the television remote control is configured to add information to the signal representing the voice command transmitted to the cable set-top box, where said information is contained in locations comprising any of:

header data, footer data and a sub-audible signal.

**27**. The apparatus of claim **26** wherein said information comprises any of:

source of said voice command, identity of a user, on air signal, off air signal, beginning of a voice command, and end of a voice command.

**28**. The apparatus of claim **19**,

where one of the following is configured to convert signals representing the voice command into cepstrals:

said remote control, said cable set-top box, a wireless transmission receiver that receives said transmission from said remote control.

**29**. The apparatus of claim **19**, the television remote control further configured to automatically delay deactivation of the activation feature for a period of time after user activation.

**30**. The apparatus of claim **19**, where:

the head-end unit is configured to transmit further command functions to the set-top box for relay to the remote control;

the set-top box is configured, responsive to receiving the further command functions, to forward the further command functions to the remote control.

**31**. The apparatus of claim **30**,

where the remote control is configured, response to receiving the further command functions, to perform any of: adjusting the gain control of said microphone and muting said microphone.

**32**. The apparatus of claim **30**,

the remote control is further configured, responsive to receiving the further command functions, to wirelessly transmit said command functions to a wirelessly operated device.

**33**. The apparatus of claim **19**, where the head-end unit is programmed such that deriving the set-top-box-compatible command function includes any of: word recognition, semantic analysis.

**34**. A centralized multi-user voice operated television control system, comprising:

television remote controls configured to directly and wirelessly control television sets and additionally to receive user voice input and wirelessly transmit first output representative of the voice input to television set-top boxes;

television set top boxes configured to receive television input signals via cable television link and provide television output signals compatible with television sets, the set top boxes additionally responsive to receiving the first output from the television remote controls to transmit representative second output to a central processing station via the cable television link;

a centralized processing station configured to receive and process second output from a multitude of television set top boxes by applying voice recognition to the second output to identify user-intended voice commands, to derive set-top-box-compatible instructions to carry out the identified voice commands, and returning signals representing the instructions to respective top boxes via the cable television link;

where the set top boxes are further responsive to receiving the signals representing the instructions from the central processing station to execute the instructions.

**35**. The system of claim **34**, where the television remote controls include circuitry to ignore user voice input except during activation of a user-operated activation feature.

**36**. The system of claim **34**, where each television remote control includes a signature generator providing a predetermined signature signal concurrent with wireless transmission of the first output, and where the set top boxes are configured to prevent transmission to the central processing station of output from the television remote controls not containing the predetermined signature signal.



**37**. The system of claim **34**,

where each television remote control includes a keypad and a first transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the first output employs a second transmitter separate from the first transmitter.

**38**. The system of claim **34**,

where each television remote control includes a keypad and a transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the first output employs the transmitter;

where each television remote control is further configured to distinguish the first output from signals representing user entries upon the keypad by one or more of the following: using transmissions of same frequency and different phase, using different frequencies, using different header or footer information, including a sub-audible signal in one or both signals.

**39**. The system of claim **34**, where:

the set top boxes are configured to only execute certain identified commands, and for other commands, to wirelessly forward a representative fourth output representing the other commands to the television remote controls;

the television remote controls further include receivers to receive the fourth output, and are further configured to directly control wireless devices by wirelessly transmitting signals representing the fourth output.

**40**. A centralized multi-user voice operated television control system, comprising:

a plurality of television remote control means each for directly and wirelessly controlling television sets and additionally receiving user voice input and wirelessly transmitting first output representative of the voice input to a television set-top box means;

a plurality of television set top box means each for receiving television input signals via cable television link and providing television output signals compatible with television sets, and responsive to receiving the first output from one of the television remote control means to transmit representative second output to a central processing station via the cable television link;

a centralized processing station configured to receive and process second output from a multitude of television set top box means by applying voice recognition to the second output to identify user-intended voice commands, to derive set-top-box-means-compatible instructions to carry out the identified voice commands, and returning signals representing the instructions to respective set top box means via the cable television link;

where each set top box means is further responsive to receiving the signals representing the instructions from the central processing station to execute the instructions.

**41**. A method for operating a centralized multi-user voice operated television control system that includes a multitude of television remote controls situated at various television

viewing sites, a multitude of set top boxes situated at the television sites to receive television input signals via cable television link and provide television output signals compatible with television sets at the television viewing sites, and a centralized processing station remote from the television viewing sites and coupled to the set top boxes via the cable television link, the method comprising operations of:

operating the television remote controls to perform additional operations including receiving user voice input and wirelessly transmitting first output representative of the voice input to set-top boxes;

operating the set top boxes to perform additional operations including, responsive to receiving the first output from the television remote controls, transmitting representative second output to a central processing station via the cable television link;



operating the centralized processing station to receive and process second output from a multitude of set top boxes by applying voice recognition to the second outputs to identify user-intended voice commands, to derive set-top-box compatible instructions to carry out the identified voice commands, and to return signals representing the instructions to the set top boxes via the cable television link;

operating the set top boxes to perform further operations including, responsive to receiving the signals representing the instructions from the central processing station, executing the instructions.

* * * * *

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. Cir. R. 32:

   This brief contains 13,565 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6):

   This brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman.

| | |
|---|---|
| Jacob Schroeder | /s/ *Jacob Schroeder* |
| Name of Counsel | Signature of Counsel |


| | |
|---|---|
| Law Firm | Finnegan, Henderson, Farabow, Garrett & Dunner, LLP |
| Address | 3300 Hillview Avenue |
| City, State, ZIP | Palo Alto, CA 94304 |
| Telephone | (650) 849-6600 |
| Fax | (202) 408-4400 |
| E-mail Address | jacob.schroeder@finnegan.com |